

50 Cal.Rptr.3d 317                                                                 Page 1
144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326
**(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)**

Court of Appeal, Fourth District, Division 3,
California.
David GUNTHER, Plaintiff and Appellant,
v.
John LIN, Defendant and Respondent.
**No. G036042.**

Oct. 26, 2006.
Review Denied Jan. 17, 2007.

**Background:** Disabled individual who was confined to a wheelchair sued restaurant owner, seeking damages under statute providing automatic minimum penalty of $4,000 for discrimination in violation of Unruh Civil Rights Act. It was undisputed that defendant's technical violations of implementing regulations of the American with Disabilities Act (ADA), to which plaintiff objected, were inadvertent rather than intentional. The Superior Court, Orange County, No. 04CC07448, Jane D. Myers, Temporary Judge, entered summary judgment in favor of defendant, and plaintiff appealed.

**Holding:** The Court of Appeal, Sills, P.J., held that statutory remedies sought by plaintiff were available only in cases of intentional discrimination.
Affirmed.

West Headnotes

**[1] Civil Rights**  1462
78k1462 Most Cited Cases
Under the American with Disabilities Act (ADA), a private individual suing a businessperson has no right to damages absent intentional discrimination. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[2] Civil Rights**  1807
78k1807 Most Cited Cases
Disabled plaintiff who was confined to wheelchair was not entitled to higher automatic minimum statutory penalties for restaurant owner's inadvertent, technical Unruh Civil Rights Act violations; higher penalties were only available in cases of intentional discrimination, despite fact that Unruh Act had been amended to encompass American with Disabilities Act (ADA) violations within its purview; it was undisputed that restaurant's technical violations of implementing regulations of ADA, to which plaintiff objected, were inadvertent; and, plaintiff had elected not to seek lesser minimum penalties available for unintentional ADA violations under Disabled Persons Act. West's Ann.Cal.Civ.Code §§ 51(f), 52, 54.3.
*See 8 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 898 et seq.; Cal. Civil Practice (Thomson/West 2006) Civil Rights Litigation, § 2:1 et seq.*

**[3] Statutes**  188
361k188 Most Cited Cases
In questions of statutory interpretation, courts must begin with the language of a given statute as the purest expression of legislative intent.

**[4] Statutes**  220
361k220 Most Cited Cases
The doctrine of legislative acquiescence is a canon of statutory interpretation based on the idea that a legislative body is presumed to be aware of prior judicial construction of statutory language, particularly when it undertakes to amend the area of the law judicially construed; if it doesn't change the language judicially construed, there is at least an inference that the legislature agreed with the prior judicial construction.

**[5] Statutes**  220
361k220 Most Cited Cases
Legislative inaction after a given statute has been judicially construed provides only a weak inference of acquiescence.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT A

50 Cal.Rptr.3d 317                                                    Page 2

144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326

**(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)**



**[6] Statutes** 208
361k208 Most Cited Cases
In cases of statutory ambiguity, an analysis of how a statute fits within a general statutory scheme may allow a court to divine its correct meaning.



**[7] Statutes** 217.4
361k217.4 Most Cited Cases
The Supreme Court will sometimes test a conclusion regarding statutory construction by examining contemporaneous legislative history.



**[8] Statutes** 181(2)
361k181(2) Most Cited Cases
When courts are choosing between two interpretations of the same statute, they should consider the consequences that flow from a particular interpretation, and favor the construction that leads to the more reasonable result.



**[9] Evidence** 43(4)
157k43(4) Most Cited Cases
Court of Appeal would decline respondent restaurant owner's request that it take judicial notice of some 28 lawsuits filed by appellant disabled individual against small businesses, in individual's appeal from trial court's order entering summary judgment in favor of restaurant owner in action to recover damages for Unruh Civil Rights Act violations, since abuses that could occur under expansive interpretation of Act urged by appellant on appeal were well documented without any references to his own personal conduct. West's Ann.Cal.Civ.Code §§ 51, 52.
**\*\*319** Law Offices of Morse Mehrban and Morse Mehrban for Plaintiff and Appellant.

Mohajerian Law Corporation and Al Mohajerian, Los Angeles, for the Defendant and Respondent.

**\*226 OPINION**
SILLS, P.J.

**I. LEGAL BACKGROUND LEADING TO THIS CASE**
In 1991--and the year is important as we shall later explain--our Supreme Court issued its opinion in *Harris v. Capital Growth Investors XIV* (1991) 52

Cal.3d 1142, 278 Cal.Rptr. 614, 805 P.2d 873, which, among other things, judicially construed the triggering language of section 52 of the Civil Code. Strictly speaking, section 52 is not part of California's Unruh Civil Rights Act, which by its terms refers only to section 51 of the Civil Code (*Gatto v. County of Sonoma* (2002) 98 Cal.App.4th 744, 757, 120 Cal.Rptr.2d 550 ["By its own terms, the Unruh Civil Rights Act comprises *only* section 51."] ), though it provides for certain remedies for discrimination in violation of the Unruh Civil Rights Act.

According to the state Supreme Court, the language in section 52 "reveals a desire to punish intentional and morally offensive conduct." (*Harris, supra,* 52 Cal.3d at p. 1172, 278 Cal.Rptr. 614, 805 P.2d 873.) [FN1] The *Harris* court thus rejected an interpretation of **\*227** section 52 [FN2] that would have applied section 52 to a policy of landlords (requiring minimum incomes of three **\*\*320** times a month's rent) that assertedly had a disparate impact on women, even though the landlords had no intent to discriminate against women. (See *Harris, supra,* 52 Cal.3d at pp. 1170-1175, 278 Cal.Rptr. 614, 805 P.2d 873; see particularly p. 1175 ["In summary, we hold that a plaintiff seeking to establish a case under the Unruh Act must plead and prove intentional discrimination in public accommodations in violation of the terms of the Act. A disparate impact analysis or test does not apply to Unruh Act claims."].)

FN1. To quote section 52 from the *Harris* decision, and the italicized words and ellipses are original to the *Harris* decision, not our own: "Whoever *denies,* or who *aids,* or *incites* such denial, or whoever *makes any discrimination,* distinction, or restriction on account of sex, color, race ... contrary to the provisions of Section 51 ..., is liable for each and every such *offense* for the actual damages, *and* such amount as may be determined by a jury, or a court sitting without a jury, *up to a maximum of three times the amount of actual damage* but in no case less than two hundred fifty dollars ($250), and such attorney's fees as may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51...." (*Harris, supra,* 52 Cal.3d at p. 1172, 278 Cal.Rptr. 614, 805 P.2d 873, italics and ellipses in the original.) The only change in the quoted language since the *Harris* decision was that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

50 Cal.Rptr.3d 317                                                                                     Page 3

144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326

**(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)**

"discrimination, distinction or restriction on account of" followed by a listing of categories of sex, color race etcetera "contrary to the provisions of Section 51" became, simply, "discrimination or distinction contrary to Section 51." The change, as we explain anon, was intended to broaden the categories of persons who might sue under section 52 to include disabled persons (hence the dispensing of such specific categories as sex, color and race), but otherwise did not touch the emphasized words and phrases that the *Harris* court had construed to contemplate intentional discrimination, i.e., "denies" "aids or incites a denial" "makes any discrimination" and "offense" remain the same today as they did when *Harris* was decided. In 1994 the minimum $250 penalty in section 52 at the time of the 1991 *Harris* decision was increased to $1,000 (see 1994 Stats. ch. 535, § 3, p. 2761), and in 2001 it was increased again to its current $4,000 (Stats.2001, ch. 261, § 1, p.1996).

FN2. All statutory references in this opinion are to the Civil Code unless otherwise specifically designated.

More than one year later, in 1992, Governor Wilson signed legislation (known as AB 1077) which added this language to section 51: "A violation of the right of any individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section," that is, section 51. (These words would later be recodified as subdivision (f) of section 51, which is how, for reader convenience, we will refer to them in this opinion.)

The new legislation did *not* change the language in section 52 which the *Harris* case had interpreted. (And, to get ahead of ourselves for moment, as we explain below, a review of the legislative history of the 1992 legislation reveals no intention to change the *Harris* decision).

The Americans with Disabilities Act of 1990, commonly known as the ADA, contains provisions which, of course, prevent intentional discrimination against disabled individuals and provides for compensatory awards for such discrimination. (See, e.g., 42 U.S.C. § 12112(a) [employers may not "discriminate against a qualified individual with a disability"]; *Buie v. Quad/Graphics, Inc.* (7th Cir.2004) 366 F.3d 496, 503 [noting possibility of proving discrimination by either "direct" or "indirect" method]; *Griffin v. Steeltek, Inc.* (10th Cir.2001) 261 F.3d 1026, 1028-1029 [noting possibility of compensatory damages under the ADA if plaintiff establishes that employer " 'engaged in unlawful intentional discrimination' "].)

In enacting the ADA, Congress also contemplated architectural regulations, or "design standards," which would be promulgated by the executive branch of the federal government to facilitate the equal access of disabled individuals to public accommodations, such as restaurants. One federal court summarized Congress' approach this way: "In drafting Title III of the ADA, Congress painted with a broad brush and then directed the Attorney General to *228 promulgate regulations to implement the law.... Those regulations were to include design standards, which must be 'consistent with the minimum guidelines and requirements issued by the Architectural and Transportation Barriers Compliance Board,' commonly referred to as the 'Access Board.' " (*Independent Living Resources v. Oregon Arena Corporation* (D. Oregon 1997) 982 F.Supp. 698, 707-708 (hereinafter *Independent Living I.*) [FN3]

FN3. The *Independent Living* case basically concerned a multitude of architectural issues that arose out of the building the arena for the Portland Trail Blazers. The opinion is so long that it begins, like a long law review article, with a formal table of contents.

The architectural regulations or "design standards" implemented by the federal ADA are often referred to in the literature as "ADAAGs," which is an acronym for "ADA Architectural Guidelines." (See *Independent Living I, supra,* 982 F.Supp. at pp. 707-708 ["The guidelines issued by the Access Board are denominated the 'ADA Accessibility Guidelines' ('ADAAG.') The design standards enacted by the Attorney General are identical to the ADAAGs, but are denominated as 'Standards.' Despite the technical distinction, the two terms are **321 often used interchangeably."]; *Access Now, Inc. v. Ambulatory Surgery Center Group, Ltd.* (S.D.Fla.2001) 146 F.Supp.2d 1334, 1336 ["These guidelines are called ... ("ADAAG")...."].) The "ADAAGs" are found in Appendix A to Part 36 of title 28 of the Code of Federal Regulations. [FN4]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

50 Cal.Rptr.3d 317                                                                          Page 4

144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326

(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)

FN4. The proper formal citation to a particular guideline under our state's style manual would be "28 Code of Federal Regulations part 36, Appendix A, standard" followed by the numerical designation, e.g., 28 Code of Federal Regulations part 36, Appendix A, Standard 4.13. Federal courts tend to use either "Standard" or the more exotic acronym "ADAAG" in referring to the various guidelines, but our rough computer search suggests that the majority of federal courts, when they have occasion, refer to the guidelines generally as ADAAGs and particular guidelines as "ADAAG" followed by the numerical designation. (E.g., *Access Now, supra,* 146 F.Supp.2d at p. 1337 ["As stated explicitly in ADAAG 4.1.3(14)...."].) Accordingly, we will follow suit and hereafter refer to particular guidelines by citing to "ADAAG" and then the number of the particular guideline.

