1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RONALD WILSON,

                                    NO. CIV.S-05-1239 LKK/DAD

        Plaintiff,

                                   O R D E R

   v.

HARIA and GOGRI CORP. dba       **TO BE PUBLISHED**
JACK-IN-THE-BOX #551; OPT
GOLDEN HILLS VAC, LLC,

        Defendants.
_____/

    Plaintiff alleges that defendant violated the Americans with
Disabilities Act ("ADA") and California's Unruh Civil Rights Act ("Unruh
Act") by failing to remove architectural barriers at its restaurant.
Pending before the court is plaintiff's motion for summary judgment.  The
court previously stayed the motion pending the potential resolution of
a question of state law by the California Supreme Court.[1]  This court now

_____

    [1]  As discussed below, the California Supreme Court
subsequently denied review of an intermediate appellate court
decision that could have provided definitive guidance on whether
plaintiffs must prove intentional disability discrimination under
the Unruh Act to obtain damages.

1



EXHIBIT C

resolves the matter based on the parties papers and after oral argument.

For the reasons set forth below, the motion is granted.

## I. Facts[2]

Plaintiff Ronald Wilson is a 70 year old disabled man.

Plaintiff suffers from severe idiopathic neuropathy, peripheral

neuropathy ("silent disease") with symptoms of ALS (a.k.a. Lou

Gehrig's disease), and motor-sensory neuropathy.[3]  Decl. of Ronald

Wilson ("Wilson Decl.") ¶ 3.  Because of his condition, plaintiff

experiences stiffness, muscle twitching, shaking, weakness, and

spasms.  Id.  When traveling in public, plaintiff uses a cane,

wheelchair, or both.[4]  Plaintiff also owns a van with a spinner knob

and has been issued a disability placard by the state of California.

Plaintiff regularly visits the defendant Haria and Gorgri

Corporation's restaurant, a Jack-in-the-Box.  He retained receipts to

the restaurant from thirteen separate visits over 2005-2006.  Wilson

Decl. ¶ 11.  In each of these visits, plaintiff alleges that there

were several architectural barriers in place that prevented plaintiff

from enjoying full and equal access to the goods and services at the

---

[2] All facts are undisputed unless otherwise noted.

[3] At several points, defendant notes that the only evidence supporting plaintiff's factual allegations is his own declaration. This is, however, sufficient to meet plaintiff's initial burden on summary judgment, and as defendant repeatedly fails to tender any probative evidence in opposition, the court may appropriately treat these allegations as effectively undisputed.

[4] Defendant notes that, on one occasion in 2006, the owner and operator of the restaurant allegedly observed plaintiff walking without the assistance of a cane or a wheelchair.  Decl. of Maheshkumar Gogri ("Maheshkumar Decl.") ¶ 4.

2

1   restaurant.

2       There is no dispute that after commencement of the instant suit,

3   at least some of these barriers were removed.[5]  Plaintiff maintains,

4   however, that there are six outstanding barriers that had yet to be

5   remedied as of August 24, 2006.  Wilson Decl. ¶ 16.  Specifically,

6   plaintiff identified the following six barriers: (1) the cut-out curb

7   ramp had a slope of 8.8% at the top and 12.6% at the bottom; (2) the

8   door to the men's restroom did not have a 12-inch strike side

9   clearance on the push side, the door pressure was 12 pounds, and the

10  door did not open to a full ninety degrees; (3) the toilet paper

11  dispenser was 42 inches from the back wall; (4) the restroom

12  handle/lock was not accessible; (5) none of the accessible seating in

13  the restaurant was designated as accessible with signage; and (6) the

14  disabled parking space lacked the words "No Parking" painted in the

15  access aisle.  Id.

16      With respect to at least two of the barriers, defendant claims

17  that they have been remedied as of November 27, 2006 (the date that

18  the declaration of Maheshkumar Gogri was executed).  First, defendant

19  contends that the words "no parking" are now painted in the access

20  aisle of the disabled parking spot.  Gogri Decl. ¶ 11.  Second,

21  defendant maintains that the toilet paper dispenser is now in

22  compliance with all regulations.  Id.  However, plaintiff visited the

23  restaurant on November 30, 2006 and took photographs that show that

24  _____

25      [5] Defendant does not dispute that these barriers were in
    existence at the time of plaintiff's visits but merely claims that
26  they have since been remedied.

3

1  the dispenser is still 42 inches from the back wall.  Wilson Decl. II,

2  ¶ 3(c), Ex. E.

3      With respect to the issue of signage for accessible seating in

4  the restaurant, defendant contends that the placards are often stolen,

5  vandalized, or otherwise obscured by customers, and that it is the

6  policy of the restaurant to replace the placards in such

7  circumstances.  Id.  Accordingly, defendant states that if plaintiff

8  observed the absence of required signage, it was because the placards

9  were in the process of being replaced.  Id.  When plaintiff visited

10  the restaurant on November 30, 2006, he found that the signage was

11  still missing, and took photographs to document his observations.