Some of the ADAAGs are basically so intuitive and obvious--such as requiring the doors to at least one stall in a public restroom to be wide enough to allow a wheelchair to pass through [FN5]--that it would be hard to believe that noncompliance with them could be other than intentional. [FN6] Other "ADAAGs," however, do not implicate any intentional conduct at all, such as the requirement that the pipes underneath the sink in a public restroom be *229 wrapped with insulation, [FN7] or the remarkable requirement that any visual alarms be *exactly* 80 inches above the highest floor level within the space or *exactly* 6 inches below the ceiling, whatever is lower. [FN8] For example, a customer using a wheelchair who entered a public restroom before a contractor had finished working on a remodel of it and had gotten around to wrapping insulation on the pipes under the sink would find a restroom in "violation" of the ADA even though the owner was remodeling the restroom precisely in order to insure that wheelchair customers had equal access to its toilet facilities.

FN5. See ADAAG 4.13 and ADAAG 4.17.5 [minimum clearances for toilet stall doors].

FN6. While there is the possibility that a given architectural modification might not be "readily achievable" within the meaning of 42 U.S.C. section 12182(b)(2)(A)(iv), it should be equally clear that in certain cases, such as new construction or remodeling, a failure to provide for sufficient space for toilet stalls would be so obvious as to implicate at least a prima facie case of discriminatory intent.

FN7. ADAAG 4.19.4.

FN8. ADAAG 4.28.3(6). See also ADAAG 3.1 ["Dimensions that are not marked minimum or maximum are absolute, unless otherwise indicated in the text or captions."] Though another ADAAG states that "All dimensions are subject to conventional building industry tolerances for field conditions" (ADAAG 3.2), that possibility only confirms the ease by which the ADAAGs can be violated unintentionally.

It is, in fact, very easy to violate one of the ADAAGs inadvertently, even if one has the best of intentions. For example, one federal case, *Torres v. Rite Aid Corp.* (N.D.Cal.2006) 412 F.Supp.2d 1025, even held that one defendant's reliance on the United States Department of Justice's Title III Technical Assistance Manual was insufficient because there was a technical conflict with what the manual said and the promulgated regulations--ironically issued by the Department of Justice itself. [FN9]

FN9. The manual, in addressing the topic of objects that might protrude into the aisles of a store, plainly stated: "Only equipment that is fixed or built in to the facility, is covered by the accessibility standards...." (*Torres v. Rite Aid Corp., supra,* 412 F.Supp.2d at p. 1032, citing Department of Justice, Title III Technical Assistance Manual, pt. 5.3000 (1994).) But that didn't help a drug store in a case involving plastic cardboard advertising signs and other "moveable, protruding objects" in aisles. (See *id.* at p. 1029.) Because the Department of Justice's manual conflicted with its own regulations, the drug store could not get summary judgment on that basis. The drug store even had a letter from a Department of Justice official stating that regulations covered only fixed building elements, and of course that was insufficient as well. (See *id.* at pp. 1032-1033.)

**322 Thus it is not surprising that a number of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326

**(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)**

courts have noted that there can be "violations" of the ADA--that is, noncompliance with certain ADAAGs and other ADA regulations--by even the best-intentioned property owners. (See *Fell v. Spokane Transit Authority* (1996) 128 Wash.2d 618, 628, 911 P.2d 1319 ["ADA's protection is not even conditioned upon a finding of 'discrimination,'...."]; *Independent Living I, supra,* 982 F.Supp. at p. 707 ["With limited exceptions, the defendant's mental state has little bearing upon whether the Rose Garden [the indoor sports stadium alleged to be non-compliant] complies with the requirements of Title III of the ADA, at least in an action commenced by a private party."]; *Helen L. v. DiDario* (3d Cir.1995) 46 F.3d 325, 335 ["Because the ADA evolved from an attempt to remedy the effects of 'benign neglect' resulting from the 'invisibility' of the disabled, Congress *230 could not have intended to limit the Act's protections and prohibitions to circumstances involving deliberate discrimination. Such discrimination arises from 'affirmative animus' which was not the focus of the ADA or section 504 [of the Rehabilitation Act of 1973]."].)

[1] And it was precisely because it was so easy for businesspeople-- particularly small businesspeople-- to inadvertently violate the ADA that Congress limited the circumstances under which they might be sued for such a technical violation. Under the ADA, a private individual suing a businessperson has *no* right to damages absent intentional discrimination. [FN10] Under such circumstances, the most a private person can obtain are the attorney fees incurred in an action to force the businessperson into compliance. (*Boemio v. Love's Restaurant* (S.D.Cal.1997) 954 F.Supp. 204, 207 ["Monetary damages are not recoverable by private Plaintiffs under the ADA."]; *Independent Living I, supra,* 982 F.Supp. at p. 771 ["A private litigant may obtain injunctive relief and recover attorney fees under this subchapter, but is not entitled to recover compensatory or punitive damages on such claim."]; see also *American Bus Ass'n v. Slater* (D.C.Cir.2000) 231 F.3d 1, 5 ["By specifying the circumstances under which monetary relief will be available, Congress evinced its intent that damages would be available in no others."]; McCabe, *California Disability Anti-Discrimination Law: Lighthouse in the Storm or Hunt for Buried Treasure?* (2005) 36 McGeorge L.Rev. 661, 662 ["suits arising under federal law permit private plaintiffs to obtain only injunctive relief," citing 42 USC §§ 2000a-3(a) & 12188(a)(1) ].)

FN10. Cases where plaintiffs recover money damages for intentional discrimination of the ADA are often *employment* cases. Even in those cases, however, it is sometimes very easy for employers to technically violate the ADA without intentionally discriminating. (See *Griffin v. Steeltek, supra,* 261 F.3d at pp. 1028-1029 ["Compensatory damages are available under the ADA, however, only if the plaintiff establishes that the employer not only technically violated § 12112(d)(2)(A) by asking a prohibited question, but also that by doing so it actually 'engaged in unlawful intentional discrimination.' "]; see, e.g., *Gonzales v. Sandoval County* (D. New Mexico 1998) 2 F.Supp.2d 1442, 1443-1444, 1448 [leaving jury award of $50,000 in compensatory damages intact where jury found intentional discrimination by defendant employer].)

By contrast with the federal ADA, California's Civil Code section 52 allows private **323 parties to seek damages, and in fact even provides for an automatic minimum penalty--now up to $4,000--*when* the statute is triggered. [FN11]

FN11. To quote subdivision (a) of the statute as it reads today: "Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51, 51.5, or 51.6 is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damages *but in no case less than four thousand dollars ($4,000),* and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51, 51.5, or 51.6." (Italics added.) The reference to section 51.6, which is the Gender Tax Repeal Act of 1995, involving price discrimination because of gender, is also new since the *Harris* decision.

**\*231 II. THIS CASE**

And with that, we come to the case at hand. Plaintiff David Gunther uses a wheelchair. He entered the restroom in a Jack-in-the-Box restaurant owned by defendant John Lin at a time just before the completion of remodeling. The toilet was accessible

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

50 Cal.Rptr.3d 317                                                                                          Page 6
144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326
**(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)**

and otherwise in compliance with the ADAAGs, but he found (a) a lack of insulation underneath the sink, and (b) a mirror that was too high. Gunther brought this action, seeking at least $8,000 in automatic penalties under section 52 for the two alleged ADAAG violations.

There is also no question that defendant Lin never intended to violate the ADA. In his answer to Gunther's complaint Lin claimed that Gunther had entered the restroom "before our handyman had finished his work" of wrapping insulation around the pipe under the sink. Moreover, normally the restroom never has mirrors for anybody (because the mirror was subject to vandalism); an employee simply hung one by mistake.

Because there is no evidence that defendant Lin ever intended to violate the ADAAGs in any way, he brought a summary judgment motion based on the _Harris_ decision, which, as we have seen, construed the language in section 52 to require an intent to discriminate before its damage provisions would be triggered. Plaintiff Gunther conceded that Lin had no discriminatory intent, but argued that _Harris_ had been superseded by the 1992 legislation which added what is now known as subdivision (f) to section 51. Relying on _Harris_ and finding the decision remained good law, the trial court granted the summary judgment, resulting in a judgment of dismissal from which this appeal has been taken.

[2] We have examined the general statutory scheme of California law governing the access of disabled persons to public accommodations, and also the legislative history of the 1992 legislation adding what is now subdivision (f) to section 51, and conclude:

(1) To interpret what is now subdivision (f) of section 51 to provide for automatic penalties for even the most technical violations of the ADAAGs would contravene the rule that no statute should be interpreted so that it becomes redundant; in this case the statute made redundant being section 54.3. By its terms section 54.3 provides disabled persons with an alternative means of enforcing ADA violations, and--at the time of AB 1077--had already been construed to provide for automatic minimum penalties for unintentional conduct. *232(_Donald v. Cafe Royale, Inc._ (1990) 218 Cal.App.3d 168, 180, 266 Cal.Rptr. 804 ["section 54.3 contains no intent element"].)

Since section 54.3 by its terms forces a plaintiff to choose between it and section 52 (see § 54.3, subd. (c) ["A person may not be held liable for damages pursuant to **324 both this section and Section 52 for the same act or failure to act."] ), the two statutory schemes, as we confront them in our decision today, perfectly dovetail with each other. A plaintiff can now go for the relatively larger recovery provided by section 52 but will have the higher burden of establishing intentional discrimination under section 52, or, alternatively, may elect to proceed under section 54.3 and have a much lower burden--simple technical violation of the ADA without any showing of intent--but can only recover a lesser amount. To interpret section 52 to allow for automatic penalties for nonintentional conduct is to render section 54.3 largely redundant.