12  Wilson Decl. II, ¶ 3(f), Ex. F.

13                          **II. Standard**

14      Summary judgment is appropriate when it is demonstrated that

15  there exists no genuine issue as to any material fact, and that the

16  moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

17  P. 56(c); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157

18  (1970); Secor Ltd. v. Cetus Corp., 51 F.3d 848, 853 (9th Cir. 1995).

19      Under summary judgment practice, the moving party

20      [A]lways bears the initial responsibility of informing
        the district court of the basis for its motion, and
21      identifying those portions of "the pleadings,
        depositions, answers to interrogatories, and admissions
22      on file, together with the affidavits, if any," which it
        believes demonstrate the absence of a genuine issue of
23      material fact.

24  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the

25  nonmoving party will bear the burden of proof at trial on a

26  dispositive issue, a summary judgment motion may properly be made in

reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Secor Ltd., 51 F.3d at 853.

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; see also First Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir. 1998). The opposing party must demonstrate that the fact in contention is

material, i.e., a fact that might affect the outcome of the suit under the governing law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Owens v. Local No. 169, Ass'n of Western Pulp and Paper Workers</u>, 971 F.2d 347, 355 (9th Cir. 1992) (quoting <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987)), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, <u>Anderson</u>, 477 U.S. 248-49; <u>see also</u> <u>Cline v. Indus. Maint. Eng'g & Contracting Co.</u>, 200 F.3d 1223, 1228 (9th Cir. 1999).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  <u>First Nat'l Bank</u>, 391 U.S. at 290; <u>see also</u> <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); <u>see also</u> <u>Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc.</u>, 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c); <u>see also</u> <u>In re Citric Acid Litigation</u>, 191 F.3d 1090, 1093 (9th Cir. 1999).  The evidence of the opposing party is to be believed, <u>see</u> <u>Anderson</u>, 477

1  U.S. at 255, and all reasonable inferences that may be drawn from the

2  facts placed before the court must be drawn in favor of the opposing

3  party, see Matsushita, 475 U.S. at 587 (citing United States v.

4  Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).  See also

5  Headwaters Forest Def. v. County of Humboldt, 211 F.3d 1121, 1132 (9th

6  Cir. 2000).  Nevertheless, inferences are not drawn out of the air,

7  and it is the opposing party's obligation to produce a factual

8  predicate from which the inference may be drawn.  See Richards v.

9  Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

10  aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

11      Finally, to demonstrate a genuine issue, the opposing party

12  "must do more than simply show that there is some metaphysical doubt

13  as to the material facts. . . . Where the record taken as a whole

14  could not lead a rational trier of fact to find for the nonmoving

15  party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S.

16  at 587 (citation omitted).

17                      **III. Analysis**

18      Plaintiff moves for summary judgment against defendant Haria and

19  Gogri Corp, seeking damages under state law and injunctive relief

20  under the ADA.  With respect to damages, defendant argues that, in

21  light of recent California case law, proof of intent to discriminate

22  on the basis of disability is required for damages under section 52(a)

23  of the Unruh Act.  With respect to injunctive relief, defendant

24  contends that the alleged violations have either been remedied or

25  would cost too much to remedy, and that the alleged violations do not

26  render the restaurant or its facilities inaccessible.  For the reasons

1    set forth below, plaintiff's motion is granted.

2    **A. ADA Claim**

3        Title III of the ADA prohibits discrimination against people

4    with disabilities in places of public accommodation.  42 U.S.C. §

5    12182(a).  One form of such discrimination is the failure to remove

6    architectural barriers.  24 U.S.C. § 12182(b)(2)(A)(iv).  In order to

7    prove discrimination stemming from an architectural barrier, plaintiff

8    must demonstrate that (1) he is disabled, (2) the facility in question

9    is a place of public accommodation, (3) the facility contains an

10   architectural barrier, (4) the plaintiff had actual knowledge of the

11   architectural barrier precluding his full and equal access to the

12   facility.  42 U.S.C. §§ 12182(a), 12182(b)(2)(A)(iv), 12188(a).

13       There is little dispute that most of these elements are present

14   in the case at bar.  First, given that plaintiff is unable to walk

15   without the use of a mobility aid (e.g., wheelchair or cane), there is

16   no genuine dispute that he is disabled within the meaning of the ADA.[6]

17   See 42 U.S.C. § 12102(2)(A) (defining disability as a physical or

18   mental impairment that substantially limits a major life activity).

19   Second, a restaurant is a place of public accommodation.  42 U.S.C. §

20   12181(7)(B).   Third, assuming the alleged architectural barriers

21   _____

22       [6] The fact that defendant asserts that plaintiff was observed
     walking without the aid of a cane or wheelchair on one occasion is
23   not sufficient to create a genuine dispute regarding this issue.
     Gogri Decl. ¶ 11.  Such an event would not negate the fact that
24   plaintiff's numerous medical conditions nevertheless constitute a
     substantial limitation on his ability to walk.  See 29 C.F.R. §
25   1630.2(j) (defining substantial limitation as either a total
     inability to perform major life activity or a significant
26   restriction on the same).