(2) The legislative history surrounding the adoption of the 1992 legislation buttresses the conclusion that emerges from the general statutory scheme: The Legislature did not change the _Harris_ rule requiring a intentional discrimination to trigger the automatic penalty provisions of section 52. Even though the general subject of remedies for discrimination against the disabled was before the Legislature within a relatively short time after the _Harris_ decision, and section 52 was in fact amended by AB 1077, the language in section 52, subdivision (a) that had been construed by the _Harris_ court as requiring intentional discrimination was left untouched. [FN12] Moreover, the construction given the language in section 52 by _Harris_ is not inconsistent with the addition of subdivision (f) to section 51, since there are instances where relief under section 51 may be sought absent intentional discrimination.

> FN12. As we note in footnote 1 above, there was a change so that instead of setting forth a list of specific categories (sex, race, etcetera), the language defining the people who might litigate under the statute was simplified to say that discrimination or distinction "contrary to Section 51" would be covered. Since the language construed by _Harris_ already included the disjunctive categories of "discrimination, distinction or restriction," we do not perceive any significance in the change to the disjunctive "discrimination or distinction" as regards the _Harris_ decision.

(3) In fact, the primary purpose of the 1992 legislation adding subdivision (f) to section 51 was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

50 Cal.Rptr.3d 317                                                                                      Page 7

144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326

**(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)**

not to overturn the requirement for intentional discrimination to trigger section 52, but to strengthen existing California disability law by expanding the scope of that law to include mental disabilities as well as physical disabilities. Up to the 1992 legislation, California disability law did *not* cover mental disabilities; however, the recently enacted federal ADA did cover mental disabilities. By incorporating violations of the ADA into California's disability statutes, the legislature accomplished its purpose of expanding the coverage of the state law up to the ADA level.

**\*233** (4) To the degree that there is any arguable ambiguity in section 52 (assuming arguendo that *Harris'* construction of the actual language is not itself dispositive), the canon of interpretation that courts should adopt the more reasonable construction applies. In this case the more reasonable interpretation follows the legislative scheme and the legislative history just outlined: Private enforcers of the ADA are presented with a choice between the strict liability regime of section 54.3 or the regime requiring intentional discrimination of section 52. The alternative interpretation, as a number of federal courts have already indicated (e.g., *Doran v. Del Taco, Inc.* (C.D.Cal.2006) 2006 WL 2037942), has led to unconscionable abuses.

In the present case, Gunther elected to go for the relatively higher minimum penalty provided by section 52 rather than the lower penalty of section 54.3, but his election required, under state law, a showing **\*\*325** of intentional discrimination. The trial court was accordingly correct to grant the summary judgment motion.

### III. DISCUSSION
#### A. The Triggering Language of Section 52
[3] In questions of statutory interpretation, courts must begin with the language of a given statute as the purest expression of legislative intent. (E.g., *S.B. Beach Properties v. Berti* (2006) 39 Cal.4th 374, 379, 46 Cal.Rptr.3d 380, 138 P.3d 713 ["In construing any statute, we first look to its language."]; *DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601, 7 Cal.Rptr.2d 238, 828 P.2d 140 ["To determine the intent of legislation, we first consult the words themselves, giving them their usual and ordinary meaning."]; see also *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 572, 88 Cal.Rptr.2d 19, 981 P.2d 944 [" 'If the plain language of a statute is unambiguous, no court need, or should, go beyond that pure

expression of legislative intent.' "].)

As an intermediate appellate court, we are in the fortunate position of being spared the need to parse the ordinary, plain meaning of the triggering language of subdivision (a) of section 52 ("denies, aids or incites a denial, or makes any discrimination or distinction") in order to determine whether that language contemplates unintentional or inadvertent conduct as distinct from intentional discrimination. The state's highest court, in *Harris,* has already held that those words do not contemplate unintentional conduct, though it should be noted that the *Harris* decision not only looked at the words, but also the contrast between the words used in the section and the words used in **\*234** a federal civil rights statute. After quoting the triggering language from section 52, subdivision (a), here is the relevant passage from the *Harris* decision: "Several aspects of the foregoing language point to an emphasis on intentional discrimination. The references to 'aiding' and 'inciting' denial of access to public accommodations, to making discriminations and restrictions, and to the commission of an 'offense' imply willful, affirmative misconduct on the part of those who violate the Act. Moreover, the damages provision allowing for an exemplary award of up to treble the actual damages suffered with a stated minimum amount reveals a desire to punish intentional and morally offensive conduct. In contrast, title VII of the Civil Rights Act does not allow recovery of compensatory or punitive damages, but confines the plaintiff to specified forms of equitable relief." (*Harris, supra,* 52 Cal.3d at p. 1172, 278 Cal.Rptr. 614, 805 P.2d 873.)

The 1992 legislation, AB 1077, made only minor changes in the triggering language (see footnote 1 above), basically dropping the enumeration of specific categories ("sex, color, race" etcetera "contrary to Section 51 ....") in favor of a more streamlined encapsulation, i.e., simply "contrary to Section 51...." The key words, actually put into italics in the *Harris* decision itself ("denies" "aids or incites a denial" "makes any discrimination" and "offense") were left untouched.

The question arises: Did the change that the 1992 legislation made to section 51, namely the addition of the language that would later be codified as subdivision (f) of section 51, necessarily, as a matter of text, *force* a change in the already judicially-interpreted meaning of the triggering language of section 52? The answer to that precise question is no,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

50 Cal.Rptr.3d 317                                                                                                    Page 8
144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326
(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)

because subdivision (f) of section 51 has force and effect *independent* of the need for intentional discrimination as required by the language of section 52, subdivision (a). Specifically, *any* "violation" of section 51--hence, even **326 an unintentional violation--may be remedied by an unfair competition law action under Business and Professions Code section 17200 et seq., without the need for intentional discrimination as required by section 52. (See *Consumers Union of United States, Inc. v. Fisher Development, Inc.* (1989) 208 Cal.App.3d 1433, 257 Cal.Rptr. 151 [injunctive relief to stop housing development restricting residency to persons aged 45 or older predicated on Unruh Act]; see generally, *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 562, 71 Cal.Rptr.2d 731, 950 P.2d 1086 [" 'any unlawful business practice ... may be redressed by a private action charging unfair competition in violation of Business and Professions Code section 17200 and 17203.' "].) [FN13] Of course, *most* of the time, violations of section 51 implicate *235 discriminatory conduct, including violations of the ADA, so that a section 52 remedy (including the minimum penalty of $4,000) will be available.

> FN13. We recognize, of course, that the issue of *standing* on the part of a nonaggrieved person, e.g., a public interest group, to enforce a nonintentional violation of section 51, is not before us. (Cf. *Midpeninsula Citizens for Fair Housing v. Westwood Investors* (1990) 221 Cal.App.3d 1377, 271 Cal.Rptr. 99 [public interest group had no standing to sue apartment complex owners for occupancy limitation policy in violation of sections 51 and 51.2 under Unruh Act because the public interest group's rights had not been violated].)

The 1991 case law construing the plain language section 52 and the 1992 legislation adding a new subdivision to section 51 can thus be harmonized. There is no textual need to retroactively override the ordinary meaning of the terms used in section 52 as read by the *Harris* court in order to give force and effect to subdivision (f) of section 51.

Ordinarily, our analysis could and should stop with the language of the statute, authoritatively construed by our high court. (See *Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775, 72 Cal.Rptr.2d 624, 952 P.2d 641 [" 'Ordinarily, if

the statutory language is clear and unambiguous, there is no need for judicial construction.' "].) Which is what the trial court here did. It stopped with the language as construed by *Harris.*

However, Gunther essentially asserts that despite the actual language in section 52, the 1992 legislation was intended by the Legislature to extend the reach of section 52 even to *un* intentional violations of the ADA, specifically unintentional noncompliance with the various and often technical architectural guidelines, a position which one federal court decision has taken, and language in another federal court decision might be construed to support. Gunther directs us to an uncodified expression of legislative intent to the effect that the 1992 legislation--which, as we shall see, included much more than merely adding the language now constituting subdivision (f) to section 51--was to "strengthen California law in areas where it is weaker than the Americans with Disabilities Act of 1990 (Public Law 101-336) and to retain California law when it provides more protection for individuals with disabilities than the Americans with Disabilities Act of 1990." (Stats.1992, ch. 913, § 1.)

Essentially, Gunther asserts that this uncodified expression means that the Legislature intended to subject businesses (and, as shown by the case law, usually small businesses, like restaurants) to the worst of all possible worlds: (1) the strict liability of the ADA architectural guidelines but *without the counterbalancing* limitations in the ADA disallowing private enforcement combined with (2) the minimum $4,000 penalty of California's section 52 but *without the counterbalancing* protection **327 established by *Harris* (and, for that matter, the plain meaning of the language of section 52 itself) requiring intentional conduct for the minimum penalty under section 52 to be triggered.

Did the 1992 Legislature really mean to do *that?* To answer the question fully, we may proceed to various canons of legislative interpretation *236 as well as to legislative history. (See, e.g., *Mejia v. Reed* (2003) 31 Cal.4th 657, 663, 3 Cal.Rptr.3d 390, 74 P.3d 166 ["When the plain meaning of the statutory text is insufficient to resolve the question of its interpretation, the courts may turn to rules or maxims of construction ...."]; see also *Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1153, 45 Cal.Rptr.3d 21, 136 P.3d 821 ["When as here a statute is susceptible to more than one

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

50 Cal.Rptr.3d 317                                                                                                    Page 9

144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326

**(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)**

reasonable interpretation, 'we look to "extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' "]; cf. also *S.B. Beach Properties v. Berti, supra,* 39 Cal.4th 374, 379, 46 Cal.Rptr.3d 380, 138 P.3d 713 [" 'If the language permits more than one reasonable interpretation, however, the court looks "to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' "]; *Microsoft Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 750, 758, 47 Cal.Rptr.3d 216, 139 P.3d 1169 ["As with any issue of statutory interpretation, we begin with the text of the relevant provisions. If the text is unambiguous and provides a clear answer, we need go no further. [Citation.] If the language supports multiple readings, we may consult extrinsic sources, including but not limited to the legislative history and administrative interpretations of the language."].)

B. The 1992 Legislative Acquiescence to the 1991 Judicial Construction
Since the 1992 legislation followed so closely on the heels of the 1991 *Harris* decision construing section 52, and since the 1992 legislation did, indeed, modify section 52, just not the triggering language construed by *Harris,* it is perhaps most logical to begin our examination with the doctrine of legislative acquiescence.