1  exist, plaintiff satisfies the requirement of actual knowledge, given

2  that he personally encountered them during his multiple visits to the

3  restaurant.  Fourth, while defendant would ordinarily be entitled to

4  prove that the removal of the alleged architectural barriers is not

5  "readily achievable" (given that the facility was in existence prior

6  to the passage of the ADA in 1993), the court holds that this is an

7  affirmative defense, which defendant has waived.[7]  Accordingly, the

8  only remaining issue is whether the architectural barriers alleged by

9  plaintiff were in place during his visits, and whether they continue

10  to exist.

11  ///

12

13  _____

        [7] The Ninth Circuit has yet to rule on this issue, but courts
14  are generally in agreement that whether barrier removal is readily
    achievable is an affirmative defense.  See Colorado Cross
15  Disability Coalition v. Hermanson Family Ltd. P'ship, 264 F.3d 999,
    1002-03 (10th Cir. 2001); Gathright-Dietrich v. Atlanta Landmarks,
16  Inc., 452 F.3d 1269, 1274 (11th Cir. 2006).  See also Lentini v.
    Calif. Ctr. for the Arts, 270 F.3d 837 (9th Cir. 2004) (holding
17  that whether an accommodation "fundamentally alters" a service or
    facility is an affirmative defense).
18        In Colorado Cross, the Tenth Circuit established a burden-
    shifting framework in which the plaintiff bears in the initial
19  burden of production but the defendant bears the ultimate burden
    of persuasion.  264 F.3d at 1002-03.  The plaintiff must first
20  suggest a method of barrier removal and proffer evidence that the
    method meets the statutory definition of readily achievable.  Id.
21  Thereafter, the burden shifts to the defendants to rebut that
    showing and prove that the suggested method is not readily
22  achievable.  Id.
          Here, defendant has failed to plead that barrier removal is
23  not readily achievable in its answer.  Accordingly, the defense is
    waived.  Enlow v. Salem-Keizer Yellow Cab Co., Inc., 389 F.3d 802, 819
24  (9th Cir. 2004).  While plaintiff has not come forward with any
    evidence regarding barrier removal, he need not do so where such
25  evidence would be unnecessary, given defendant's waiver.  In
    contrast, the Colorado Cross court noted that the defendant in that
26  case had properly pled that barrier removal was not readily
    achievable as an affirmative defense.  Id., n.3.

9

1      **1. Cut-Out Curb Ramp**

2          Defendant concedes that the slope of the cut-out curb ramp is in

3   violation of ADAAG § 4.7.2 and 4.8.2.[8]  However, it defends this non-

4   compliance on two grounds.  First, defendant states, without any

5   accompanying evidence, that fixing the grade "would be several

6   thousand dollars."  Gogri Decl. ¶ 11(b).  However, as noted above,

7   defendant waived its ability to make this argument when it failed to

8   plead that the barrier removal was not "readily achievable" as an

9   affirmative defense.  Second, defendant maintains that the degree of

10  non-compliance is de minimis and did not render the restaurant

11  inaccessible.  The argument misapprehends the law.  Ultimate access is

12  not a defense under the ADA.  See Boemio v. Love's Rest., 954 F. Supp.

13  204, 208 (S.D. Cal. 1997) ("The standard cannot be 'is access

14  achievable in some manner'.  We must focus on the equality of access.

15  If a finding that ultimate access could have been achieved provided a

16  defense, the spirit of the law would be defeated.").

17      **2. Restroom Door**

18          There is no genuine dispute that the men's restroom door is

19  inaccessible in several respects.  First, there is not a 12-inch

20  strike side clearance on the push side of the door required by ADAAG §

21  4.13.6.  Defendant claims that fixing this violation would cost

22  $70,000 and that it does not render the restroom inaccessible.  Both

23  ─────────────────

24      [8] Title III gives the Department of Justice authority to
    develop regulations implementing the requirements of the ADA.  42
    U.S.C. § 12186(b).  Pursuant to this authority, the Attorney
25  General adopted the ADA Accessibility Guidelines ("ADAAGs")
    codified at 28 C.F.R. Pt. 36, Appendix A.  See Fortyune v. Am.
26  Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).

1  these arguments are unavailing, for the reasons noted above.  Second,

2  the door pressure required to open the door is 12 pounds, exceeding

3  the 5 pound maximum allowed by ADAAG § 4.13.11.  Defendant has no

4  response to this contention and its accompanying evidence.  Third,

5  plaintiff presents evidence that the door-stop prevents the door from

6  opening to a full 90 degrees.  ADAAG § 4.13.5.  Again, defendant fails

7  to respond to this point.

8       **3. Toilet Paper Dispenser**

9       Plaintiff also provides evidence that the toilet paper dispenser

10  is too far from the back wall.  Specifically, it is 42 inches away,

11  exceeding the maximum 36 inches allowed.  ADAAG § 4.17.3; Fig. 30(d).

12  Wilson Decl. II, ¶ 3(c), Ex. E.  Defendant states that the dispenser

13  was moved and was in compliance as of November 27, 2006.  However,

14  plaintiff visited the restaurant on November 30, 2006, and took

15  pictures of the restroom, placing a measuring tape along the wall to

16  document the distance from the back wall to the dispenser.  There is

17  no genuine dispute that the dispenser location is still in violation.