[4] The doctrine of legislative acquiescence is a canon of statutory interpretation based on the idea that, in a nutshell, a legislative body is presumed to be aware of prior judicial construction of statutory language, particularly when it undertakes to amend the area of the law judicially construed: If it doesn't change the language judicially construed, there is at least an inference that the legislature agreed with the prior judicial construction. (E.g., *People v. Garcia* (2006) 39 Cal.4th 1070, 1088, 48 Cal.Rptr.3d 75, 141 P.3d 197 ["Because the Legislature amended the welfare fraud statutes after this court's decision in *Sims* became final, we assume that the Legislature was aware of this court's construction of the welfare fraud statutes in that case. Had the Legislature wanted to invalidate *Sims,* it could have provided that no administrative decision would prevent a prosecution for *237 welfare fraud."]; *White v. Ultramar, Inc., supra,* 21 Cal.4th at p. 572, 88

Cal.Rptr.2d 19, 981 P.2d 944 ["when the Legislature amends a statute, we presume it was fully aware of the prior judicial construction"].)

A textbook example of the doctrine of legislative acquiescence may be found in *People v. Leahy* (1994) 8 Cal.4th 587, 34 Cal.Rptr.2d 663, 882 P.2d 321. There, our high court noted that the Legislature had **328 "ample opportunity to amend" various evidentiary statutes to "abrogate or modify" a certain standard involving expert testimony that a prior Supreme Court case, specifically, *People v. Kelly* (1976) 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240, had "found implicit" within those statutes. (See *Leahy, supra,* 8 Cal.4th at p. 604, 34 Cal.Rptr.2d 663, 882 P.2d 321.) The *Leahy* court noted that the Legislature had "made frequent amendments" to other parts of the evidence laws involving expert testimony, but did not amend the particular sections (Evid.Code, §§ 720 and 801) construed in the prior court case. In that light the *Leahy* court declared this principle: "Legislative failure to amend sections 720 or 801, although not conclusive, may be presumed to signify legislative acquiescence in our *Kelly* decision." (*Leahy, supra,* 8 Cal.4th at p. 604, 34 Cal.Rptr.2d 663, 882 P.2d 321.)

[5] We are also mindful, however, that the doctrine of legislative acquiescence has limitations, which, ironically, the *Harris* case itself recognized. For example, legislative inaction after a given statute has been judicially construed provides only a weak inference of acquiescence. (See *Harris, supra,* 52 Cal.3d at p. 1156, 278 Cal.Rptr. 614, 805 P.2d 873 ["The presumption of legislative acquiescence in prior judicial decisions is not conclusive in determining legislative intent. As we have also stated: ' "Legislative silence after a court has construed a statute gives rise at most to an arguable inference of acquiescence or passive approval.... But something more than mere silence is required before that acquiescence is elevated into a species of implied legislation...." ' "].)

Very recently our Supreme Court issued *Big Creek Lumber Co. v. County of Santa Cruz, supra,* 38 Cal.4th 1139, 45 Cal.Rptr.3d 21, 136 P.3d 821 (hereinafter, *Big Creek II* ), which, when we compare the majority and dissenting opinions, teaches a number of lessons with which the entire high court would appear to agree. In *Big Creek II,* legislative acquiescence to a lower appellate court decision (*Big Creek I* [FN14]) counted as one factor among several

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

50 Cal.Rptr.3d 317                                                                                          Page 10
144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326
(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)

to support a conclusion about how a particular state timber preemption statute should be construed. The dissenters, however, thought that legislative acquiescence to the prior lower decision was not persuasive, partly because they thought the lower court decision had itself misconstrued the plain language of the statute, and partly because the "general subject" of that decision had not come before the Legislature in *238 "connection with a subsequent amendment." (_Big Creek II, supra,_ 38 Cal.4th at p. 1174-1175, 45 Cal.Rptr.3d 21, 136 P.3d 821 (dis. opn. of Moreno, J.).)

> FN14. Specifically, _Big Creek Lumber Co. v. County of San Mateo_ (1995) 31 Cal.App.4th 418, 37 Cal.Rptr.2d 159.

As applied to the case at hand, it would be safe to say that much _more_ force should be accorded to the fact that the triggering language of section 52 as construed by _Harris_ was not touched by the Legislature in the 1992 legislation than was accorded to the fact that the Legislature did not change the particular timber statute in _Big Creek II._

First, unlike _Big Creek II,_ the case before us now involves a prior _Supreme Court_ decision that _authoritatively_ construed the statutory language. Unlike what happened in _Big Creek II,_ there could not be the debate over whether the first lower court decision to have construed the statutory language got it right.

Second, not only was the _Harris_ decision from a higher court, but its construction **329 of the statutory text rested on firmer ground than the appellate court's prior construction in _Big Creek I._ There was a debate in _Big Creek II_ over whether the statutory language was ambiguous, and thus _permitted_ the prior judicial interpretation (the majority position), or whether it was unambiguous in the _opposite_ direction of the prior judicial interpretation (the dissenting position). In _Harris,_ by contrast, while there were two dissenters, neither one of them took issue with what the majority had to say about the triggering language of section 52 requiring intentional discrimination. (See _Harris, supra,_ 52 Cal.3d at p. 1176, 278 Cal.Rptr. 614, 805 P.2d 873 (dis. opn. of Mosk, J.) & pp. 1176-1183 (dis. opn. of Broussard, J.).) Their concern was the first holding of the case, which was that the Unruh Act did not reach arbitrary _economic_ discrimination. (_Harris_ arose out of a case against landlords who had an assertedly

arbitrary requirement that renters have an income at equal to or higher than three times the rent.) In contrast to the facts in _Big Creek II,_ the language in section 52 is plainer in the direction that _supports_ the inference provided by the doctrine of legislative acquiescence.

Finally, there appears to have been a more intense subsequent legislative focus on the "general subject" of the previously construed statute than in _Big Creek II._ If there was "ample opportunity" to amend in _Big Creek II_ (see _Big Creek II, supra,_ 38 Cal.4th at p. 1156, 45 Cal.Rptr.3d 21, 136 P.3d 821), there was much more ample opportunity here.

In the case before us, the very statute that had been construed in _Harris_ less than two years before-- section 52--was before the Legislature and was indeed being amended. But, as we shall see, the amendments were directed at expanding the _class_ of persons who could seek damages under section 52, but they had no effect on the triggering language in subdivision (a) construed by _Harris._

*239 The doctrine of legislative acquiescence should thus apply "in full measure" to the case before us.

### C. The Statutory Scheme of Which the Statute is a Part; and the Rule of Construction Against Statutory Redundancy or Nullification

[6] As we have seen, in cases of statutory ambiguity, an analysis of how a statute fits within a general statutory scheme may allow a court to divine its correct meaning. In the present case, interestingly enough, when we examine California statutes regarding private remedies for even unintentional ADA violations, we discover that the alternative would strip another statute also governing the rights and remedies of disabled persons, section 54.3, of force and meaning. (See _Big Creek II, supra,_ 38 Cal.4th at p. 1155, 45 Cal.Rptr.3d 21, 136 P.3d 821 ["Plaintiffs' reading of section 4516.5(d) also would violate the fundamental rule that '[c]ourts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage....' "]; _Hughes v. Board of Architectural Examiners_ (1998) 17 Cal.4th at p. 775, 72 Cal.Rptr.2d 624, 952 P.2d 641 [" ' "In analyzing statutory language, we seek to give meaning to every word and phrase in the statute to accomplish a result consistent with the legislative purpose...." ' "].)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

50 Cal.Rptr.3d 317                                                    Page 11

144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326

**(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)**

Under California law, there is an alternative set of statutory remedies available to disabled persons who encounter a violation of the ADA--section 54.3, which is part of what is commonly referred to as the Disabled Persons Act. (The title often shows up in federal court decisions, e.g., _Wilson v. Costco Wholesale Corporation_ (S.D.Cal.2006) 426 F.Supp.2d 1115, 1123 **330 [noting federal plaintiff had filed ancillary jurisdiction claims under both "Unruh Civil Rights Act" and "Disabled Persons Act"] ). The Disabled Persons Act is found in sections 54 through 55.2 of our Civil Code, and has been around in some form on the statute books since the late 1960's--more than 20 years before the federal ADA. (See Stats.1968, ch. 461.)

The Disabled Persons Act begins with the statement in subdivision (a) of section 54 that "Individuals with disabilities or medical conditions have the same right as the general public to the full and free use of ... public facilities, and other public places." (§ 54, subd. (a).)

Section 54 is immediately followed by section 54.1, subdivision (a)(3) of which--in contrast to the more spartan reference to the ADA in section *240 51-- specifically incorporates ADA _regulations_ (at least insofar as transportation is concerned). [FN15] The enforcement of section 54 is to be found in section 54.3. [FN16] However, subdivision (c) of section 54.3 makes it clear that a plaintiff must _elect_ between proceeding under section 54.3 and section 52. Subdivision (c) of section 54.3 provides: "A person may not be held liable for damages pursuant to both this section and Section 52 for the same act or failure to act."

> FN15. Subdivision (a)(3) of section 54.1 provides: " 'Full and equal access,' for purposes of this section in its application to transportation, means access that meets the standards of Titles II and III of the Americans with Disabilities Act of 1990 (Public Law 101-336) and federal regulations adopted pursuant thereto, except that, if the laws of this state prescribe higher standards, it shall mean access that meets those higher standards."

> FN16. Subdivision (a) of section 54.3 provides in its entirety: "Any person or persons, firm or corporation who denies or

interferes with admittance to or enjoyment of the public facilities as specified in Sections 54 and 54.1 or otherwise interferes with the rights of an individual with a disability under Section 54, 54.1, and 54.2 is liable for each offense for the actual damages and any amount as may be determined by a jury, or the court sitting without a jury, up to a maximum of three times the amount of actual damages but in no case less than one thousand dollars ($1,000), and attorney's fees as may be determined by the court in addition thereto, suffered by any person denied any of the rights provided in Sections 54, 54.1, and 54.2. 'Interfere' for purposes of this section, includes, but is not limited to, preventing or causing the prevention of a guide dog, signal dog, or service dog from carrying out its functions in assisting a disabled person."

Now, it is important to realize--to allude to our previous discussion of the doctrine of legislative acquiescence--that section 54.3 was construed in the 1990 _Cafe Royale_ decision as providing for strict liability--that is, liability without any need for intentional conduct--prior to the 1992 legislation which added both subdivision (f) to section 51 and subdivision (c) of section 54 (back then in the context of the minimum penalty under section 54.3 which was $250; now it is $1,000).

_Cafe Royale_ was a case decided prior to the enactment of the ADA, and contains not a word about federal law. It was also decided exclusively under Civil Code section 54 et seq., and contains not one word on the Unruh Act.