18       **4. Interior Door Handle of Restroom Door**

19       Plaintiff states that the inside door handle of the restroom

20  door requires tight grasping, pinching, or twisting of the wrist to

21  operate, in violation of ADAAG §§ 4.27.4 and 4.13.9.  Defendant has no

22  response to this, aside from stating that "It is impossible to comply

23  with a Complaint like this since it is so unclear."  Gogri Decl. ¶

24  11(e).  Having failed to produce any evidence, there is no genuine

25  dispute that the door handle is in violation of ADAAG §§ 4.27.4 and

26  4.13.9.

**5. Signage for Accessible Seating**

Defendant concedes that the required signage is often absent, but claims that this is due to constant theft and vandalism.  However, plaintiff's evidence indicates that as of November 30, 2006, after defendant's opposition was filed, the signage was absent, just as it was absent on each of plaintiff's previous visit.  While the court must draw all reasonable inferences in favor of defendant, here, it would be unreasonable for the court to presume that the signage happens to have been stolen all thirteen times that plaintiff can document that he visited the restaurant.  Accordingly, there is no genuine dispute that defendant has violated the relevant ADAAGs regarding required signage.  ADAAG §§ 4.1.2(7), 4.1.16(3), 4.30.3.

**6. "No Parking" Painted in Access Aisle**

Plaintiff concedes that, at present time, defendant has remedied this problem.  Accordingly, the motion with regard to this issue is moot.

In sum, the court finds that there is no genuine dispute that plaintiff has satisfied all the elements of his ADA claim with respect to all five of the outstanding architectural barriers described above that have yet to be removed.  Accordingly, the motion for summary judgment for the ADA claim is granted.

**B. State Law Claims**

Plaintiff also moves for summary judgment with respect to his state law cause of action under the Unruh Act and the Disabled Persons Act ("DPA"), and seeks damages under the former.  Both statutes incorporate the ADA by reference.  The Unruh Act was amended in 1992

12

1  to include the following language (now codified at Cal. Civ. Code §

2  51(f)): "A violation of the right of any individual under the

3  Americans with Disabilities Act of 1990 (Public Law 101-336) shall

4  also constitute a violation of this section."  One critical difference

5  between the ADA and the Unruh Act, however, is the available remedy.

6  The Unruh Act provides for a minimum damages of $4,000 per violation,

7  Cal. Civ. Code § 52(a), while the only remedy available under Title

8  III of the ADA is injunctive relief, 42 U.S.C. § 12188(a)(1).  Under

9  the ADA, damages are not recoverable.  Wander v. Kaus, 304 F.3d 856,

10  858 (9th Cir. 2002).

11      Here, defendant argues that in order to obtain damages

12  authorized by the Unruh Act, plaintiff must demonstrate that defendant

13  had an intent to discriminate.  The argument is premised upon a recent

14  California intermediate appellate court decision, Gunther v. Lin, 50

15  Cal. Rptr. 3d 317 (Cal. Ct. App. 2006), which was decided after

16  plaintiff's motion was filed.[9]  Where the highest court of a state has

17  not pronounced upon an issue of state law, as is the case here, a

18  federal court sitting in diversity must use its own best judgment to

19  predict how that court would decide the issue.  Takahashi v. Loomis

20  Armored Car Serv., 625 F.2d 314, 316 (9th Cir. 1980).

21      In conducting this analysis, a federal court looks to guidance

22  from state appellate court opinions, well-reasoned decisions from

23  other jurisdictions, and treatises.  U.S. v. Colin, 314 F.3d 439, 443

24  (9th Cir. 2002).  Because a federal court must take into account "all

25  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26      [9] The California Supreme Court denied the petition for review
    on January 17, 2007.

13

available data," <u>Estrella v. Brandt</u>, 682 F.2d 814, 817 (9th Cir.
1982), the decision of a California intermediate appellate court is
not controlling.  <u>Dimidowich v. Bell & Howell</u>, 803 F.2d 1473, 1482
(9th Cir. 1986) ("'[D]ecisions by California Courts of Appeal are
merely data'") (quoting <u>Am. Sheet Metal, Inc. v. EM-KAY Eng'g Co.</u>, 478
F. Supp. 809, 813 (E.D. Cal. 1979) (Karlton, J.)).  Of course, such a
decision "is not to be disregarded by a federal court unless it is
convinced by other persuasive data that the highest court of the state
would decide otherwise." <u>Estrella</u>, 682 F.2d at 817.

### 1. Prior Ninth Circuit Law

As a threshold matter, the court notes that the holding of
<u>Gunther</u> directly contradicts that of <u>Lentini v. Calif. Ctr. for the
Arts</u>.  270 F.3d 837 (9th Cir. 2004).  There, the Ninth Circuit held
that because plaintiffs need not prove discriminatory intent under the
ADA, plaintiffs also need not prove discriminatory intent under the
Unruh Act, which imported ADA standards of liability.  <u>Id.</u> at 847.
This holding was in accord with the extant case law at the time, which
also held that intent was not required.  <u>See</u>, <u>e.g.</u>, <u>Presta v.
Peninsula Corridor Joint Powers</u>, 16 F. Supp. 1134, 1135 (N.D. Cal.
1998) ("Because the Unruh Act has adopted the full expanse of the ADA,
it must follow, that the same standards for liability apply under both
Acts.").