In _Cafe Royale,_ a wheelchair user (a former deputy Attorney General and member of the Attorney General's task force on disability) discovered that he could not reach the main dining area of a tiered restaurant on his own, though the restaurant offered to lift him up the stairs. He declined an offer of help because it would attract attention and because he might be dropped in the process of being bodily picked up and moved. He sued the restaurant under section 54.3 because of the absence of ramps or elevators to the second-tiered area. The restaurant thought **331 that it had complied with the law because its architect thought, based on an informal conversation with an employee of the *241 San Francisco building department, that a certain number

50 Cal.Rptr.3d 317                                                                                    Page 12

144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326

**(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)**

of handicapped seating places was "all that was needed for compliance." (See *id.* at. p. 174, 266 Cal.Rptr. 804.)

The building department employee, however, gave the restaurant architect erroneous advice. In fact, the State Building Standards Code (required by Government Code section 4450 et seq) provided that all floors of a restaurant be on a common level or else accessible by either ramps or elevators. While a hardship exemption might be obtained, 75 percent of the main dinning area would still need to be handicap accessible, and the Cafe Royale's option of seating wheelchair patrons in the bar or having them carried to the common area was a violation.

On appeal, the fact of the violation was understood by all parties: "All parties agreed that Cafe Royale's seating capacity was in violation of the handicap access requirements." (*Cafe Royale, supra,* 218 Cal.App.3d at p. 174, 266 Cal.Rptr. 804.) Hence issue was joined as to whether the restaurant's "good faith" belief that it was "in compliance" (*ibid.*) was sufficient to deny the patron recovery under *section 54.3.* The trial court thought so, but the appellate court disagreed. The appellate court reasoned thusly: the fact that section 54.3 said a person who "denies or interferes with admittance to or enjoyment of the public facilities as specified in section 54 and 54.1 ... is liable for each offense ... but in no case less than two hundred fifty dollars ($250)...." The court said: "The plain meaning of this language is that ordinarily minimum statutory damages in the amount of $250 must be awarded for a denial of equal access in violation of section 54 et seq., *notwithstanding the defendant's intent.*" (*Id.* at p. 177, 266 Cal.Rptr. 804.) The *Cafe Royale* court reasoned that an interpretation of section 54.3 that included an element of intentional violation would, "because the level of compliance would diminish," yield "a result that is clearly repugnant to the statutory purpose." (*Id.* at pp. 179-180, 266 Cal.Rptr. 804.) So the trial court reversed the trial court judgment awarding the plaintiff nothing, and concluded that he was entitled to the $250 statutory minimum. (See *id.* at pp. 180-181, 266 Cal.Rptr. 804.)

Apropos our discussion of the doctrine of legislative acquiescence above, there is at least some presumption that the 1992 Legislature knew about the 1989 *Cafe Royale* decision and crafted the 1992 legislation in recognition of it.

An interpretation of section 52 which, contrary to *Harris,* allows for automatic penalty without intentional discrimination renders section 54.3, as construed by *Cafe Royale,* redundant. Under such an interpretation, the two statutes simply become coterminous schemes as regards unintentional violations of the ADAAGs.

**\*242** By contrast, an interpretation of section 52 which respects the meaning of the triggering language requiring intentional discrimination make the two statutes dovetail nicely. Where there is intentional discrimination, there is a four times larger minimum penalty; if there isn't, plaintiff still recovers, but less.

In that regard, we note that section 52 expressly contemplates the possibility of punitive damages (§ 52, subd. (b)(1) [FN17]) while there is no such provision in **\*332**section 54.3. So again, the statutes dovetail. The legislative policy that the greater evil of *intentional* discrimination is vindicated by assuring a higher potential exposure to damages on the part of a section 52 defendant. The difference in the two statutes also helps assure that punitive damages not be incorrectly assessed against a defendant for only unintentional conduct. (See *Taylor v. Superior Court (1979) 24 Cal.3d 890, 894-895, 157 Cal.Rptr. 693, 598 P.2d 854* [quoting Prosser that "Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage ... *or such a conscious and deliberate disregard of the interests of others that his conduct may be called wilful or wanton.*" (*Taylor* court's italics.) ].)

> FN17. Which provides: "An amount to be determined by a jury, or a court sitting without a jury, for exemplary damages."

To the degree that section 52 and section 54.3 *may* differ on exposure to attorney fees, with no exposure to a losing plaintiff if he or she proceeds under section 52 but with exposure to the plaintiff if he or she proceeds under section 54.3--and there is authority for such a reading--our analysis is further *confirmed,* though the definitive statement on that point can await another case. [FN18] It makes sense that the Legislature would insulate plaintiffs from the risk of exposure to paying defense fees if they lose where the showing required of the plaintiff-- intentional discrimination-- is higher. This **\*243** incentive furthers the legislative policy of attacking

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326

**(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)**

the greater evil of intentional discrimination by removing a potential impediment to private enforcement. Where the burden is as easy as it is under section 54.3, allowing exposure to fees if the plaintiff loses would be a logical deterrent against genuinely frivolous lawsuits.

FN18. The issue centers on section 55. Section 55 provides in its entirety: "Any person who is aggrieved or potentially aggrieved by a violation of Section 54 or 54.1 of this code, Chapter 7 (commencing with Section 4450) of Division 5 of Title 1 of the Government Code, or Part 5.5 (commencing with Section 19955) of Division 13 of the Health and Safety Code may bring an action to enjoin the violation. The *prevailing party* in the action shall be entitled to recover reasonable attorney's fees." (Italics added.) Because of the "prevailing party" clause, the trial court in *Cafe Royale* had awarded $12,000 in attorney fees against the disabled ex-deputy Attorney General. Contrast that result as regards section 54.3 with dicta in *Stirling v. Agricultural Labor Relations Board* (1987) 189 Cal.App.3d 1305, 1311, 235 Cal.Rptr. 56, to the effect that attorney fees under the Unruh Act are unilateral-the plaintiff need not fear about losing: "When the Legislature intends that the successful side shall recover its attorney's fees no matter who brought the legal proceeding, it typically uses the term 'prevailing party.' [Citations.] On the other hand, when the Legislature desires to authorize the award of fees only to one side or the other, it signals that intent by using such terms as 'plaintiff' (see e.g., ... Civ.Code, § 52 ...) or 'defendant' [citations]." In any event a *frivolous lawsuit* under the Unruh Act could be presumably redressed by such means as sanctions under section 128.7 of the Code of Civil Procedure. However, we do not go so far as to conclude, in this opinion, that the contrast between section 55 which awards attorney fees to the prevailing party and section 52, which only speaks of plaintiff's recovery, compels a conclusion that the section 54.3 plaintiff is vulnerable to attorney fees if he or she loses. Subdivisions (a) of both section 54.3 and section 52 are structured to provide for liability for attorney fees if the statute is

triggered without reference to prevailing party. We leave for another day the issue of how section 55 interacts with section 54.3 and specifically whether a section 54.3 plaintiff is vulnerable as the nonprevailing party under section 55.

D. The Legislative History of AB 1077

What we have said so far is, in theory, dispositive, but we also recognize that legislative *history* can also be *a* factor in the exploration of legislative *intent*. For example, if the legislative history, otherwise independent of the language and surrounding statutory scheme, showed *clearly* that **333 the Legislature really did intend to reverse the *Harris* decision upon the construction of subdivision (a) of section, we should at least be given pause to ponder whether the conclusion otherwise required by the language and canons of statutory construction was correct. (Cf. *J.A. Jones Construction Co. v. Superior Court* (1994) 27 Cal.App.4th 1568, 1579, 33 Cal.Rptr.2d 206 [noting importance of "*clear statement* of intent in the legislative history"].)

[7] On the other hand, as we learn from the recent decision in *Bernard v. Foley* (2006) 39 Cal.4th 794, 47 Cal.Rptr.3d 248, 139 P.3d 1196, legislative history can be a factor to be weighed along with language and structure of a statute, and will often (as is logical) *support* the conclusion to be drawn from the bare language of a statute and its surrounding statutory structure. (*Id.* at p. 809, 47 Cal.Rptr.3d 248, 139 P.3d 1196 ["In sum, we conclude that nothing in the statute's structure, terms or language authorizes us to impose a professional or occupational limitation on the definition of 'care custodian'.... This conclusion is buttressed by the legislative history of the statute, to which we now turn."].) Also, our Supreme Court will sometimes *test* a conclusion regarding statutory construction by examining contemporaneous legislative history. (E.g., *Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1208, fn. 31, 48 Cal.Rptr.3d 108, 141 P.3d 225.)

As alluded to above, the genesis of the addition of subdivision (f) to section 51 was Assembly Bill 1077 (chapter 913, Stats 1992) authored by Assembly member Bruce Bronzan, and initiated by a private organization, **244 Protection & Advocacy Incorporated (often called PAI in the historical materials). (See Assem. Jud. Com. Rep. (Jan. 22, 1992) at p. 4 ["Protection & Advocacy Incorporated (PAI) is the sponsor of this bill."].) PAI's own

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

50 Cal.Rptr.3d 317                                                              Page 14

144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326

**(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)**

letterhead designated itself as an organization advocacy group "Mandated to protect and advocate for the rights of Californians with developmental disabilities or identified as mentally ill." [FN19]

FN19. There is a body of case law involving what is, and what is not, appropriate for examination as legislative history, assuming, for sake of argument, that reference to legislative history is appropriate in the first place. A court is always on firm ground to "consider legislative committee reports and analyses, including statements pertaining to the bill's purpose." (See *Sully-Miller Contracting Co. v. California Occupational Safety & Health Appeals Bd.* (2006) 138 Cal.App.4th 684, 698, fn. 6, 41 Cal.Rptr.3d 742; see also *Hutnick v. United States Fidelity & Guaranty Co.* (1988) 47 Cal.3d 456, 465, fn. 7, 253 Cal.Rptr. 236, 763 P.2d 1326.) There is also authority that mere summaries by proponents of bills are *not* appropriate legislative history (see *Williams v. Superior Court* (2001) 92 Cal.App.4th 612, 621, fn. 6, 111 Cal.Rptr.2d 918), and in that vein there is the well established "judicial reticence to rely on statements made by individual members of the Legislature as an expression of the intent of the entire body." (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 258, 104 Cal.Rptr. 761, 502 P.2d 1049.) We may therefore arguably be incorrect in even looking at the miscellaneous materials from the Senate Judiciary Committee's bill file to test what is otherwise a clear conclusion dictated by the language of the statute and canons of statutory construction. Perhaps we should confine our discussion to the legislative committee reports and analyses-- at the very least this opinion would be shorter. In any event, this opinion should *not* be read as authority for the idea that miscellaneous materials in committee files are good legislative history. However, by consulting these materials as well as looking at the committee reports and analyses we are able to say with confidence that *nothing* in the legislative history shows an intent to change what *Harris* said about section 52. (The issue is, as it turns out, ultimately academic. Only if it turned out that the miscellaneous materials from the committee

bill file *clearly* showed an intent to reverse *Harris* (which they don't) would we be forced to confront their independent value-- probably little or none--as legislative history.)