<u>Gunther</u>'s holding raises the issue for district courts
as to whether they are bound by <u>Lentini</u> or are now obligated to
reconsider the matter in light of the subsequent opinion by an
intermediate court of the state.  The state of the law is less

14

1  than clear.   In In re Watts, the Ninth Circuit held that an

2  intervening decision by an intermediate court requires that

3  court to reconsider a previous contrary opinion.   In re Watts,

4  298 F.3d 1077, 1083 (9th Cir. 2002).   This does not answer the

5  question of whether a district court is free to disregard the

6  Circuit's previous opinion, a question which has divided courts

7  around the country.[10]  Happily, this court need not answer that

8  question.[11]  Whatever else is true, it is clear that federal

9  courts are free to disregard the decisions of intermediate state

10  courts where there is "convincing evidence" that the state's

11  highest court would decide differently.   In re Watts, 298 F.3d

12  at 1083.   Here, there is convincing evidence suggesting that the

13  decision is not likely the law of the state of California.[12]

---

15  [10] Compare In re E&S Dist. Asbestos Litiq., 772 F. Supp. 1380,
1391 (S.D.N.Y. 1991), Wankier v. Crown Equip. Corp., 353 F.3d 862,
16  866 (10th Cir. 2003), Aceto v. Zurich Ins. Co., 440 F.2d. 1320,1322
(3rd Cir. 1971), and Nussbaum v. Mortgage Serv. America Co., 913 F.
17  Supp. 1548, 1554 (S.D. Fla. 1995) with Taco Bell Corp. V. Cont'l Cas.
Co., 388 F.3d. 1077-79 (7th Cir. 2004).

18  [11] The problem is particularly troublesome in California.   I
have previously noted the relative weakness of the doctrine of
19  stare decisis in California jurisprudence.   See Froyd v. Cook, 681
F. Supp. 669, 672 n.9 (E.D. Cal. 1988).   There, after examining the
20  status of the doctrine within the state, I observed that a "federal
district court need give no greater weight to intermediate
21  appellate decisions than the superior court of the state does."
Id.; see also Ortland v. County of Tehama, 939 F. Supp. 1465, 1468
22  (E.D. Cal. 1996).   I am not aware of any change in California law
bearing upon the issue.

24  [12] This is so even though the California Supreme Court denied
review in Gunther.   Denial of review is "not [] without
25  significance," but review may be denied for any number of reasons
(including, for instance, the fact that there is not yet an
appellate district split on an issue), and it does not necessarily
26  signal the California Supreme Court's approval of a particular

## 2. **Gunther**

In short, Gunther held what every other court before it has rejected: that proof of intent is required to collect damages for disability discrimination under the Unruh Act, which authorizes a minimum of $4,000 per violation.  50 Cal. Rptr. 3d at 325; Cal. Civ. Code § 52(a).  The court reached this conclusion by interpreting the 1992 legislation that amended the Unruh Act to include disability discrimination.  Specifically, it found that this legislation did not overrule Harris v. Capital Growth Investors XIV, 52 Cal. 3d 1142, 1172 (1991), which, in rejecting a disparate impact theory of sex discrimination, noted that the statute's language (e.g., "denies," "aids or incites a denial," "make any discrimination," and "offense") appeared to cover only intentional discrimination.  This language was not altered by the 1992 legislation.

Conceptually, then, Gunther envisions a two-step process for obtaining damages: first, the plaintiff must prove that the defendant engaged in discrimination, Cal. Civ. Code § 51, and second, that the discrimination was intentional, Cal. Civ. Code § 52.  According to Gunther, the 1992 legislation altered the first step (by expanding the class of prohibited discrimination to include disability discrimination) but did nothing to alter the second step.

Gunther's reasoning is flawed from the outset.  Its conclusion is premised on the view that the Unruh Act is comprised only of Section 51, but this divorces the law from its enforcement provision

case.  DiGenova v. State Bd. of Educ., 57 Cal. 2d 167, 178 (1962).

16

1   in Section 52.  While <u>Gunther</u> notes that, by its own terms, the Unruh

2   Act comprises only Section 51, the case that <u>Gunther</u> cites for this

3   proposition goes on to say that courts "have consistently described as

4   Unruh Civil Rights Act claims causes of action based under seemingly

5   related provisions set forth in sections of the Civil Code that follow

6   section 51."  <u>Gatto v. County of Sonoma</u>, 98 Cal. App. 4th 744, 756

7   (2002).  Indeed, even the <u>Harris</u> court referred to the Unruh Act as

8   encompassing the enforcement provision found in Section 52.  52 Cal.

9   3d at 1172 (referring to Section 52 as "the language of the Act").[13]

10  Accordingly, when the 1992 legislation made a violation of the ADA a

11  per se violation of the Unruh Act, it also intended that these victims

12  of disability discrimination would be entitled to the remedies

13  afforded in the enforcement provision.