**\*\*334** In the wake of the passage of the federal ADA in 1990, scheduled to take effect in 1992, there was a perceived need to bring California law into conformity with the provisions of the ADA, particularly because the ADA covered mental disabilities while state law did not, particularly in the area of employment. (See Senate Rules Committee Report (Third Reading, after the Assembly floor vote), dated 1/30/92, at p. 1 ["The ADA will go into effect in July of this year.... California law and regulations currently provide protection to disabled persons in many of the areas covered by the ADA. In some areas, state law **\*245** and regulations may provide more protection than the ADA. In other areas, *such as employment discrimination against individuals with mental disabilities,* California law provides less protection." (Italics added.) ]; Assembly Judiciary Committee Report on AB 1077 1/6/92) at p. 1 ["California law and regulations currently provide protection to disabled persons in many of the areas covered by the ADA. In some areas, state law and regulations may provide more protection than the ADA. In other areas, such as employment discrimination against individuals with mental disabilities, California law provides less protection."]; see also Legislative Analysis of the Legal Services Section of the State Bar of California (June 13, 1991) at p. 1 ["Existing state law is a confusing hodge-podge of terminology and rights regarding disabled individuals. The purpose of AB 1077 is to conform state law to the Americans With Disabilities Act of 1990(ADA)."].)

Indeed, if there is one dominant theme in the legislative history of AB 1077, it was the broadening of state law to include mental disabilities along with physical ones to bring it in line with the ADA. This effect was recognized in the reports of the various committees, including the Senate Rules Committee, [FN20] the Assembly Judiciary Committee [FN21] and the Senate Judiciary Committee. [FN22]

FN20. The following language comes from pages 4-5 of the Senate Rules Committee Report on AB 1077, dated August 29, 1992: --"Existing law prohibits discrimination on the basis of physical or mental disability in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326

**(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)**

the receipt of benefits under any program funded directly or financially assisted by the state. [¶] This bill would make that prohibition applicable to any disability as defined, rather than mental or physical disability, and would require these programs to meet or exceed specified protections and prohibitions in the Americans with Disabilities Act of 1990."

--"The bill would require employers and certain other entities to make specified reasonable accommodations for employees with physical or mental disabilities and would require an employee making certain preemployment inquires concerning a prospective employee's fitness, or refusing to hire or discharging a disabled employee, to comply with the Americans with Disabilities Act of 1990."

--"The bill would specify that the definitions of 'physical disability' and 'mental disability' in the California Fair Employment and Housing Act are superseded by the definition of 'disability' in the federal Americans with Disabilities Act of 1990 if broader civil rights protections would thereby be produced for persons with mental or physical disabilities or a medical condition."

FN21. From the Report of the Assembly Judiciary Committee on AB 1077 dated January 22, 1992, at page 2: "Modify the language contained in state anti-discrimination laws to ensure that protections are given to individuals with *physical or mental disabilities.* (Conforms to the ADA.)"

FN22. See Report of the Senate Judiciary Committee on AB 1077 dated June 9, 1992, at page 10: "This bill complies with ADA requirements that protect of [sic ] individuals with either physical *or* mental disabilities."

What one does *not* find in the legislative history of AB 1077 is any mention of the *Harris* intentional discrimination issue as it interacted with the provision of in the bill (which later became subdivision (f) of section 51) making violations of the ADA a **335 "violation" of section 51. There was a *related* bill, AB 3825, which, at the time (the

Spring of 1992), *246 *did* target the *Harris* decision's conclusion that "arbitrary economic discrimination" was not within the purview of the Unruh Act. [FN23] But that bill never became law. [FN24]

FN23. See Bill Summary -AB 3825 by Prudence K. Poppink for State & Consumer Services Agency, dated March 16, 1992 at page 1. AB 3825 "includes the following major provisions which are of direct interest to the Fair Employment and Housing Commission (Commission): [¶] 2) Amending the Unruh Civil Rights Act to prohibit arbitrary economic discrimination, reaffirming *In re Cox* and overturning *Harris v. Capital Growth Investors and Gay v. Polk Gulch, Inc.* (modified from SB 1257)...."

FN24. In fact, it had already been vetoed by the time the Legislative Counsel's office sent Governor Pete Wilson a Report on the Enrolled Bill concerning AB 1077. (See letter from Legislative Counsel of California entitled "Report on Enrolled Bill" re A.B. 1077 to Honorable Pete Wilson, dated October 1, 1992, page 1, footnote 1.)

The best case one can make from the legislative history is the *general* statement of legislative intent (also quoted from Stats.1992, ch. 913, § 1) behind the passage of AB 1077 was to "strengthen California law in areas where it is weaker than the Americans with Disabilities Act of 1990 (Public Law 101-336) and to retain California law when it provides more protection for individuals with disabilities than the Americans with Disabilities Act of 1990." (Stats.1992, ch. 913, § 1.)

It does not follow from this statement, however, that the Legislature implicitly amended *section 52* to allow for minimum penalties for even unintentional conduct. Several reasons support this conclusion.

First, the Legislature accomplished its intent by indeed "strengthening" California law where it provided less protection--most specifically by broadening coverage to those with mental disabilities, [FN25] but also by insuring that the architectural *standards themselves* would be at least the level set by federal law. [FN26]

FN25. Other areas made stronger were to

50 Cal.Rptr.3d 317                                                                                    Page 16

144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326

**(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)**

limit an existing exemption for practitioners of the healing arts to refuse treatment to disabled persons and access to public accommodations by persons using guide or signal dogs. (See Senate Rules Committee Report, August 29, 1992 at p. 2)

FN26. See Senate Rules Committee Report at page 6 ["Existing law requires specified places of public amusement and resort to be equipped with wheelchair spaces and other seating and accommodations for persons with physical disabilities. [¶] This bill would make compliance with these provisions subject to no lesser standards than prescribed in federal regulations."] and Assembly Judiciary Committee Report at page 3 ["Generally, provide that state law or regulation guaranteeing full and equal access for disabled individuals meet or exceed the standards under the ADA. Also, require that regulations developed by the State Architect meet or exceed the architectural access standards in the ADA."]. The question of whether original California standards provide more or less protection is not always an easy one, however. For example, one commentator has noted that it is unclear what offers more protection-- original California standards that require that curb ramps have a one-half inch lip at the bottom or federal standards that require a flush transition? (See Becker, *Private Enforcement of the Americans With Disabilities Act Via Serial Litigation: Abusive or Commendable* (2006) 17 Hastings Women's L.J. 93, 96.) Under the facts in this case we need not deal with the issue, though it does illustrate why unintentional violations of the ADAAGs might not be subject to the higher automatic minimum penalties of section 52.

*247 And at the same time, California law was *retained* in areas where it was indeed "stronger" than the ADA. Section 54.3, with its minimum penalties based on strict liability for architectural noncompliance, as shown in *Cafe Royale,* was unaffected. There is nothing necessarily inconsistent **336 with the Legislature strengthening "protection" for the disabled and *retaining* an intentional discrimination requirement for the higher minimum penalty provided under section 52. In that regard, the

focus of the Senate Rules Committee's Report on the addition of subdivision (f) to section 51 addressed only the context of broadening coverage. [FN27]

FN27. Senate Rules Committee Report on AB 1077, dated August 29, 1992, at page 2: "Existing provisions of the Unruh Civil Rights Act and related provisions, with certain exceptions, prohibit various types of discrimination by business establishments and franchisors, and in written instruments relating to real property, including discrimination on the basis of blindness or other physical disability. [¶] This bill would make a violation of the Americans with Disabilities Act of 1990 also a violation of the Unruh Civil Rights Act, and would expand the express coverage of that act and related provisions to include discrimination on account of *any* disability." (Italics added.)

Second, the force of section 51's subdivision (f)'s application of ADA law to the Unruh Civil Rights Act itself, *consistent with the Harris reading of section 52,* should not be underestimated. After AB 1077, intentional violations of the ADA, even architectural or structural ones, [FN28] would be redressed with the potential for punitive damages under the Unruh Act, and unintentional violations could be made the subject of injunctive relief. And *un* intentional violations would result in the minimum penalty provided by section 54.3.

FN28. Senate Rules Committee Report August 29, 1992, at page 2: "Existing provisions of the Unruh Civil Rights Act and related provisions specify that persons providing property for compensation are not required to modify their property or provide a higher degree of care for physically disabled persons than for persons who are not physically disabled. [¶] This bill would delete those provisions."

Third, if the Legislature really had wanted to impose the higher minimum penalties contemplated by section 52 for *unintentional* section 51 violations, one might think that it would have been noticed by those opposing the bill, if not also by impartial analysts who would spot the redundancy such a measure would create for section 54.3. [FN29] But no. The issue is not mentioned in the *248 various references

144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326

**(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)**

to the arguments of those opposing AB 1077, which tended to focus on the extension of coverage to employers of five or more people, [FN30] something which supporters themselves recognized as the main reason for opposition to the bill. [FN31] The *closest* any **337 opponent of the bill came to objecting to any effect which the addition of the language that would become subdivision (f) would have on section 51 was a letter from a labor law advisor for the California Chamber of Commerce, which asserted (a) that the bill would allow for punitive damages which "are not allowed under the similar ADA provisions," and (b) that the bill had within it the potential exposure of operators of places of public accommodations "to greater liability [than the ADA], even for unintentional violations of the new federal standard." [FN32] Even that lone warning, however, we must now note, is consistent with a reading of section 52 requiring intentional discrimination. Section 52, subdivision (b)(1) does indeed (a) allow for punitive damages, which, post AB 1077, could include damages for the intentional violation of the ADA [FN33] while section 54.3 does indeed (b) allow for *249 greater liability for unintentional violation of the ADA than the ADA itself allows. (For unintentional violations the ADA offers no minimum penalties.)

    FN29. At this point we will have to make reference to materials from the Senate Judiciary Committee's bill file that do not appear to be, strictly speaking, good evidence of legislative history. (See footnote 20 above.) We do so only to prove a negative, i.e., to show that there really is nothing in the legislative history or "legislative nonhistory" that shows an intent by the Legislature to undo the *Harris* decision.

    FN30. See Memorandum from Shirley Knight, Assistant State Director NFIB dated January 21, 1992 to Members, Assembly Judiciary Committee at p. 1 ["While the Americans Disabilities Act of 1990 applies only to employers of 15 or more employees, AB 1077 would include employers of 5 to 14 employees."]; letter from Willie Washington, Director, Human Resources California Manufacturers Association, to Honorable Bill Lockyer, Chair, Senate Judiciary Committee, dated June 2, 1992 ["ADA applies only to employers of 15 or

more employees, and this bill would further expand its application to employers of 5 to 14 employees."].