14          **a. Plain Meaning**

15      The traditional rules of statutory construction compel the same

16  conclusion.  The first step of statutory construction is to assign the

17  "usual and ordinary meanings" to the words of a statute.  <u>Wells v.</u>

18  <u>One2One Learning Found.</u>, 29 Cal. 4th 1164, 1170 (2006).  "If the words

19  themselves are not ambiguous, we presume the Legislature meant what it

20  said, and the statute's plain meaning governs."  <u>Id.</u>

21      Here, the language of the 1992 legislation, codified in (now)

22  Section 51(f), could not be clearer: "A violation of any right of any

23  individual under the [ADA] shall also constitute a violation of this

24  _____

25      [13] Furthermore, as discussed below, the legislative history to
    Section 51(f) also indicates that the legislature viewed the Unruh
26  Act as comprising both Sections 51 and 52.

                                    17

1   section."  As noted above, "this section" refers to the Unruh Act,

2   including its enforcement provision in Section 52.  Every court to

3   have considered the issue with the exception of <u>Gunther</u> has read

4   Section 51(f) as not requiring proof of intent.  <u>See</u>, <u>e.g.</u>, <u>Lentini</u>,

5   370 F.3d at 847; <u>Presta</u>, 16 F. Supp. 2d at 1136; <u>Hubbard v. Twin Oaks</u>

6   <u>Health and Rehabilitation Ctr.</u>, 408 F. Supp. 2d 923, 928-99 (2004)

7   (Karlton, J.); <u>Boemio</u>, 954 F. Supp. at 208.

8              **b. Legislative History**

9       The legislative history of Section 51(f) reveals an intent to

10  include unintentional disability discrimination within the scope of

11  the Unruh Act.  The Assembly Committee on Judiciary report on AB 1077

12  (as amended January 2, 1992, p.2) stated that the bill would: "Make a

13  violation of the ADA a violation of the Unruh Act.  Thereby providing

14  persons injured by a violation of the ADA with the remedies provided

15  by the Unruh Act (e.g., right of private action for damages)."  The

16  description in the Senate Committee on Judiciary report on AB 1077 (as

17  amended June 1, 1992, p. 5) expressed a similar view.[14]

18      Also of particular significance is a letter from a labor law

19  advisor for the California Chamber of Commerce to the bill's author

20  which stated that the proposed bill would expose operators of places

21  of public accommodations "to greater liability [than the ADA], even

22  for unintentional violations of the new federal standard."  <u>Gunther</u>,

23  50 Cal. Rptr. 3d at 337 (quoting letter from Malanie Wiegner, Labor

24  ────────────────

25      [14] "[T]his bill would make a violation of the ADA a violation of the
    Unruh Act.  Thereby providing persons injured by a violation of the ADA
26  with the remedies provided by the Unruh Act (e.g., right of private
    action for damages, including punitive damages)."

1   Law Advisor, California Chamber of Commerce, to Honorable Bruce

2   Bronzan, dated June 1, 1992, at page 2).

3       _____Gunther_ sweeps this letter aside.  The court argues that the

4   Disabled Persons Act "does indeed [] allow for greater liability for

5   the ADA than the ADA itself allows."  Id. at 337.  But, quite

6   obviously, the legislature was voting on changes to the Unruh Act, not

7   the DPA, and the letter was referring to the higher liability imposed

8   by the former, not the latter.  Of course, a lone letter is not

9   controlling, but, as the only piece of legislative history to squarely

10  address the issue of intent, it is nonetheless extremely relevant.

11  And it is certainly more relevant than the inference Gunther attempts

12  to draw from the "little opposition" that the bill drew from business

13  groups.  Id. at 337.

14      As the court in Cross recently noted in a post-Gunther decision,

15  "the result under Gunther [] leaves a successful ADA plaintiff without

16  a corresponding Unruh Act remedy [and] undermines the California

17  legislature's purpose in passing section 51(f) to provide that a

18  violation of the ADA is also a violation of the Unruh Act."  Cross v.

19  Pac. Coast Plaza Invs., L.P., 2007 U.S. Dist. LEXIS 16138, *15 (S.D.

20  Cal. Mar. 6, 2007).  Like the court in Cross, this court also

21  "presumes that the California legislature did not intend section 51(f)

22  to be a law that is all bark and no bite."[15]  Id., at *15-16.

23  _____

24      [15]  The  court  in  Cross  ultimately  declined  to  exercise
    supplemental jurisdiction over plaintiff's Unruh Act claims in the
    interests  of  comity.   Here,  however,  and  in  contrast  to  Cross,
25  defendants  have  not  filed  a  motion  to  dismiss  the  supplemental
    state law claims.  Furthermore, the court finds that the issue of
26  state law presented by the instant action is not particularly novel

1         **c. Liberal Construction**

2     If the language of the Section 51(f) were ambiguous, and the

3 legislative history unclear -- which they are not -- the California

4 Supreme Court has also held that the Unruh Act must be interpreted "in

5 the broadest sense reasonably possible" in order to "banish

6 [discriminatory] practices from California's community life."