    FN31. The legislative history materials supplied by the Legislative Intent Service contain from the legislative bill file of the Senate Judiciary Committee two documents, one a set of questions and answers, and the other a "fact sheet," each with identical language about the opposition, that appear to have been prepared by PAI, or in any event supporters of the bill (since the questions and answers otherwise urge readers to contact Senate Judiciary Committee members to support the bill). Here is that language as it characterizes the opposition to AB 1077: "*Who opposes AB 1077?* [¶] The Chamber of Commerce and others in the business community. [¶] *Why Do They Oppose AB 1077?* [¶] The ADA specifies that persons with mental and developmental disabilities must be protected if they work for an employer who employs 15 or more persons. [¶] Existing California law does *not* cover persons with mental or developmental disabilities. However, it specifies that businesses which employ five or more employees are covered by discrimination laws."

    FN32. See letter from Melanie Wiegner, Labor Law Advisor, California Chamber of Commerce, to Honorable Bruce Bronzan, dated June 1, 1992, at page 2 (part of Senate Judiciary Committee miscellaneous material bill file).

    FN33. Which was also a concern expressed by a letter from the Building Owners and Managers Association of California (BOMA), which objected to the possibility of punitive damages for ADA violations. ["BOMA's concerns with AB 1077 lay strictly with the fact that the measure would place the protection for disabled rights in the state's Unruh Civil Rights Act, including the requirement that all public accommodations meet the ADA accessibility standards. The problem with placing the requirements for accessibility under the Unruh Civil Rights Act is that persons found to be in violation of the Act's provisions can be subject to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

50 Cal.Rptr.3d 317                                                                                     Page 18
144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326
(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)

punitive damages."].

There is a distinction, however, between the possibility of punitive damages for intentional conduct (the *Harris* reading of section 52) and the inevitability of minimum damages for unintentional conduct (the reading that Gunther now wants us to adopt). No one opposing the bill made the point that the bill was obliterating that distinction--the most likely reason being that there was nothing in the language of the bill or the discussions of what it was supposed to do that alerted them to the possibility. Added support for that conclusion is found in the letter from the bill's author, Bruce Bronzan, to Governor Wilson urging him to sign the bill: Bronzan confidently pointed out that "AB 1077 has *little opposition* as a result of meetings with business groups and various administrative departments" (italics added), a statement hardly suggestive of the kind of abuses against small businesses which the Gunther interpretation (see below) would later entail.

And of course, post AB 1077, section 54.3 does indeed allow for greater liability than the ADA for unintentional violations of the ADA, albeit not quite as great a liability as plaintiff Gunther here wants.

In sum, the legislative history of AB 1077 does not support an intention--not a clear intention, not even a fuzzy intention--by the Legislature to change the meaning of the triggering language in section 52. The intention of strengthening **338 state law where it was weaker than federal law and retaining state law where it was stronger than federal law was perfectly compatible with not altering the established interpretation of section 52 at the time.

E. The Rule of Reasonable Construction
[8] We now come to the canon of statutory construction which says that when courts are faced between two interpretations of the same statute, courts should consider the consequences that flow from a particular interpretation. (See *Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1291, 48 Cal.Rptr.3d 183, 141 P.3d 288 ["To the extent this examination of the statutory language leaves uncertainty, it is appropriate to consider 'the consequences that will flow from a particular interpretation.' "].) The idea is that, as between two interpretations, and all else being equal, courts should prefer the more reasonable one (see *ibid.* ["Where more than one statutory construction is *250 arguably possible, our 'policy has long been to favor the

construction that leads to the more reasonable result.' "].) It is a policy that "derives from the presumption that the Legislature intends reasonable results consistent with its apparent purpose." (*Ibid.*) And, of course, when one interpretation leads to absurd results, that is certainly a reason to reject it. (See *Big Creek Lumber II, supra,* 38 Cal.4th at p. 1156, 45 Cal.Rptr.3d 21, 136 P.3d 821 [rejecting interpretation of timber statute because it "could lead to absurd results"].)

We have already seen that California offers two alternative forms of redressing violations of ADAAGs, which, if read in tandem, make perfect sense. On the other hand, reading section 52 as Gunther would have us means that section 54.3 becomes superfluous, a result "absurd" itself.

[9] However, the federal district courts have accumulated some experience as to the "consequences that flow" from Gunther's interpretation, because his view was expressed by a panel of the Ninth Circuit in 2004 (and, we explain in the next part of this opinion, without much actual analysis or any confrontation with the language in section 52, or the havoc it would create with the balance created by the Legislature between section 52 and section 54.3). And what they have discovered is that the Gunther re-write of section 52 has led to some gross abuses of the judicial system and small businesses. [FN34]

> FN34. Respondent Lin has asked this court to take judicial notice of some 28 lawsuits which Gunther himself filed between August 2003 and November 2004, plus points us to admissions by Gunther to the effect that he deliberately seeks out small businesses to bring ADA suits against them. Since the abuses that can occur under Gunther's interpretation of section 52 are well documented without any references to his own personal conduct, we decline the request to take judicial notice.

For example, in *Doran v. Del Taco, Inc.* (C.D.Cal.2006) 2006 WL 2037942, the plaintiff had sued so many fast food chains that he couldn't keep them all straight. (2006 WL 2037942 at p. 9.) He was trying to sue a particular Del Taco restaurant 500 miles from his home before ever visiting it. His incentive was the Gunther reading of the section 52 that would allow for a minimum $4,000 penalty for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

50 Cal.Rptr.3d 317                                                    Page 19

144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326

**(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)**

unintentional technical violations of ADAAGs. The federal district court lamented the abuses of the ADA: "Despite the important mission of the ADA, there are those individuals who would abuse its private cause of action provision by filing lawsuits solely with the intent to profit financially." (2006 WL 2037942 at *5.) The court noted that "rather than informing the businesses of the violations and attempting to remedy them, **339 lawsuits are filed and damage awards are requested." (2006 WL 2037942 at *6, quoting *Doran v. Del Taco, Inc.* (C.D.Cal.2005) 373 F.Supp.2d 1028, 1030.)

*251 Another federal court (operating on the assumption that even technical violations of the ADAAGs are subject to section 52) put it this way: "However, enterprising plaintiffs (and their attorneys) have found a way to circumvent the will of Congress by seeking money damages while retaining federal jurisdiction. Because a violation of the ADA also constitutes a violation of California's Unruh Civil Rights Act, Cal. Civ.Code § 51(f), and the California Disabled Persons Act ("CDPA"), Cal. Civ.Code § 54(c), Plaintiffs can sue in federal court for injunctive relief under the ADA, and tack on state law claims for money damages under the Unruh Act and CDPA. *See, e.g., Moeller v. Taco Bell Corp.,* 220 F.R.D. 604, 607 (N.D.Cal.2004)." (*Molski v. Mandarin Touch Restaurant* (2004) 347 F.Supp.2d 860, 862-863; see also *Rodriguez v. Investco, L.L.C.* (M.D.Fla.2004) 305 F.Supp.2d 1278, 1280- 1281 [ability to profit from the ADA has given rise to a "cottage industry."].)

The irony here is that by adopting Gunther's reading of section 52 courts have in effect read section 54.3 out of the scheme of compliance with ADAAGs. In doing so the rational balance now established in the law calibrating the "punishment" with the "crime"-- for intentional violations, the penalty is four times greater than for unintentional violations--is wholly undone. That balance can make the difference between a small business making a technical correction (e.g., moving a mirror down) or going out of business altogether. (See Becker, *Private Enforcement of the Americans With Disabilities Act Via Serial Litigation: Abusive or Commendable* (2006) 17 Hastings Women's L.J. 93, 111 [noting that a drive-in restaurant in Salinas went out of business after being sued by vexatious litigant Molski; also noting closing of Chinese restaurant in Stockton after ADA suit].)

We absolutely know that reading section 52, subdivision (a) to require intentional discrimination is *a* valid interpretation of the statute-- that is the least one can take away from the *Harris* decision. Even assuming, however, for sake of argument that such a reading is not *the only* valid interpretation, there is really is no choice between competing interpretations. Gunther's proffered interpretation (no requirement of intentional discrimination) opens the door for abusive litigation; the alternative interpretation respects the need for compliance-- nonintentional violations still carry a minimum penalty under section 54.3--while not creating the incentive for abuse, much less sabotage. We cannot believe that the Legislature ever intended to create an incentive for that.

*252 F. The Two Federal Court Decisions
Construing State Law on the Issue
Are Not Persuasive To the Degree That They Imply
Section 52 Does Not Require
Discriminatory Intent

Two federal cases have confronted Unruh Act claims in connection with defenses based on a lack of intentional discrimination. The procedural context of one of the cases, a federal district court decision, *Presta v. Peninsula Corridor Joint Powers Board* (N.D.Cal.1998) 16 F.Supp.2d 1134, really didn't focus the court on damages pursuant to section 52. *Presta* is, strictly speaking, distinguishable from our conclusion today--indeed *supports* it to the degree that it recognizes that injunctive relief is obtainable under the Unruh Act for unintentional violations of the ADA. Only if one teases out an implication in the decision--and it's pretty oblique if it's there--that the plaintiff might have **340 also been seeking monetary claims pursuant to section 52 would it contradict our conclusion today.

The other case, *Lentini v. California Center for the Arts* (9th Cir.2004) 370 F.3d 837, is indeed incompatible with our decision today, because there the federal intermediate appellate court, in the one brief paragraph that it devoted to the issue, basically refused to follow what our own state Supreme Court said in *Harris.* As we explain below, the *Lentini* court's analysis cannot be considered an accurate statement of California law. But first we analyze *Presta,* since the panel of the Ninth Circuit that wrote *Lentini* purported to follow the *Presta* decision.

We should note at the outset, however, that neither *Presta* nor *Lentini* case involved a technical,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

50 Cal.Rptr.3d 317                                                                              Page 20

144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326

**(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)**

unintentional violation of an ADAAG. Both arose out of situations where a human being acting for the defendant had to make a conscious decision as to how to proceed given the presence of a person with a disability. Neither court faced the issue of intentionality for a "violation" of section 51 in the acute way that we do now.