7 Isbister v. Boys' Club of Santa Cruz, Inc., 40 Cal. 3d 72, 76 (1985);

8 see also Presta, 16 F. Supp. at 1136; Burks v. Poppy Constr. Co., 57

9 Cal. 2d 463, 468 (1962). If this statement is to have any force

10 beyond mere rhetoric, it must be applied to situations such as this

11 one, where a court might construe a statute in two different ways, one

12 narrow and one broad.

13     Moreover, liberal construction of the Unruh Act is needed to

14 banish the discriminatory practices at issue here. As Judge Henderson

15 recognized in Presta, disability discrimination is simply different

16 than other forms of discrimination. "Combating discrimination as it

17 affects persons with disabilities requires recognizing . . . that

18 often the most damaging instances in which rights of persons with

19 disabilities are denied come not as the result of malice or

20 discriminatory intent, but rather from benevolent inaction when action

21 is required." 16 F. Supp. 2d at 1136. See also Boemio, 954 F. Supp.

22 at 208 n.4.

23     As discussed below, there is an obvious practical connection

24 between the availability of the $4,000 damage minimum and the

25 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26 or complex in light of the overwhelming body of case law finding
that proof of intent is not required.

20

1  enforcement of the ADA.  Second, injunctive relief was already

2  available in 1992, when the Unruh Act was amended to include

3  disability discrimination.  Because of the "sweeping" coverage of

4  California's Unfair Competition Law, see Wilner v. Sunset Life Ins.

5  Co., 78 Cal. App. 4th 952, 964 (2000), injunctive relief for ADA

6  violations was already available under state law.  Accordingly, if

7  this court were to follow Gunther, it would nullify the 1992

8  legislation, and it is clear that courts may not conclude that the

9  legislature engaged in an idle gesture.  Viking Pools v. Maloney, 48

10 Cal. 3d 602, 609 (1998).

11          **d. Other Canons of Statutory Construction**

12      Gunther also relies upon three canons of statutory construction:

13 avoidance of statutory redundancy/nullification, the rule of

14 reasonable construction, and legislative acquiescence.  50 Cal. Rptr.

15 4th at 327-33, 338-39.  As explained below, the court finds that none

16 of these canons alters the conclusion that the Unruh Act covers

17 unintentional ADA violations.

18          **i. Avoiding Statutory Redundancy/Nullification**

19      First, Gunther argues that if the Unruh Act were read to include

20 unintentional ADA violations, it would nullify the DPA or render it

21 redundant.  The DPA has been interpreted to authorize damages of no

22 less than $1,000 per violation, even where no intent to discriminate

23 is shown.  See Donald v. Café Royale, 218 Cal. App. 3d 168, 177 1990).

24 According to Gunther, "the two statutes [the Unruh Act and the DPA]

25 dovetail nicely.  Where there is intentional discrimination, there is

26 a four times larger minimum penalty; if there isn't, plaintiff still

                                21

1  recovers, but less." Gunther, 50 Cal. Rptr. 3d at 331.

2      I cannot agree.  The DPA and the Unruh Act are inevitably

3  redundant in some respects, no matter how the court construes the

4  latter.[16] Gunther characterizes the DPA as covering only unintentional

5  discrimination, and the Unruh Act as covering only intentional

6  discrimination, but such is not the case.  Rather, the DPA authorizes

7  damages for both intentional and unintentional discrimination, because

8  intent is simply irrelevant under the statute.  See Café Royale, 218

9  Cal. App. 3d at 177 ("Viewing the statute reasonably and in a

10 commonsense fashion compels the conclusion that no intent element is

11 set forth.").  Accordingly, the portion of the DPA covering

12 intentional discrimination is inevitably redundant with the portion of

13 the Unruh Act covering intentional discrimination.[17]

14                  **ii. Rule of Reasonable Construction**

15     Second, Gunther argues that the rule of reasonable construction

16 also points toward adopting its interpretation of the Unruh Act.  Id.

---

17     [16] At the same time, it is not clear that the two prohibit the

18 same class of conduct, and it is possible that the DPA prohibits
   a smaller category of discrimination tied to physical places.  The

19 Unruh Act entitles all individuals to "full and equal
   accommodations, advantages, facilities, privileges, or services in

20 all business establishments of every kind whatsoever." Cal. Civ.
   Code § 51.  By contrast, the DPA's language is narrower.  It

21 provides disabled people "with the same right as the general public
   to the full and free use of the streets, highways, sidewalks,

22 walkways, public buildings, medical facilities, including
   hospitals, clinics and physicians' offices, public facilities and

23 other public places." Cal. Civ. Code § 54(a).  Accordingly, it is
   an open question whether the DPA covers discrimination unconnected

24 to a physical location, as in insurance discrimination, or
   discrimination on the internet.

25
       [17] Furthermore, as noted above, the Gunther court's

26 interpretation also risks nullifying Section 51(f).

                                22

1  at 338.  See Copley Press, Inc. v. Superior Court, 39 Cal. 4th 1272,

2  1291 ("To the extent [] examination of statutory language leaves

3  uncertainty, it is appropriate to consider the consequences that will

4  flow from a particular interpretation") (internal quotation marks

5  omitted).  Gunther argues that its interpretation is the more

6  reasonable one for two reasons.  First, it purportedly avoids

7  redundancy, an issue addressed above.  50 Cal. Rptr. 3d at 338.