In *Presta* the facts were extremely simple: On numerous occasions the plaintiff, a person of severely limited mobility, was not given sufficient time to board and disembark an Amtrak train, and in fact was treated "rudely when she asked for assistance." (*Presta, supra,* 16 F.Supp.2d at p. 1135.) The plaintiff brought an ADA action in federal court, and appended to it an Unruh Act violation claim as well as to a Disabled Persons Act claim under section 54. The court only described the plaintiff's quest for relief under the Unruh Act as a "claim." (See *ibid.* ["In this lawsuit, Presta brings claims of common law negligence, and violations of Title II of the Americans with Disabilities Act, Section 504 of *253 the Rehabilitation Act of 1973, the California Civil Code § 54 ('California Public Accommodations Act') and California Civil Code § 51 ('Unruh Civil Rights Act')."].) One finds no reference in the opinion anywhere to a claim for minimum penalties under section 52. In fact, the reference to section 54 would create an inference that any minimum penalties (at least for unintentional conduct) the plaintiff was seeking would have been pursuant to section 54.3.

A dispute over jury instructions prompted the federal district court judge to write a short opinion slated for publication in the Federal Supplement over whether an Unruh Act claim requires a plaintiff to prove "that the defendant harbored discriminatory intent." (See *Presta, supra,* 16 F.Supp.2d at p. 1135.)

In rejecting defendant jury instructions which would have told the jury that plaintiff had to show the "discrimination was unreasonable, arbitrary, or invidious" (*id.* at p. 1136), the court reasoned that the federal ADA (specifically Title II, 42 U.S.C. § 12132) was intended to guard "against both intentional discrimination and simple exclusion from services resulting not from intentional discriminatory acts, but rather from inaction, thoughtlessness, or equal treatment when particular accommodations are necessary." (*Presta, supra,* 16 F.Supp.2d at p. 1136, citing *Crowder v. Kitagawa* (9th Cir.1996) 81 F.3d 1480, 1483.)

When the court addressed the 1992 addition of the language now constituting subdivision (f) to section 51, it stated: " 'The plain language of the amendment clearly incorporates the entire ADA into § 51 ... The only plausible interpretation is that the amendment makes § 51 coextensive with the ADA.' *McCormack v. Advanced Micro Devices,* 1994 WL 715655, (N.D.Cal.). Because the Unruh Act has adopted the full expanse of the ADA, it **341 must follow, that the same standards for liability apply under both Acts. Accordingly, if Plaintiff need not demonstrate discriminatory intent to prove a claim under the ADA, she similarly need not show such intent to prevail under the Unruh Act." (*Presta, supra,* 16 F.Supp.2d at pp. 1135-1136.) And with that it rejected the defendant's jury instructions.

The *Presta* opinion never mentioned the *Harris* decision in connection with its determination that Unruh Act claims pursuant to violations of the ADA could be pressed without a showing of intent. But then it did not have to. As we have shown above, claims for injunctive relief for ADA violations under the Unruh Act do indeed *not* require discriminatory intent. The *Presta* decision did cite *Harris* for its historical observations about the Unruh Act (see *Presta, supra,* 16 F.Supp.2d at p. 1135), but that is as far as it went. The decision never *254 confronted what *Harris* had said about the triggering language in section 52 with the plaintiff's section 51 Unruh Act claims.

Now to *Lentini.* There, a quadriplegic woman in a wheelchair used a Shih Tzu/Poodle as a "service dog" for protection and retrieval of small dropped items. She attended two performances at an "intimate" (see *Lentini, supra,* 370 F.3d at p. 842) performing arts center, where the dog made noises--but the trial court would later determine that the noises were to alert its owner as to a possibly dangerous situation. No customers made complaints on either occasion, but the house manager, on a third visit, refused the patron admittance to the theater with the dog, and in fact called the police and had a citizen's arrest made when she refused to leave. (See *id.* at p. 840-841.) The ejection was the result of an unwritten venue policy to exclude service animals who had made noises at prior events regardless of the level of noise and regardless of whether the noise was made for a "legitimate reason," such as an " 'oncoming medical emergency or dangerous condition.' " (*Id.* at p. 842.)

The patron sued the performing arts center, the house

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

50 Cal.Rptr.3d 317                                                                                   Page 21

144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326

**(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)**

manager and the director of sales and services under the ADA, the Unruh Act *and* the Disabled Persons Act. (The court never confronted the problem of the election between section 52 and section 54.3 as required by section 54.3, subdivision (c).) Most of the case as it confronted the Ninth Circuit on appeal concerned the propriety of the injunctive relief given the patron by the federal district court. It had ordered the theater to modify its policy so as not to exclude service animals who had made noises on previous occasions *if* the noise was legitimate (to benefit the disabled owner); it also imposed damages, including making the house manager individually liable for $5,000.

On appeal, the court specifically declined to address the argument that the defendants had not actually violated the ADA, since it had not been raised until the reply brief. (*Lentini, supra,* 370 F.3d at p. 843, fn. 6.) It did, however, conclude that a regulation requiring modification of policies and practices to permit "the broadest feasible access be provided to service animals in all places of public accommodation" (*id.* at p. 843, quoting 28 C.F.R. Pt. 36, App. B at p. 697) justified the order, in effect assuming that the defendants had indeed violated the ADA.

Then it turned to the issue of damages. Damages, of course, could not be justified under federal law, so the court looked to state law, namely the Unruh Act. The trial court had found that "appellants" (including the theater itself, the director of sales and services and the house manager) did not intentionally discriminate against the **342 patron, though the Ninth Circuit would conclude otherwise as to the house manager. (See **255*id.* at pp. 846, and p. 846, fn. 9, and pp. 849-851.) And the other human actor--the director of sales and services--had specifically directed the staff not to let the patron back in after he heard a noise at one of the two prior concerts. (*Id.* at p. 849.) Indeed, he later lied to the assistant director of sales about the reason for the ejection (falsely claiming that the patron had failed to present her ticket). (See *id.* at p. 849.)

The court first established that a plaintiff need not show intentional discrimination under the ADA (see *Lentini, supra,* 370 F.3d at p. 846 ["It is undisputed that a plaintiff need not show intentional discrimination in order to make out a violation of the ADA."] ) and then, in a single paragraph's analysis, concluded that "regardless of whether *Harris* may

continue to have relevance to other Unruh Act suits, no showing of intentional discrimination is required where the Unruh Act violation is premised on an ADA violation." (*Id.* at p. 847.)

The *Lentini* analysis was so short that we may quote it in full now: "This result is mandated by the plain meaning of the Unruh Act's language, which states that a violation of the ADA is, *per se,* a violation of the Unruh Act. *See Biehl v. C.I.R.,* 351 F.3d 982, 986 (9th Cir.2003) ("Statutory interpretation begins with the plain meaning of the statute's language." (citation and quotation marks omitted)). 'Because the Unruh Act has adopted the full expanse of the ADA, it must follow, that the same standards for liability apply under both Acts.' *Presta,* 16 F.Supp.2d at 1135. Therefore, we affirm the district court's conclusion that, insofar as the appellants violated the ADA, a showing of intentional discrimination was not required in order to award damages under the Unruh Act." (*Lentini, supra,* 370 F.3d. at p. 847.)

In a tag end footnote, the Ninth Circuit panel stated that given its conclusion about the Unruh Act, "we need not address Lentini's alternative argument that she can recover the relevant damages under the Disabled Persons Act without a showing of intentional discrimination." (*Lentini, supra,* 370 F.3d at p. 847, fn. 10.)

To the degree that *Presta* or *Lentini* is read as authorizing monetary damage and minimum damage claims under section 52, it is not persuasive as a statement of state law, for these reasons:

(1) Neither case ever confronted the actual language *in section 52* construed by *Harris* that triggers the minimum penalty of $4,000. The district court *Presta* decision did not confront what *Harris* had said about the need for intentional conduct at all, and *Lentini* felt that it did not need to confront of *how* subdivision (f) of section 51 could somehow transform language, which *Harris* had said contemplated intentional discrimination, into language which contemplated unintentional conduct.

\*256 (2) Neither case dealt with the fact that the Legislature did not alter the triggering language of section 52 when it was considering legislation that involved section 52 and had already been construed by the state's highest court to require intentional discrimination. Neither case, in that regard, made any attempt to reconcile section 52 as already construed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

50 Cal.Rptr.3d 317                                                                                                          Page 22

144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326

**(Cite as: 144 Cal.App.4th 223, 50 Cal.Rptr.3d 317)**

by the state's highest court with the addition of subdivision (f) to section 51.

(3) Neither case showed any recognition of the two alternative--and under section 54.3, subdivision (c) *mutually exclusive*--means of enforcing the ADA under state law, depending on the intentionality (§ 52) or unintentionality (§ 54.3). The *Lentini* decision, in fact, treated the two as cumulative, **343 when the plain language of section 54.3, subdivision (c) is that they are mutually exclusive. (*Lentini* would have been on much sounder footing if it had upheld the damage award based on section 54.3, subdivision (c) instead.)

(4) Neither case confronted the problem that its implied reading of section 52 rendered another part of state law redundant as regards unintentional violations of the ADA.

(5) Neither case dealt with the problem that even if their own implied reading of section 52 was plausible, their interpretation had the consequence of encouraging abusive litigation, a consequence we doubt the Legislature intended. Their failure to discuss at all the possibility that the Legislature's 1992 amendment did not disturb the holding in *Harris* further undermines their persuasive authority.

Ironically, another consequence is that the *Lentini* decision has resulted in the inundation of the federal courts with litigation in which the quest for the minimum $4,000 penalty under state law predominates. (See *Molski v. Hitching Post I Restaurant, Inc.* (C.D.2005) 2005 WL 3952248 [because plaintiff's state Unruh Act claim "substantially predominate[d] over his ADA claim," court declined to exercise supplemental jurisdictions over the plaintiff's state law claims].)

In essence, state law claims have become the tails that wag the dog of federal ADA litigation in California, as plaintiffs seek to cash in on the higher minimum penalties provided by section 52, ignoring section 54.3. But that is a federal procedural problem that we leave for the federal courts to resolve themselves. For our part, however, we cannot consider either *Presta* (at least to the degree that it can be arguably read to provide for section 52 penalties for unintentional acts), or *Lentini,* to be accurate statements of our own state law and we respectfully decline to follow them.

**\*257 IV. DISPOSITION**

Gunther could have sued Lin based on Lin's unintentional ADA violations, but recovered the smaller statutory minimum penalty under section 54.3. Rather, he elected to try to obtain the larger statutory minimum penalty under section 52, but that remedy is reserved for intentional violations. California law (quite logically) does not allow plaintiffs to proceed under both statutes, and Gunther failed to present any evidence that the defendant had intentionally discriminated against him as required by section 52.

The judgment is affirmed. Costs rest with the discretion of this court. Justice is well served in this case by an award of costs against Gunther and to the prevailing respondent.

WE CONCUR: RYLAARSDAM, and ARONSON, JJ.

144 Cal.App.4th 223, 50 Cal.Rptr.3d 317, 06 Cal. Daily Op. Serv. 10,048, 2006 Daily Journal D.A.R. 14,326

END OF DOCUMENT