8  Second, it allegedly avoids the "gross abuses of the judicial system"

9  that have been caused by an interpretation of the Unruh Act embracing

10  monetary liability for unintentional ADA violations (e.g., the Ninth

11  Circuit's holding in Lentini).  Id.

12      Gunther argues that ADA litigation has been spurred by the

13  minimum $4,000 penalty for "unintentional technical violations of the

14  ADAAGS" and cites with approval the lamentation of one district court

15  that "[d]espite the important mission of the ADA, there are those

16  individuals who would abuse its private cause of action provision by

17  filing lawsuits solely with the intent to profit financially."  Id.

18  (internal quotation marks omitted).[18]

19      As an initial matter, the fact that the Unruh Act contains a

20  damages provision that happens to provide an incentive for its

21  enforcement hardly lends support for a claim that the law is being

22  undermined.  Because insufficient public resources have been invested

23  in enforcing the law, and in educating the public about the ADA, this

24

25      [18] One cannot but help noting the pious recognition of the

26  statute's salutary purpose before each deprivation of a benefit
    under the statute.

1   task has been left to private parties and their attorneys.  It would

2   be fundamentally unfair to, on the one hand, deny disabled people the

3   benefit of public enforcement, while, on the other, deprive them of an

4   incentive for their efforts at private enforcement.[19]

5        Furthermore, there is no basis in law for distinguishing between

6   "real" violations of the ADA and merely unintentional "technical"

7   violations of the ADA.  A court cannot pick and choose which

8   violations it deems serious enough to warrant relief under the Unruh

9   Act.  Presumably, no court would argue that placing a toilet paper

10  dispenser too far for a disabled person to reach with ease -- which is

11  what the defendant in this case did -- is merely a "technical"

12  violation.  The legislature has drawn clear lines with respect to what

13  is legal and what is illegal, and it is not for a court to arbitrarily

14  decide which violations are serious enough to warrant relief.

15                    **iii. Legislative Acquiescence**

16       Third, <u>Gunther</u> invokes the doctrine of legislative acquiescence

17  in finding that the legislature did not overrule <u>Harris</u>.  <u>Gunther</u>, 50

18  Cal. Rptr. 3d at 327.  In short, it contends the California

19  legislature is presumed to be aware of prior judicial constructions of

20  statutes.  While the presumption is not conclusive, <u>Harris</u>, 52 Cal. 3d

21  at 1156, it is a factor to be considered.  Here, <u>Gunther</u> argues that

22

---

23       [19] The court has already held elsewhere that the mere fact
     that a person has filed multiple lawsuits does not make him or her
24   a vexatious litigant.  <u>Wilson v. Pier 1 Imports (US), Inc.</u>, 411 F.
     Supp. 2d 1196, 1200 (E.D. Cal. 2006) ("[T]he number of lawsuits
25   plaintiff has filed does not reflect that he is a vexatious
     litigant; rather, it appears to reflect the failure of the
26   defendants to comply with the law.").

                                    24

1  since the legislature amended the Unruh Act in 1992, but failed to

2  change the language construed by Harris as requiring intent, the

3  legislature approved of the court's judicial construction.

4      The doctrine of legislative acquiescence is of little assistance

5  here.  First, as noted above, the case law prior to Gunther has

6  uniformly held that intent was not required to obtain damages for

7  disability discrimination.  If the legislature had acquiesced to

8  anything, it was that body of case law spanning multiple years, not a

9  few lines from Harris.  Second, even if the court acquiesced to

10  Harris, it is impossible to know which part they acquiesced to.

11  Harris rejected a disparate impact theory of sex discrimination for

12  multiple reasons, including, for example, the fact that there was no

13  language or history to suggest that the legislature envisioned

14  disparate impact as a viable claim, and that federal decisions at that

15  time were in conflict as to the availability of that claim.  52 Cal.

16  3d at 1172-73.

17      Finally, Gunther's discussion of legislative acquiescence is

18  circular.  Application of the doctrine serves to reinforce Gunther's

19  interpretation of the statute only if one accepts, as a starting

20  point, that the text of the statute does not evince an intent to

21  authorize damages for unintentional ADA violations.  In other words,

22  if one were to construe Section 51(f) as authorizing damages for

23  unintentional ADA violations based on its language, as the courts did

24  in Lentini and Presta, it would make no sense to say that the

25  legislature acquiesced to a judicial construction entirely contrary to

26  what it in fact intended.

25

1    In sum, the court concludes that a plaintiff may obtain damages

2  under the Unruh Act for violations of the ADA even without a showing

3  of intentional discrimination.  In light of both the legislative

4  history of the statute, and the directive to interpret the statute as

5  broadly as possible to effectuate its purposes, the court finds that

6  Gunther does not control.  Accordingly, the relief requested is hereby

7  granted, and plaintiff is entitled to $52,000 for defendant's thirteen

8  violations of the Unruh Act.

9                          **IV. Conclusion**

10   The motion for summary judgment is granted as to the ADA claim

11 and the Unruh Act claim.

12   IT IS SO ORDERED.

13   DATED:  March 22, 2007.

26