# Exhibit 1

EXECUTION COPY

MANAGEMENT AGREEMENT

BETWEEN

CITY OF SAN FRANCISCO UPTOWN PARKING CORPORATION

AND

SAN FRANCISCO PARKING, INC.

dba

CITY PARK, INC.

for the management of

**UNION SQUARE GARAGE**
**333 POST STREET**
**SAN FRANCISCO, CALIFORNIA 94108**

Dated:  March 1, 2001

Table of Contents

| Sections | | Page |
|---|---|---|
| 1. | SUMMARY OF TERMS | 2 |
| 2. | DEFINITIONS | 3 |
| 3. | MANAGEMENT SERVICES | 7 |
| 4. | TERM OF MANAGEMENT AGREEMENT | 8 |
| 5. | MANAGEMENT FEE | 8 |
| 6. | PARKING OPERATION DUTIES | 10 |
| 7. | STAFFING, EMPLOYEES AND CONTRACTING | 15 |
| 8. | EQUIPMENT AND CAPITAL IMPROVEMENTS | 17 |
| 9. | MAINTENANCE AND REPAIRS | 17 |
| 10. | FISCAL DUTIES AND MATTERS | 18 |
| 11. | HAZARDOUS MATERIAL COVENANTS | 21 |
| 12. | INSURANCE AND SURETY BONDS | 22 |
| 13. | INDEMNITY | 24 |
| 14. | DAMAGE OR DESTRUCTION | 25 |
| 15. | MANAGER'S REPRESENTATIONS AND WARRANTIES | 25 |
| 16. | EVENTS OF DEFAULT; REMEDIES | 26 |
| 17. | RIGHT OF TERMINATION | 28 |
| 18. | DUTIES UPON TERMINATION AND EXPIRATION | 28 |
| 19. | NOTICES | 28 |
| 20. | ASSIGNMENTS | 29 |
| 21. | GENERAL PROVISIONS | 29 |

---

Exhibits

Exhibit A:    Description of Garage Property
Exhibit B:    Parking Rate Schedule
Exhibit C:    Prevailing Wage Requirements
Exhibit D:    Maintenance Standards
Exhibit E:    Form of Budget
Exhibit F:    Form of Faithful Performance Bond

# MANAGEMENT AGREEMENT
## FOR
## UNION SQUARE GARAGE

THIS MANAGEMENT AGREEMENT dated as of March 1, 2001 ("**Management Agreement**"), is between the **CITY OF SAN FRANCISCO UPTOWN PARKING CORPORATION**, a nonprofit public benefit corporation ("**Corporation**"), and **SAN FRANCISCO PARKING, INC., dba CITY PARK, INC.** ("**Manager**").

## BACKGROUND

A.     Manager is engaged in the business of providing skilled management and supervision of parking garage facilities.

B.     The Corporation leases from the City and County of San Francisco ("**City**") the land and improvements described in <u>Exhibit A</u> attached hereto as a site for public off-street parking commonly known as Union Square Garage ("**Garage**"), pursuant to that certain Union Square Public Parking Garage Lease, by and between the City and the Corporation, dated May 1, 1999 (the "**Lease**").

C.     Manager is the current manager of the Garage.

D.     Under the Lease, the Corporation is obligated to generally maintain and operate the Garage and to select a professional operator to manage the parking of vehicles at the Garage, subject to the approval of the City's Parking and Traffic Commission (the "**Commission**").

E.     The Corporation is in the process of extensively renovating, reconstructing and improving the Garage and a public park located above the Garage.

F.     The Corporation expects to issue bonds to finance the renovation, reconstruction and improvement to the Garage.

G.     The Corporation expects the renovation, reconstruction and improvement of the Garage and public park to be complete by June 2002.

H.     The Corporation desires to hire Manager to provide management and supervisory services in the operation of the Garage until the completion of the renovation, reconstruction and improvement of the Garage.

I.     No later than the earlier of (1) the completion of the renovation, reconstruction and improvement of the Garage, or (2) June 30, 2002, Corporation will have published a request for proposal for the long-term management of the Garage and have selected a manager.

J.     Now, the Corporation and Manager wish to memorialize the terms and conditions pursuant to which the Manager shall provide the agreed upon management and supervisory services.

# AGREEMENT

In consideration of the above recitals and the mutual covenants and agreements contained herein, the parties to this Management Agreement agree as follows:

## 1.  SUMMARY OF TERMS

**1.1.   Summary of Terms.**  The following is a summary of the basic terms of this Management Agreement.  Each item below shall be deemed to incorporate all the terms set forth in this Management Agreement pertaining to such item.  In the event of any conflict between the information in this Section and any more specific provision of this Management Agreement, the more specific provision shall control.

| | |
|---|---|
| Reference Date: | March 1, 2001 |
| Manager: | San Francisco Parking, Inc.<br>dba City Park, Inc. |
| Garage Name and Location: | Union Square Garage<br>333 Post Street<br>San Francisco, CA 94108 |
| Term:  (Section 4.1) | March 1, 2001 through March 31, 2001 |
| Extension Term:  (Section 4.2) | Month-to-month extensions at Corporation's option, not to extend past June 30, 2002 |
| Management Fee:  (Section 5.1) | Fixed Fee ($4,166.66 per Month) plus Incentive Fee |
| Incentive Fee:  (Section 5.1) | 15% of Gross Revenue that exceeds Target Revenue as set forth in Section 5.1(b) of this Management Agreement. |
| Target Revenues:  (Section 5.1) | Target Revenue:  $467,000 per month |
| Notice Address of Corporation: (Section 19.1) | Uptown Parking Corporation<br>444 Stockton Street<br>San Francisco, CA 94108<br>Attention:  Greg Sokol |
| Key Contact for Corporation: | Greg Sokol<br>Telephone No.: (415) 982-7275 |

|  |  |
|---|---|
| Notice Address of City:<br>(Section 19.1) | S.F. Department of Parking and Traffic<br>25 Van Ness Avenue, Suite 420<br>San Francisco, CA 94102<br>Attention: Director, Parking Authority |
| with copies to: | Real Estate Division<br>Department of Administrative Services<br>25 Van Ness Avenue, Suite 400<br>San Francisco, CA 94102<br>Attention: Director of Property |
| Key Contact for City: | Director, Parking Authority<br>Telephone No.: (415) 554-9830 |
| Alternate Contact: | Deputy Director, Parking Authority<br>Telephone No.: (415) 554-9869 |
| Notice Address of Manager:<br>(Section 19.1) | City Park, Inc.<br>325 – 5th Street<br>San Francisco, CA 94107<br>Attention: Tim Leonoudakis |
| Key Contact for Manager: | Tim Leonoudakis<br>Telephone No.: (415) 495-3909 |

## 2.   DEFINITIONS

For purposes of this Management Agreement, initially capitalized terms shall have the meaning ascribed to them in this Section.

**2.1**   **[Intentionally omitted.]**

**2.2**   "**Agents**" shall mean the officers, directors, employees, agents, contractors, licensees and subtenants of such Party, and their respective heirs, legal representatives, successors and assigns.

**2.3**   "**Banking Day**" shall mean any day which is not a Saturday or Sunday or a day on which banking institutions are authorized or required by law to be closed in San Francisco, California, or by the Federal Reserve System for commercial banking purposes.

**2.4**   "**Bonds**" shall mean the City of San Francisco Uptown Parking Corporation Parking Revenue Bonds (Union Square), Series 2001.

**2.5**   "**City**" shall mean the City and County of San Francisco.

**2.6**   "**City Parking Revenue Account**" shall have the meaning given such term in Section 10.2 hereof.

**2.7**   "**Commission**" shall mean the Parking and Traffic Commission of the City.

**2.8**   "**Controller**" shall mean the Controller of the City.

2.9    **"Corporation"** shall mean the City of San Francisco Uptown Parking Corporation.

2.10    **"Corporation Property"** shall have the meaning given such term in Section 8.1 hereof.

2.11    **"Daily Report"** shall have the meaning given such term in Section 10.3 hereof.

2.12    **"Director"** shall mean the Executive Director of the City's Department of Parking and Traffic, or her or his designee.

2.13    **"Environmental Laws"** shall mean any present or future federal, state or local Laws or policies relating to Hazardous Material (including, without limitation, its use, handling, transportation, production, disposal, discharge or storage) or to human health and safety, industrial hygiene or environmental conditions in, on, under or about the Garage, the Land or any other property, including, without limitation, soil, air and groundwater conditions.

2.14    **"Fiscal Year"** shall mean the Corporation's fiscal year, commencing on May 1st and ending on April 30th.

2.15    **"Fixed Fee"** shall have the meaning given such term in Section 5.1(a) hereof.

2.16    **"Garage"** shall mean the land and improvements commonly known as the Union Square Garage and as described in Exhibit A attached hereto.

2.17    **"Gross Revenues"** shall mean (a) all revenues, from whatever source, received from the operation of the Garage and from any income-generating activity carried on therein, including, but not limited to, the following: (1) all revenues received from the operation of the Garage for daily and monthly parking of any vehicle therein, including all High Volume Revenues, and any valet parking revenues; (2) all revenue from pay telephones, vending machines and the selling price of all merchandise sold in, on, about or from the Garage in the ordinary course of business by Manager; provided, however, that the selling price of any returned merchandise shall be excluded and, with respect to pay telephone revenue and sales of merchandise by vending machines, only the amount of the commission paid to Manager for and on behalf of the City on account of such sales shall be included; (3) all charges of any character made by Manager for the rendering of any service or work of any kind conducted in, on, about or from the Garage; (4) the gross amount of all deposits forfeited by Garage customers and retained or received by Manager in connection with the operation of the Garage, (5) fees collected for storage rental and (6) the value of any in-kind services received by the Manager in exchange for a benefit derived from the use of the Garage; less (b) the amount of all Parking Taxes payable from the operation of the Garage and all Security Deposits collected.

2.18    **"Hazardous Material"** shall mean any material that, because of its quantity, concentration or physical or chemical characteristics, is deemed by any federal, state or local governmental authority to pose a present or potential hazard to human health or safety or to the environment. Hazardous Material includes, without limitation, any material or substance defined as a "hazardous substance," or "pollutant" or "contaminant" pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA," also commonly known as the "Superfund" law), as amended, (42 U.S.C. Sections 9601 et seq.) or pursuant to Section 25281 of the California Health & Safety Code; any "hazardous waste" listed pursuant to Section 25140 of the California Health & Safety Code; any asbestos and asbestos containing

materials whether or not such materials are part of the structure of any existing improvements on the Land, any improvements to be constructed on the Land by or on behalf of Manager or the Corporation, or are naturally occurring substances on, in or about the Land; and petroleum, including crude oil or any fraction thereof, and natural gas or natural gas liquids.

2.19    "**Hazardous Material Claims**" shall mean any and all enforcement, Investigation, Remediation or other governmental or regulatory actions, agreements or orders threatened, instituted or completed pursuant to any Environmental Laws, together with any and all Losses made or threatened by any third party against the Corporation or the City, their Agents, or the Land, the Garage or any Improvements, relating to damage, contribution, cost recovery compensation, loss or injury resulting from the presence, release or discharge of any Hazardous Materials, including, without limitation, Losses based in common law. Hazardous Materials Claims include, without limitation, Investigation and Remediation costs, fines, natural resource damages, damages for decrease in value of the Land, the Garage or any Improvements, the loss or restriction of the use or any amenity of the Land, the Garage or any Improvements, and attorneys' fees and consultants' fees and experts' fees and costs.

2.20    "**High Volume Parkers**" shall mean each separate person, firm, corporation, partnership or other entity which pays Gross Revenues to the Corporation in excess of $8,333.00 per month at the "High Volume Rate(s)" set forth in Exhibit B attached hereto.

2.21    "**High Volume Revenue**" shall mean Gross Revenues received from High Volume Parkers.

2.22    "Incentive Fee" shall have the meaning given such term in Section 5.1(b) hereof.

2.23    "**Indemnify**" shall mean, whenever any provision of this Management Agreement requires a person or entity (the "**Indemnitor**") to indemnify any other entity or person (the "**Indemnitee**"), the Indemnitor shall be obligated to defend, indemnify and protect the Indemnitee, its officers, employees, agents, stockholders, constituent partners, and members of its boards and commissions harmless from and against any and all Losses arising directly or indirectly, in whole or in part, out of the act, omission, event, occurrence or condition with respect to which the Indemnitor is required to Indemnify such Indemnitee, whether such act, omission, event, occurrence or condition is caused by the Indemnitor or its agents, employees or contractors, or by any third party or any natural cause, foreseen or unforeseen; provided that no Indemnitor shall be obligated to Indemnify any Indemnitee against any Loss from the negligence or intentional wrongful acts or omissions of such Indemnitee, or such Indemnitee's agents, employees or contractors. If a Loss is attributable partially to the negligent or intentionally wrongful acts or omissions of the Indemnitee (or its agents, employees or contractors), such Indemnitee shall be entitled to Indemnification for that part of the Loss not attributable to such Indemnitee's (or its agents, employees or contractors) negligent or intentionally wrongful acts or omissions.

2.24    "**Indenture**" shall mean that certain indenture between the Corporation and the Trustee providing for the issuance of the Bonds.

2.25    "**Investigation**" when used with reference to Hazardous Material means any activity undertaken to determine the nature and extent of Hazardous Material that may be located in, on, under or about the Land, the Garage and any other improvements or any portion thereof or which have been, are being, or threaten to be Released into the environment. Investigation shall

include, without limitation, preparation of site history reports and sampling and analysis of environmental conditions in, on, under or about the Land, the Garage or any other improvements.

**2.26**    **"Invitees"** shall mean the clients, customers, invitees, guests, licensees, assignees and subtenants.

**2.27**    **"Land"** shall mean the land, owned by the City, on which the Garage is located.

**2.28**    **"Law"** shall mean any law, statute, ordinance, resolution, regulation, proclamation, order or decree of any municipal, county, state or federal government or other governmental or regulatory authority with jurisdiction over the Garage or the Land, or any portion thereof, whether currently in effect or adopted in the future and whether or not in the contemplation of the Parties

**2.29**    **"Lease"** shall mean that certain Union Square Public Parking Garage Lease, dated May 1, 1999, by and between the City and the Corporation.

**2.30**    **"Losses"** shall mean any and all claims, demands, losses, damages, liens, liabilities, injuries, deaths, penalties, fines, lawsuits and other proceedings, judgments and awards rendered therein, and costs and expenses, including, but not limited to, reasonable attorneys' fees.

**2.31**    **"Manager"** shall mean San Francisco Parking, Inc., dba City Park, Inc. or its successors or assigns.

**2.32**    **"Management Fee"** shall have the meaning given such term in <u>Section 5.1</u> hereof.

**2.33**    **"Monthly Report"** shall have the meaning given such term in <u>Section 10.4</u> hereof.

**2.34**    **"Operating Expenses"** shall mean the following actual costs of Manager directly associated with the performance of Manager's obligations under this Management Agreement: (1) costs of salaries, payroll taxes and other payroll expenses, (2) cost of Worker's Compensation Insurance and fidelity and surety bonds required hereunder, (3) possessory interest taxes or any other taxes, other than Parking Taxes, which may be assessed against and paid by Manager as a result of this Agreement, if any, (4) the reasonable costs of responding to an immediate threat to life safety, provided Manager notifies the Corporation of such costs within 24 hours of the occurrence thereof, and provided further that Manager may not incur any costs beyond those reasonably necessary to immediately abate such life safety hazard without the prior written consent of the Corporation, (5) any other actual costs of Manager under this Management Agreement that are included in the Budget, such as parking equipment maintenance, employee uniforms and parking, garage and office supplies, or costs that are incurred by Manager as a result of a delegation of duties to Manager pursuant to a written request by the Corporation, (6) the costs of preparing the Annual Audit described in <u>Section 10.10</u> below, or the costs of responding to any other audit requested by the Corporation, and (7) the costs of making any capital improvements to the Garage that are to be made by Manager and that are requested by the Corporation and the Director in writing.

**2.35**    **"Parking Rates"** shall have meaning given such term in <u>Section 6.2</u> hereof.

**2.36** "**Parking Taxes**" shall mean the Tax on Occupancy of Parking Space in Parking Stations, as imposed by Article 9 of the San Francisco Municipal Code, beginning with Section 601 thereof, and any successor ordinances or amendments thereto, or any other federal, state or local tax or fee imposed on the occupancy of parking spaces.

**2.37** "**Party**" shall mean the Corporation or Manager; "**Parties**" means both the Corporation and the Manager.

**2.38** "**Release**" when used with respect to Hazardous Material means any actual or imminent spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into or inside the Garage or any other improvements constructed hereunder by or on behalf of the Manager, the Corporation or the City, or in, on, under or about the Land or the Garage or any portion thereof.

**2.39** "**Remediation**" when used with reference to Hazardous Material means any activities undertaken to clean up, remove, contain, treat, stabilize, monitor or otherwise control Hazardous Materials located in, on, under or about the Garage, the Land or which have been, are being, or threaten to be Released into the environment. Remediate includes, without limitation, those actions included within the definition of "remedy" or "remedial action" in California Health and Safety Code Section 25322 and "remove" or "removal" in California Health and Safety Code Section 25323.

**2.40** "**Revenue Fund**" shall have the meaning given such term in <u>Section 10.2</u> hereof.

**2.41** "**Security Deposit**" shall mean the $25.00 security deposit for each access card issued to monthly users, as set forth in <u>Section 6.1(b)</u> hereof, and the $25.00 security deposit for each validation card issued to High Volume Parkers, as set forth in Section 6.1(f) hereof.

**2.42** "**Target Revenues**" shall mean $467,000 in Gross Revenues per month.

**2.43** "**Tax Collector**" shall mean the Tax Collector of the City.

**2.44** "**Treasurer**" shall mean the Treasurer of the City.

**2.45** "**Treasurer's Account**" shall have the meaning given such term in <u>Section 10.2</u> hereof.

**2.46** "**Trustee**" shall mean U.S. Bank, or any other successor trustee under the Bonds.

**3.    MANAGEMENT SERVICES**

**3.1    Services for Hire.** With the consent of the City, the Corporation hereby hires the Manager, solely as an independent contractor, to provide management and supervisory services in the operation of the Garage. Such services shall be provided in accordance with the terms and conditions of this Management Agreement.

**3.2    General Authority to Manage.** Subject to Section 3.3 below, Manager is hereby given authority to manage and supervise the day-to-day operation of the Garage as an independent contractor and to perform the specific duties hereinafter set forth, subject to, governed by, conditioned upon, and in accordance with the terms and provisions of this Management Agreement.

**3.3**    <u>Control Retained by the Corporation</u>.  Subject to (i) certain controls vested in the City under the Lease and (ii) the restrictions on the Manager and the Corporation as a result of the tax-exempt status of the Bonds, the Corporation shall at all times have the authority to exercise control over the Garage and the parking operations conducted therein, in accordance with the Lease.  The Corporation shall permit daily parking, monthly parking, high volume parking, valet parking, validated parking and off-site valet services with respect to the Garage in accordance with the provisions of this Management Agreement; provided, that the provision of any such parking or ancillary services does not adversely affect the tax-exempt status of the Bonds.

**3.4**    <u>Subject to Lease and Indenture</u>.    Anything herein to the contrary notwithstanding, the Manager and the Corporation understand and acknowledge that the management and operation of the Garage is subject and subordinate to the terms and conditions of the Lease and the Indenture.  Manager and the Corporation agree to comply with all of the requirements of the Lease and the Indenture in so far as they govern the operation of the Garage and the performance of any duties to be performed by Manager or the Corporation hereunder.  In the event of any conflict between the terms and conditions of this Management Agreement and the terms and conditions of the Lease or the Indenture, the terms and conditions of the Lease or the Indenture (as the case may be) shall prevail.

4.    TERM OF MANAGEMENT AGREEMENT

**4.1**    <u>Term</u>.  The initial term of this Management Agreement shall be March 1, 2001 through March 31, 2001.

**4.2**    <u>Extension</u>.  This Agreement will automatically renew for successive one-month periods until the earlier of the expiration of this Agreement as set forth below or until this Agreement is terminated pursuant to <u>Section 17</u> hereof.  In no event, without the written consent of the Director as set forth below, shall the Corporation extend any monthly term beyond 11:59 p.m., June 30, 2002.  Notwithstanding anything in this <u>Section 4.2</u> to the contrary, the Corporation, only with the written consent of the Director, may extend the term of this Agreement on a month-to-month basis to no later than 11:59 p.m., December 31, 2002.

5.    MANAGEMENT FEE

**5.1**    <u>Monthly and Incentive Fees</u>.  The Corporation shall pay Manager the following fees (collectively, **"Management Fee"**):

(a) <u>Fixed Fee</u>.  A monthly fixed fee in an amount equal to Four Thousand One Hundred Sixty-Six Dollars and Sixty-Six Cents ($4,166.66) (**"Fixed Fee"**) shall be due and payable within ten (10) days after the Corporation receives the Monthly Report required by <u>Section 10.4</u> hereof.  Should the commencement date or the expiration date occur on any day other than the first day of a calendar month, the Management Fee for that particular month shall be prorated based on a 30-day month.

(b) <u>Incentive Fee</u>.  In addition to the Fixed Fee, Manager shall be entitled to an Incentive Fee in an amount equal to fifteen percent (15%) of the amount by which the Gross Revenues received each month exceed Target Revenues.  The Corporation shall calculate the Incentive Fee in arrears on the first day of each month, commencing April 1, 2001, as follows:

If aggregate Gross Revenues for the period from March 1, 2001 through the last day of the month immediately preceding the date of calculation (the "Effective Period") exceed the product of (i) Target Revenues, multiplied by (ii) the number of complete months in the Effective Period, then the Corporation shall pay Manager an amount equal to 15% of such excess, but in no event more than the difference between (x) the Incentive Fee Cap, minus (y) the aggregate incentive fees previously paid to Manager during the Effective Period. The Incentive Fee Cap shall be an amount equal to the product of (i) $4,166.67 multiplied by (ii) the number of complete months in the Effective Period.

The Corporation shall pay the Incentive Fee to Manager within sixty (60) days after the end of each month, provided that the Corporation and the Director have received all the Daily Reports and Monthly Reports for said month and have received a letter from the Manager stating the total amount of the Gross Revenues for the month. The Corporation's payment of the Management Fee shall not constitute an acceptance of Manager's Gross Revenues figures contained in its documentation, nor will it constitute a waiver of the Corporation's right to audit such numbers pursuant to <u>Section 10.10</u> hereof.

(c) <u>Target Revenues Subject to Adjustment</u>. The Parties agree that from time to time the Parking Rates may be adjusted thereby causing an impact on the Gross Revenues generated at the Garage. If the Parking Rates are adjusted, the Corporation, upon the written request of the Director, may elect, in its sole discretion, to adjust the amount of the Target Revenues based upon the Corporation's and the Director's calculation of the projected percentage impact that the Parking Rate adjustment will have on Gross Revenues for the Garage. To effect the adjustment to the amount of the Target Revenues, the Director shall send a written request to the Corporation and the Manager, stating (i) the revised target amounts and (ii) the proposed effective date of the revised target amounts, which date cannot be before the effective date of the new Parking Rates. If the Corporation elects to adjust Target Revenues pursuant to such request, the Corporation shall, upon receipt of prior written authorization from the Director, provide written notice to Manager. Should the effective date be on a date other than the first day in a calendar month, the Corporation shall use a pro rata basis to calculate the Incentive Fee. The Director's and the Corporation's method for calculating the revised Target Revenues shall be absolute, conclusive and binding upon the Manager.

5.2  <u>City Inducement</u>. As a material inducement to City's consent to this Management Agreement, Manager shall use its best efforts to ensure that Gross Revenues for the Garage exceed Target Revenues. Target Revenues shall be subject to the following adjustments: (i) for each day that less than 1,000 spaces are available for parking for at least 12 hours for reasons not caused by Manager, the Target Revenue shall be reduced by $16.00 of Gross Revenues net per parking space times the difference between 1,000 and the number of spaces actually available on such day for at least 12 hours, (ii) to the extent that the Manager demonstrates that either the City or the Corporation materially detrimentally interfered with Manager's ability to generate Gross Revenues, whether because of the Corporation's failure to satisfy its maintenance obligations under <u>Section 9</u> below or otherwise, the Target Revenue shall be reduced by an amount equal to the loss of Gross Revenues directly attributable to such material detrimental interference, and (iii) to the extent that the Corporation requires Manager to provide valet parking at the Garage under <u>Section 6.1(d)</u> below, and such valet parking interferes with Manager's ability to generate Gross Revenues, the Target Revenue shall be reduced by an amount equal to the loss of Gross Revenues directly attributable to such valet parking.

5.3    **Compensation for Additional Services.**  If the Corporation upon its own election or upon receipt of a written request from the Director directs, in writing, that the Manager provide valet parking services pursuant to Section 6.1(d), the following provisions shall apply:

(a)    **Reimbursement and Management Fee.**  The Corporation shall reimburse the Manager, as an Operating Expense, for the amount of all out-of-pocket payments by the Manager for services and products that the Manager provides at the direction of the Corporation.

(b)    **Reimbursement Requests.**  The Manager shall submit with each Monthly Report under Section 10.4 below, an invoice for all Operating Expenses, including salaries, wages, payroll taxes and benefits and the management fee covered under Section 5.2(a) above. Each invoice shall be accompanied by such supporting documentation evidencing such salaries, wages, payroll taxes and benefits as the Corporation shall require.

5.4    **Limitations on Payment of Fees.**  All Management Fees due to Manager under this Management Agreement are subject to the budget approval of the City's Controller, the fiscal provisions of the Lease and any applicable tax laws related to the issuance of the Bonds.

5.5    **Fees During Suspended Operations.**  If for any reason whatsoever any condition prevents the operation of the Garage or any portion thereof at any time for more than thirty (30) consecutive days, except where such condition is caused solely by the Corporation or the City, the Management Fees shall be prorated commencing from the expiration of such 30-day period and continuing until the date the condition affecting the Garage has been abated and normal operations of the Garage have resumed.  The Management Fees shall be adjusted so that the percentage that the Management Fees for the last complete month of operation prior to the condition bears to Gross Revenues for such month is the same percentage the adjusted Management Fees bears to the Gross Revenues for the months during the condition.  This Section 5.5 shall not apply to events covered by Section 14 hereof.  The Corporation, with the written consent of the Director, may adjust the Target Revenues during this condition until such condition has abated.

6.    **PARKING OPERATION DUTIES**

6.1    **General Operational Duties.**  Manager shall (i) supervise the proper and efficient parking of all cars utilizing the Garage, (ii) maximize the use of the space available in the Garage, (iii) use best efforts to maximize the revenues generated by the Garage, (iv) operate the Garage in a first class and workmanlike manner, and (v) use best efforts to accommodate any rehabilitation, construction and renovation of the Garage and Union Square Park and work cooperatively with the City and the Corporation to facilitate such efforts to minimize the impact on users of the Garage.  In addition to the foregoing general duties, Manager shall be responsible for the following specific duties:

(a)    **Daily Parking.**  Manager shall charge and collect the daily Parking Rate from all daily users of the Garage.  In connection therewith, the Corporation shall establish and maintain a parking ticket system for daily users of the Garage in a form approved by the Director.  Corporation shall order and purchase all parking tickets to be issued at the Garage.  Upon receipt of the parking tickets from the printer and prior to the use of such tickets at the Garage, Corporation shall deliver to the Director or Manager, upon request, the printer's manifest showing beginning and ending serial numbers and certified as correct by the printer.  Manager shall issue a ticket to all daily users of the Garage.  Each ticket that is issued shall be

date and time stamped to indicate arrival and departure of the vehicle. The ticket shall also be stamped with the charged amount. Any alteration to the time, date or charge stamped on the ticket must be initialed by the person making the change and must state the reason for the change. Any changes made without such initialing and written explanation shall be disregarded, and the ticket shall be deemed to have been collected in accordance with the date and time stamped on the ticket, and such amount shall be included in the Gross Revenues deposited that day (or on the next Banking Day, if such day is not a Banking Day), whether or not such amount is actually received by Manager. Manager shall be responsible for collecting and accounting for all numbered tickets. If a ticket is mutilated or destroyed, Manager shall prepare a report, which shall be attached to the Daily Report, showing the number of the destroyed or mutilated ticket, explaining how it was destroyed or mutilated and attaching thereto the remnants of such ticket. If a ticket is lost by the operator of a vehicle parked in the Garage, Manager shall prepare a charge slip showing (i) the amount charged for parking, (ii) the license plate or vehicle identification number, and (iii) the driver's license number of the operator of the vehicle. The completed charge slip must be signed by the vehicle operator. Any ticket that is unaccounted for in the Daily Report shall be treated as a lost ticket and Corporation shall be deemed to have collected the amount specified in <u>Exhibit B</u> attached hereto; such amount shall be included in the Gross Revenues deposited on the next Banking Day.

      (b)   <u>**Monthly Parking**</u>. Manager shall require all monthly users to execute a month-to-month agreement and release of the Corporation and City, the form of which must be preapproved by the Corporation and the City. Manager shall collect all monthly parking fees no later than the fifth day of each month. Manager may assess a late charge to monthly users who are delinquent in payment of their monthly parking fee. If a monthly user has not paid his or her monthly parking fee by the fifth day of each month, the Manager shall invalidate the access cards of such delinquent monthly users on the sixth day of each month. Delinquent monthly users may reactivate access cards by paying a Twenty-five Dollar ($25.00) late charge, in addition to the delinquent monthly fee, to the Manager. Manager shall have discretion to waive such late charges and shall maintain a written record of all waived late charges and the reason for non-collection. Manager shall supervise and control the billing and collection of monthly parking fees which fees are specified in <u>Exhibit B</u>. From time-to-time, the Corporation and the Director shall determine the maximum number of monthly parking agreements that shall be permitted in the Garage. Manager shall establish a security access system for monthly users. Should the security system require the use of a security access card, the Manager shall collect a security deposit of Fifty Dollars ($50.00) for each card issued and deposit such amounts into the City Parking Revenue Account on the day such amounts are collected. For any lost or destroyed cards, Manager shall reissue a new card and collect Twenty-five Dollars ($25.00) for such card. Upon termination of any monthly agreement, Manager shall direct the City to immediately refund to the monthly user his or her deposit, without interest. Manager shall keep a written record containing the names of all monthly users along with their access card number, parking commencement date, amount of security deposit and date of transfer to the City Parking Revenue Account, parking termination date and amount of deposit refund.

      (c)   <u>**Validation Parking**</u>. When and as directed by the Corporation with the consent of the Director, Manager shall use its best efforts to enter into agreements with local merchants for validation parking. The guidelines for validation parking shall be established by the Corporation and the Director. All agreements must be preapproved by the Corporation and the Director.

(d)    <u>Valet Parking</u>.  When and as directed by the Corporation with the consent of the Director, Manager shall provide for valet parking in the Garage.  Manager shall submit all expenses for Valet Parking in each Monthly Report for reimbursement as an Operating Expense.

(e)    <u>Off Site Valet Services</u>.  Manager is authorized to perform valet parking services for users of the Garage in which employees of Manager pick up vehicles at locations other than the Garage (**"Off Site Valet Services"**) and Manager is authorized to charge the users of such services a valet fee.  In connection with all Off Site Valet Services, Manager is responsible for collecting the correct Parking Rate from each user and shall be liable to the Corporation for any incorrectly collected Parking Rate.  The correct Parking Rate for any such user will be determined solely on the status of that user as a daily parker, a monthly parker or a High Volume Parker.  The fact that the user is paying for Off Site Valet Services performed by the Manager shall have no effect on the Parking Rate charged to the user.  Except for (1) the procedures for collection of the Parking Rate and (2) use of space within the Garage that is set aside for vehicles parked within the Garage pursuant to Off Site Valet Services, all Off Site Valet Services must be offered and performed in a manner that does not provide any benefit, privilege, or use to the Manager or the user with respect to the Garage that is not available to any other person or entity.  The expenses of Manager for any Off Site Valet Services shall not be treated as Operating Expenses.  Notwithstanding the foregoing, the Corporation shall be free to enter into agreements with other providers of off site valet services on such terms as it shall determine in accordance with the Lease.

(f)    <u>High Volume Parking</u>.  Manager shall require all High Volume Parkers to xecute a month-to-month agreement and release of the Corporation and City, the form of which must be preapproved by the Corporation and the Director.  By no later than the fifth day of each month, each High Volume Parker shall purchase from Manager one or more validation cards containing at least $8,334.00 of credit at the appropriate high volume Parking Rate specified in <u>Exhibit B</u> for such High Volume Parker.  High Volume Parkers shall have access to the Garage and to available spaces therein on the same basis as vehicles using daily parking and monthly parking.  The Corporation and the Director shall determine the maximum number of monthly parking agreements for High Volume Parkers that shall be permitted in the Garage.

Each High Volume Parker agreement shall require that the High Volume Parker establish and maintain a parking ticket system for vehicles to be parked in the Garage in a form prescribed by this Agreement and approved by the Corporation and the Director.  Each High Volume Parker shall issue a ticket to each vehicle to be parked in the Garage.  Each ticket that is issued shall be date and time stamped to indicate arrival(s) and departure(s) of the vehicle, and shall have the license plate or vehicle identification number of the vehicle recorded on the ticket.  The ticket shall also be stamped with the amount charged to the High Volume Parker for such vehicle.  Any alteration to the time, date or charge stamped on the ticket must be initialed by the person making the change and must state the reason for the change.  Any changes made without such initialing and written explanation shall be disregarded, the ticket shall be deemed to have been collected in accordance with the date(s) and time(s) stamped on the ticket, and such amount shall be included in the amount billed or debited to the High Volume Parker.  The High Volume Parker shall be responsible for the collecting and accounting for all tickets.  If a ticket is mutilated or destroyed, the High Volume Parker shall prepare a report showing the number of the destroyed or mutilated ticket, explaining how it was destroyed or mutilated and attaching thereto the remnants of such ticket.  If a ticket is lost for a vehicle parked in the Garage, the High Volume Parker shall prepare a charge slip showing (i) the amount charged for parking of such vehicle, and (ii) the license plate or vehicle identification number of the vehicle.  The High Volume Parker shall provide a report to the Corporation at least once for each calendar month on

or before the fifth day of the next succeeding month which shall include the number of vehicles parked in the Garage during such period, the rate charged for each vehicle, the parking ticket for each such vehicle which shows the vehicle license plate or vehicle identification number, the date and time stamps for arrivals and departures of such vehicle, and such other information as the Corporation shall require. The High Volume Parker shall make its books and records with respect to vehicles parked in the Garage and the amounts charged therefor available for inspection by the Corporation or the Director during regular business hours upon reasonable prior notice.

Corporation shall order and purchase all validation cards to be used at the Garage by High Volume Parkers. Upon receipt of the validation cards from a manufacturer of validation cards and prior to the use of such validation cards at the Garage, Corporation shall deliver to the Director and Manager the manufacturer's manifest showing the serial numbers of all validation cards. Each time a validation card is used by a High Volume Parker, the card number, date of use, Garage entry-time, Garage exit-time and appropriate Parking Rate shall be recorded by the Manager in a computerized format approved by the Corporation and the Director. Each day, Manager shall reconcile each High Volume Parker account by deducting the appropriate Parking Rate(s) from the credit remaining on such High Volume Parker's validation cards. If at the end of any month any High Volume Parker's usage exceeds the amount of credit remaining on such High Volume Parker's validation cards, Manager shall bill and collect, at the appropriate Parking Rate(s), the difference between the amount of the actual usage by such High Volume Parker and the amount of credit remaining on such High Volume Parker's validation cards. Any unused credit remaining at the end of any month on any High Volume Parker's validation cards may be carried forward to the next succeeding month; provided, that any such accumulated credit shall not be refunded, and shall be cancelled upon the expiration or termination of the High Volume Parker's agreement with the Corporation, and in any event on April 30 of each year (except for a reasonable carryover amount as determined by the Corporation and the Director not to exceed $8,334).

Manager shall be responsible for collecting and accounting for all validation cards. If a validation card is lost, mutilated or destroyed, Manager shall invalidate such card and shall prepare a report, which shall be attached to the Daily Report, showing the serial number of the lost, destroyed or mutilated validation card, and attaching thereto the remnants of such validation card. If a validation card is lost by the High Volume Parker of a vehicle parked in the Garage, Manager shall replace the card and prepare a charge slip with (i) the validation card serial number, (ii) the license plate or vehicle identification number, and (iii) the driver's license number of the operator of the vehicle. The vehicle operator must sign the completed charge slip. The Corporation, with the approval of the Director, at any time may change the validation procedures set forth in this paragraph.

Manager is responsible for selling credit for validation cards to High Volume Parkers at the rates specified in Exhibit B. If a validation card is lost or destroyed, Manager shall reissue a new card to the High Volume Parker and collect Twenty-five Dollars ($25.00) for such card. Manager shall deposit the funds representing replacement card amounts into the City Parking Revenue Account on the day that such amounts are collected. Manager shall keep a written record containing the names of all High Volume Parkers along with their validation card serial number, month-to-month parking agreement commencement and termination dates.

(g)  **Rules and Regulations.** Manager shall ensure that all users of the Garage comply with all rules, regulations, or restrictions that the Corporation, with the approval of the Director, may adopt from time to time.

(h)    **Other Services.**  Manager shall perform such other acts and duties as are required under the terms of this Management Agreement.

(i)    **Garage Name.**  The Garage shall be operated as the Union Square Garage or such other name as the City may from time to time choose or determine at its sole and absolute discretion.

(j)    **Signs, Advertising, etc.**  Except for signs stating the Parking Rates, Manager shall not permit the erection of any signs, billboard, advertising, or displays at the Garage. Manager shall not permit the circulation of any commercial announcements, pamphlets or circulars.  The Corporation, with the written consent of the Director, shall have the right to lease or use any portion of the Garage for advertising.   Such arrangements shall be between the Corporation and any third party.  Manager shall cooperate in good faith with the Corporation, City and such parties.

(k)    **Storage Rental.**   Manager shall not allow any storage rental unless preapproved in writing by the Corporation.  If such storage rental is approved, Manager shall require all monthly users to execute a rental agreement and release form, which form must be preapproved by the Corporation.  All collected fees shall be deposited into the Revenue Fund on the day such amount is collected.

(l)    **Commercial Use.**   Except for parking, Manager's Offices, a temporary performance ticket booth rental and any valet parking booth; Manager shall not permit the use of any portion of the Garage for a commercial purpose.

(m)    **Vending Machines and Telephones.**   The installation of any vending machines or telephones in the Garage must be preapproved in writing by the Corporation.  Once approved, the Corporation will be charged with the responsibility of entering into any necessary agreements with such parties and administering such contractual relationship.

(n)    **Public Use of Facility.**  Manager acknowledges that the public shall always be entitled to use the Garage, subject to the rates, charges, hours and rules of operation as set forth herein and adopted pursuant to the terms of this Management Agreement.

(o)    **Compliance with Laws.**  Manager shall comply and conform with all laws and all governmental regulations, rules and orders that may from time to time be put into effect relating to, controlling or limiting the use and operation of the Garage.  Manager shall not use or occupy the Garage in an unlawful, noisy, improper or offensive manner and shall use its best efforts to prevent any occupancy of the Garage or use made thereof which is unlawful, noisy, improper or offensive or contrary to any law or ordinance applicable to the Garage.  Manager shall not cause any rubbish, dirt or refuse to be placed in the streets, sidewalks or alleys adjoining the Garage or to accumulate in the Garage.

(p)    **Other Agreements.**  Except as permitted by paragraph (e) of this Section 6.1, Manager shall not enter into any other contract, agreement or other arrangement relating to or affecting, directly or indirectly, (i) the management, use or operation of the Garage, or any services with respect thereto, or (ii) the receipt, use, payment or amount of Gross Revenues, without the prior written consent of the Corporation and the City.  The City and the Corporation shall not give such consent if such contract, agreement or other arrangement would adversely affect the exclusion from gross income of interest on the Bonds.

(q)    **Other Consideration.** Except as permitted by paragraph (e) of this <u>Section 6.1</u>, Manager shall not receive any payment, fee, compensation or other consideration, whether monetary or in-kind, relating to, directly or indirectly, the management, use or operation of the Garage, or any services with respect thereto (including but not limited to services for any High Volume Parkers), other than its Management Fee and any reimbursement of Operating Expenses paid by the Corporation pursuant hereto, without the prior written consent of the Corporation and the City.  The City and the Corporation shall not give such consent if such payment, fee, compensation or other consideration would adversely affect the exclusion from gross income of interest on the Bonds.

6.2    **Garage Parking Rates.**  For all vehicles parked in the Garage, Manager is authorized and directed to charge and collect parking fees according to Parking Rate Schedule attached hereto as <u>Exhibit B</u> (collectively **"Parking Rates"**).  From time to time, the Parking Rates charged at this Garage may be adjusted by the Corporation and the City Board of Supervisors in accordance with the Lease.  In such event, the Corporation shall give written notice to the Manager as to the new rates.  Such notice shall specify the effective date of the new rates.  Upon receiving such notice, the Manager shall implement the new rates on the effective date.  Manager shall not have any right to adjust the authorized parking rates or collect any other rates or charges at the Garage.

6.3    **Hours of Operation.**  The Manager shall operate the Garage and the Garage shall remain open all 365 days of the year, twenty-four (24) hours per day.

## 7.    STAFFING, EMPLOYEES AND CONTRACTING

7.1    **Parking Personnel.**  Manager shall select, furnish, and employ on its own behalf such competent and qualified operating personnel necessary to perform its responsibilities under this Agreement in an efficient and professional manner.  All personnel engaged by Manager shall be employees of Manager subject to its sole supervision, direction and control, and under no circumstances shall they be considered employees of the Corporation or the City.  Manager shall comply with all applicable federal, state and local laws, ordinances and regulations pertaining to all employees.  Except as otherwise provided herein, Manager shall have the exclusive right to hire and discharge its employees.  Manager shall control and supervise the conduct, demeanor and appearance of its employees and shall train its employees to render a high degree of courteous and efficient service to the public.  All employees shall wear uniforms of a design and color chosen by Manager to present a clean and efficient image, and the Corporation reserves the right to require changes in such uniforms in its reasonable discretion.  Notwithstanding the above, the Corporation shall have the right, in its reasonable discretion, to request that Manager relocate or transfer any employee from the Garage, and Manager shall use its best efforts to comply with such request.  Notwithstanding the Manager's right to hire the necessary employees to operate the Garage, the Corporation shall have the right to direct the Manager to hire additional employees if it reasonably determines that the Manager is failing to operate the Garage in an efficient and professional manner, provided however that nothing herein shall permit the Corporation to direct or require the Manager to meet or provide specific terms of employment to Manager's employees, including, without limitation terms or conditions related to seniority, wages or labor representation.

7.2    **Manager of Operation.**  Manager shall select, hire and appoint, subject to the continuing approval of the Corporation, a manager of its operation of the Garage, who must be a highly-qualified and experienced manager of automobile parking facilities, charged with responsibility and authority by Manager in respect to the method, manner, and conduct of the

Garage operation. During all times of operation at the Garage when a total of two or more employees are working in either manager or attendant positions, one on-duty and on-site employee shall be designated the acting manager and shall be authorized to direct any other employees to respond to emergencies, inquiries and complaints. In addition, the acting manager shall have the skills to produce reports, such as revenue reports and parking utilization reports, from the on site parking equipment and shall have a working knowledge of the figures contained in each report.

**7.3** **Security Personnel.** The Corporation shall, at its sole cost, provide reasonable security to protect the Garage, Garage users, and property in the Garage, against damage, injury, theft or other loss. In the partial satisfaction of this subparagraph, at least one (1) uniformed security guard shall be on duty at all times while the Garage is operational. Guards hired to provide security at the Garage shall not carry a firearm, unless specifically approved in writing by the Director. In addition, the Corporation shall provide reasonable armored car service to the Manager.

**7.4** **Payroll and Taxation.** Manager shall make or cause to be made all necessary payroll deductions for disability and unemployment insurance, social security, withholding taxes and other applicable taxes, and prepare, maintain and file or cause to be filed all necessary reports with respect to such taxes or deductions, and all other necessary statements and reports pertaining to labor employed in or about the Garage. Notwithstanding the Manager's direct employment of garage employees, all compensation (including fringe benefits) paid to such personnel by Manager shall be considered Operating Expenses of the Garage.

**7.5** **Independent Contractor; Payment of Taxes.** If a local, state or federal taxing authority determines that Manager or any of its employees is an employee of the Corporation for purposes of collection of any employment taxes, the amounts payable to Manager under this Management Agreement shall be reduced by an amount equal to the employee and employer portions of the amount due to such taxing authority pursuant to that determination ("**Tax Liability**"), offsetting any credits for amounts already paid by Manager that can be applied against such Tax Liability. If the taxing authority determines that a Tax Liability exists for past services performed by Manager or its employees under this Management Agreement, Manager shall promptly remit an amount equal to the Tax Liability to the Corporation upon written request of the Corporation. If such Tax Liability is not promptly remitted, the Corporation shall cause the amount of such Tax Liability to be withheld from future payments due to Manager under this Management Agreement offsetting any amounts already paid by Manager that can be applied as a credit against such Tax Liability. A determination of employment status pursuant to this Section shall be solely for the purposes of the particular tax in question, and for all other purposes of this Management Agreement, Manager and its employees shall not be considered employees of the City or the Corporation. Notwithstanding the foregoing, should any court, arbitrator, or administrative authority determine that Manager or any of its employees is an employee of the City or the Corporation, the Corporation shall reduce the amount owed to Manager under this Management Agreement pursuant to principles similar to those stated in the foregoing sentences of this Section so that the total expenses of the City or the Corporation under this Management Agreement shall not be greater than they would have been had the court, arbitrator, or administrative authority determined that Manager and its employees were not employees of the City or the Corporation.

**7.6** **Prevailing Wages; Records; etc.** Manager hereby acknowledges that it has read and understands Sections 6.35 through 6.44 of the City's Administrative Code and agrees that

this Management Agreement shall be subject to and Manager shall comply with all obligations and requirements imposed by those sections. In connection therewith, Manager (and any of its subcontractors under this Management Agreement) shall pay its employees wages in an amount at least equal to the highest general prevailing rate of wages as paid for similar work in the City and County of San Francisco in private employment, as fixed and determined by the Board of Supervisors pursuant to Section 6.37 of the City's Administrative Code and set forth in Exhibit C attached hereto and incorporated herein by this reference. Manager (and any of its subcontractors under this Management Agreement) shall also keep, or cause to be kept, an accurate record showing the name, place of residence, citizenship, occupation and per diem pay of each person engaged by Manager in the execution and performance of this Management Agreement. Such records shall at all times be open and available to the Corporation and its duly authorized agents for inspection and examination.

8.    **EQUIPMENT AND CAPITAL IMPROVEMENTS**

    **8.1**    <u>**Ordering and Purchasing of Supplies, Equipment and Furnishings**</u>.  Except for those supplies, equipment and furnishings that are related to the performance of Manager's obligations hereunder and constitute Operating Expenses, the Corporation shall provide such supplies, equipment and furnishings required for the management and operation of the Garage, including, but not limited to, office and accounting equipment and office furnishings. Except where specifically set forth in this Management Agreement, all equipment, supplies and other tangible personal property paid for as an Operating Expenses shall be and remain the property of the Corporation; such property is referred to herein as "**Corporation Property**." Manager shall be responsible for the care and safekeeping of all Corporation Property and shall use such property only in connection with the operation of the Garage. Except for supplies and other property that are routinely used and consumed in the operation of a parking garage, Manager shall not dispose of any Corporation Property without the prior written consent of the Corporation.

    **8.2**    <u>**Approval Required for Improvements**</u>.  Manager shall not make any alterations or improvements to or upon the Garage without the prior written approval of the Corporation and the Director.

9.    **MAINTENANCE AND REPAIRS**

    **9.1**    <u>**Routine Maintenance and Repairs**</u>.  Corporation shall maintain the Garage in a clean, safe, sanitary and sightly condition commensurate with the standards of maintenance, repair and operation set forth in Exhibit D attached hereto and incorporated herein by this reference. Corporation shall, at its sole cost and expense, perform all routine maintenance and repair work on the Garage. For purposes of this Management Agreement, "routine maintenance and repair work" shall mean all ordinary maintenance and repair of the premises and equipment and replacement of supplies that are normally performed on a day-to-day or routine basis in order to keep the Garage in an efficient, clean and safe condition. Such routine maintenance and repair work shall include without limitation:

        **(a)**    Repairing lamps and lighting fixtures and replacing bulbs, fluorescent tubes and ballasts; replacing tickets in ticket issuing machines; maintaining and replacing, if required, arms on traffic entry and exit gates; maintaining, repairing and replacing sliding or overhead doors and gates, and roll up doors; maintaining revenue control equipment; repairing, replacing and cleaning signs; maintaining elevators (Corporation shall contract for a full-service elevator repair contract, as applicable, providing for emergency, 24-hour service); maintaining heating,

ventilating and other mechanical equipment; maintaining fire alarm call boxes, extinguishers and hose boxes in good working order; maintaining plumbing in good and sanitary working order; and performing emergency maintenance and repairs as required to maintain the premises in good and safe condition.

(b)    Regular cleaning of all parking areas, Garage offices, elevators and other portions of the Garage premises; regular washing of all windows; prompt removal of dirt, debris, oil, grease and other liquids from the parking areas, elevators, floors and stairways; regular cleaning of floors, walls and ceilings of the pedestrian areas; regular removal of accumulated trash and other rubbish; regular cleaning of the sidewalks on all sides of the Garage; regular cleaning and maintenance of the common areas and bathrooms (including trash removal); and such other cleaning as shall be required to keep the premises in a clean, safe and attractive condition.

(c)    Striping of the floors and surfaces of the Garage as needed.

(d)    Otherwise cleaning, repairing and painting the floors and walls and fences of the Garage and the sidewalks, curbs and driveways thereof as needed (particularly when such surfaces have been marred by graffiti or other forms of vandalism).

(e)    Contracting for full-service elevator maintenance with a contractor acceptable to the Corporation.

(f)    Contracting for electricity, telephone, uniforms, vermin extermination, trash collection, water, sewer and any other similar utilities or services necessary to the operation of the Garage.  Corporation shall pay all billings for the above services when due.

(g)    Steam cleaning of all sidewalks and stairwells shall be performed on a quarterly basis and the entire Garage on a semi-annual basis.  At the discretion of the Corporation, steam cleaning may be required to be performed less frequently if the Garage, including sidewalks and stairwells, is maintained in a clean and orderly state.

(h)    Prompt removal of pigeon droppings from floors and all accessible surfaces.

(i)    Thorough cleaning of all ventilation system supply and exhaust vents shall be performed on a semi-annual basis.

(j)    Any other maintenance or repair required by the Corporation or the City.

9.2    **Maintenance Duties of Manager.**   The Corporation may from time to time request Manager to perform routine maintenance and repair work that is necessary to keep the Garage in good and clean condition and in a proper state of repair.  Any such work performed by Manager at the request of the Corporation shall be considered as an Operating Expense.

10.    **FISCAL DUTIES AND MATTERS**

10.1    **Budget/Marketing Plan.**   Manager and Corporation shall jointly prepare an operating budget for the performance of the Manager's services under this agreement ("Budget") for every calendar month.  Each Budget shall be submitted to the Director, for his or her review and approval, at least sixty (60) days prior to the commencement of each calendar month; provided, however, for the first year, the Budget shall be submitted within thirty (30)

days of the date hereof. The Budget shall also contain a marketing plan. The initial marketing plan shall be submitted sixty (60) days after request by the Director with subsequent marketing plans to be submitted as part of the Budget. The Budget shall be in the form attached hereto as Exhibit E, as such form may be modified from time to time by the Director. The Director shall have the right to comment on each Budget and request revision to any budget. Except as may otherwise be provided herein, the Manager shall not be entitled to reimbursement of Operating Expenses unless such expenses are included in the Budget.

10.2    **Gross Revenues and Other Monies; Deposits and Transfers of Monies.** All Gross Revenues generated by the Garage shall be the sole and exclusive property of the Corporation, subject to the rights of the holders of the Bonds, the Trustee and the City under the Indenture and the Lease. Notwithstanding the Manager's receipt of Gross Revenues on behalf of the Corporation, the Manager shall have no right, title, interest, lien or set-off rights on or against any portion of the Gross Revenues generated by the Garage. While any Bonds are outstanding Manager shall deposit all Gross Revenues in the Revenue Fund established under the Indenture immediately following receipt of such funds, but not less frequently than daily on any Banking Day. If no Bonds are outstanding, all Gross Revenues shall be deposited by Manager in a separate revenue fund established by the Corporation. Manager shall deposit all collected Parking Taxes and Security Deposits into a City Parking Revenue Account established by the Corporation with U.S. Bank Trust National Association or such other bank selected by the Corporation (the "Bank") on the same day such amounts are collected if such day is a Banking Day and otherwise on the immediately succeeding Banking Day. Each month the Corporation shall cause the Bank to transfer the monies on deposit in the City Parking Revenue Account to the Treasurer for deposit into an account in the Office of the Treasurer/Tax Collector (the "Treasurer's Account"). Should the Manager fail to deposit Gross Revenues, Parking Taxes or Security Deposits on a timely basis, Manager shall pay the Corporation interest on the amount that was not timely deposited. The interest rate shall be eight percent (8%) or the greatest rate of interest permitted from time to time under applicable law and shall accrue from the date, which such amount was to be deposited until such time the amount was deposited in the manner prescribed herein. The Corporation's right to collect such interest shall not limit any other rights or remedies it may have under this Management Agreement with respect to such default.

10.3    **Daily Accounting.** Every day of operation, Manager shall prepare a daily report ("Daily Report") which shall set forth a daily total of monies deposited in the Revenue Fund and in the City Parking Revenue Account in form and substance acceptable to the Corporation and the Director. If requested by the Corporation, Manager shall submit the Daily Reports to the Corporation and the Director on a weekly basis. All Daily Reports must be certified true and correct by the Manager.

10.4    **Monthly Accounting.** Within ten (10) Banking Days after the close of each month, Manager shall deliver two copies of a monthly report, on a form obtainable from the Director ("Monthly Report"), to the Corporation, the Controller, the Tax Collector and the Director. For each day submittal of the Monthly Report is late, the Manager shall incur a late charge of Fifty Dollars ($50) to cover administrative costs for revenue report and projection revisions. All submitted Monthly Reports must be certified as true and correct by the Manager. Should the Corporation or the Director or any staff members detect any inaccuracies in the Monthly Reports which were not previously communicated by the Manager, the Manager shall be subject to a One Hundred Dollars ($100) charge for each Monthly Report misreported to cover administrative costs to correct revenue reports and projections. Such charges shall be

deducted from the Management Fee.  The Director or the Corporation shall have the right to modify the form of the Monthly Report from time to time.

10.5    **Operating Expenses.**  All Operating Expenses shall be the obligation of the Manager and shall be immediately paid by the Manager when due and payable.  For any Operating Expenses that the Manager is seeking reimbursement, Manager shall submit, with the Monthly Report, valid and complete requisition documentation, including a requisition form in a written form approved by the Director and the Corporation, and any invoices, receipts or other evidence.  All Operating Expenses for which the Manager is seeking reimbursement shall be reimbursed by the Corporation (and after issuance of the Bonds, by the Corporation through a requisition with the Trustee), provided (i) Manager submits required documentation requested above, (ii) the expenditure was approved in the Budget (other than for possessory interest taxes, if any, assessed against the Manager as a result of the performance of its obligations under this Management Agreement), and (iii) the expenditure is approved by the Controller.  The Corporation shall not reimburse the Manager for any interest charges or late penalties imposed upon the Manager due to late payment of any of its bills, taxes or fees.  In the event of any unresolved disputes between the Manager and the Corporation regarding the payment of Operating Expenses, the Parties shall first seek to have such dispute resolved by the Controller.  Notwithstanding the foregoing, those Operating Costs related to Manager's labor expenses described in Section 7 above shall be reimbursed, subject to the documentation, requisition and approval requirements described above, on a monthly basis.

10.6    **Parking Taxes.**  Manager shall collect all Parking Taxes, sales taxes and other taxes, which shall be deposited into the City Parking Revenue Account and accounted for separately.  Manager shall submit to the Corporation, the City, the Controller and the Tax Collector with each Monthly Report a full accounting of all taxes due and payable to any third party, including the City.

10.7    **Possessory Interest Tax.**  Manager recognizes and agrees that this Management Agreement may create a possessory interest subject to property taxation and that Manager may be subject to the payment of property taxes levied on such interest.  Any levied possessory interest tax shall be an Operating Expense.

10.8    **Audit.**  Within thirty (30) days after the end of each Fiscal Year or within thirty (30) days after the end of Manager's term under this Agreement, Manager shall arrange for an audit, in a form acceptable to the Corporation and the Controller, of its books and records by an independent, certified public accountant acceptable to the Corporation and the Controller, which audit shall cover the previous Fiscal Year.  Manager acknowledges that the primary purpose of such audit shall be to enable the Corporation and the City to determine, clearly and accurately, the amount of Gross Revenues received by the Manager from the operation of the Garage, the Gross Revenues deposited into the Revenue Fund, and any differences between the Gross Revenues reported, the Revenue Fund deposits and audited revenues, all Operating Expense reimbursements and to verify that the form and method of Manager's record keeping provide adequate and proper control and check of all such revenue.  Additionally, the purpose of the audit shall be to enable the Corporation and the City determine that significant terms of the Management Agreement are complied with.  Some examples of significant Management Agreement terms may include, but not be limited to, the timely and appropriate remittance of Gross Revenues, the use of parking rates either specified in Exhibit B hereof or as amended, in writing, by the Corporation, the Garage was open during the hours specified in Section 6.3 hereof, the timely collection of monthly and High Volume Parker parking fees and security

deposits, the proper maintenance and retention of all required records, the timely submission of all required reports to the Corporation and the Director, the accurate and timely payment of Parking Taxes, and the integrity of non-revenue parking transactions. The Manager or his or her certified public accountant may contact the Corporation to answer any questions about the audit. Manager shall deliver an original, signed copy of each such annual audit to the Corporation, Director and the Controller by the earlier of (i) thirty (30) days after the completion of such audit or (ii) one hundred twenty (120) days after the end of the Fiscal Year covered by such audit. If the Manager does not deliver the audit in accordance with the above time schedule, the Manager shall be subject to an initial late charge of One Hundred Dollars, ($100) which shall accrue at a rate of One Hundred Dollars ($100) for each additional month the audit is delinquent. Such late charges will cover administrative costs associated with the delay in delivery of the audit.

   10.9   **Books and Records.** Manager shall establish and maintain at the Garage facility books, records and systems of account, in accordance with generally accepted accounting principles, consistently applied reflecting all business operations of Manager transacted under this Management Agreement. To the extent the Manager has not complied with generally accepted accounting principles, the Director, the Controller or the Corporation may require the Manager to restate its books, records and systems of account to conform to such requirements. These books, records and systems of account shall be retained by Manager during the term of this Management Agreement and shall be available at all reasonable times, with or without notice, for inspection and audit by the Corporation. Upon expiration or early termination of this Management Agreement, all such books, records and systems of account shall be delivered to the Corporation. All used and unused parking tickets, tapes and other records used in the operation of the traffic and revenue control devices in the Garage are owned by the Corporation, but shall be retained by Manager at the Garage unless the Corporation requests otherwise. Such tickets, tapes and records shall be available at all reasonable times, with or without, notice for inspection and audit by either the Corporation, the Director or the Controller or their agents, and shall not be destroyed without written consent from the Corporation, the Director and the Controller.

## 11.   HAZARDOUS MATERIAL COVENANTS

   11.1   **No Hazardous Materials.** Manager covenants and agrees that neither Manager nor any of its Agents shall cause or permit any Hazardous Material to be brought upon, kept, used, stored, generated or disposed of in, on or about the Garage or the Land or transported to or from the Land or the Garage, provided that Manager may store and use such substances in the Garage and on the Land in such limited amounts as are customarily used in parking garages so long as such storage and use is at all times in full compliance with all applicable Environmental Laws. Manager shall immediately notify the Corporation and the Director if and when Manager learns or has reason to believe there has been any Release of Hazardous Material in, on or about the Land or the Garage. The Corporation and the Director may from time to time request Manager to provide adequate information for the City or the Corporation to determine that any Hazardous Material permitted hereunder is being handled in compliance with all applicable Environmental Laws, and Manager shall promptly provide all such information.

   11.2   **Manager's Environmental Indemnity.** If Manager breaches any of its obligations contained in Section 11.1 above, or, if any act or omission or negligence of Manager or any of its Agents results in any Release of Hazardous Material in, on, under or about the Land or the Garage (including any Improvements thereon) or any other City property located on the Land, without limiting Manager's general Indemnity contained in Section 13 below, Manager, on behalf of itself and its successors and assigns, shall Indemnify the Corporation, the City, and

their respective officers, agents and employees, and each of them, from and against all Hazardous Materials Claims arising during or after the termination or expiration of this Management Agreement and relating to such Release. The foregoing Indemnity includes, without limitation, all costs associated with the Investigation and Remediation of Hazardous Material and with the restoration of the Garage and the Land or any other City property located on the Land to its prior condition including, without limitation, fines and penalties imposed by regulatory agencies, natural resource damages and losses, and revegetation of the Land or other City property located on the Land. Without limiting the foregoing, if Manager or any of Manager's Agents, causes or permits the Release of any Hazardous Materials in, on, under or about the Land, Garage or any other City property located on the Land, Manager shall, immediately, at no expense to the Corporation or the City, take any and all appropriate actions to return the Land, Garage or other City property located on the Land affected thereby to the condition existing prior to such Release and otherwise Investigate and Remediate the Release in accordance with all Environmental Laws. Manager shall provide the Director and the Corporation with written notice of and afford the Corporation and the City a full opportunity to participate in any discussions with governmental regulatory agencies regarding any settlement agreement, cleanup or abatement agreement, consent decree, permit, approvals, or other compromise or proceeding involving Hazardous Material. Manager specifically acknowledges and agrees that it has an immediate and independent obligation to defend the Corporation and the City from any claim which actually or potentially falls within this indemnity provision even if such allegation is groundless, fraudulent or false, and at all times before the determination of the validity of any such claim. The foregoing indemnity is not limited by the amount of insurance required to be maintained by the Manager and shall survive termination of this Agreement.

## 12.    INSURANCE AND SURETY BONDS

**12.1    Insurance.** The Corporation shall maintain such insurance as is required by its Lease and in connection with its bond financing. As of the date hereof, subject to approval by the Corporation and the Director of the insurers and policy forms, Manager shall place and maintain and/or cause to be placed and maintained throughout the term of this Management Agreement the following insurance policies:

(a)    Comprehensive general liability insurance with limits not less than $5,000,000 each occurrence, combined single limit for bodily injury and property damage, or in such greater amount and limits as the Corporation may reasonably require from time to time, including coverage for contractual liability, personal injury, broadform property damage, products and completed operations. Any deductible under such policy shall not exceed $10,000 for each occurrence.

(b)    Business automobile liability insurance with limits not less than $1,000,000 for each occurrence combined single limit for bodily injury and property damage, including coverage for owned, non-owned and hired automobiles, as applicable. Any deductible under such policy shall not exceed $10,000 for each occurrence.

(c)    Garage-keeper's legal liability insurance with limits not less than $2,000,000 for each occurrence combined single limit for loss and damage to vehicles in Manager's care, custody or control caused by fire, explosion, theft, riot, civil commotion, malicious mischief, vandalism or collision, with any deductible not to exceed $1,000 for each occurrence, and coverage for non-automobile property customarily left in the custody of a garage with a limit of $5,000.

(d)    Workers' Compensation Insurance for employees of the the Manager, including Employers' Liability, with limits not less than $1,000,000 for each accident, covering all employees employed in or about the Garage to provide statutory benefits as required by the laws of the State of California.  Said policy shall be endorsed to provide that the insurer waives all rights of subrogation against the City and the Corporation.  The pro rata amount of the Manager's policy shall be an Operating Expense.

(e)    The liability insurance policies required under subsections (a) through (c) above shall be endorsed to name as an additional insured the City and the Corporation and their respective officers, directors, agents and employees.

(f)    Should any of the required insurance be provided under a claims-made form, Manager shall maintain such coverage continuously throughout the term of this Management Agreement and, without lapse, for a period of three (3) years beyond the Management Agreement expiration, to the effect that, should occurrences during the Management Agreement term give rise to claims made after expiration of the Management Agreement, such claims shall be covered by such claims-made policies..

(g)    Should any of the required insurance be provided under a form of coverage that includes a general aggregate limit or provides that claims investigation or legal defense costs be included in such general annual aggregate limit, such general annual aggregate limit shall be double the occurrence or claims limits specified above.

(h)    All insurance and surety companies are subject to approval as to coverage forms and financial security by the Director and the Corporation.  Insurers and sureties rated by A. M. Best Co. shall have a current rating not less than A-.

**12.2    Bonds.**  As of the effective date hereof, Manager shall furnish the Corporation, and shall maintain throughout the term of this Management Agreement, and pay the cost thereof as part of Manager's Operating Expenses, the following fidelity and surety bonds made payable to the Corporation and naming the Corporation as obligee, as its interests may appear:

(a)    Blanket fidelity bond covering all officers and employees of Manager employed at the Garage, with a limit of $375,000, and any deductible not to exceed $5,000 for each loss; and

(b)    Faithful performance surety bond in the amount of $100,000 in a form substantially similar to that attached as Exhibit F, guaranteeing the faithful performance by Manager during the term of this Management Agreement of the covenants, terms and conditions of this Management Agreement.

**12.3    Miscellaneous Insurance and Bond Matters.**

(a)    All insurance policies and bonds obtained pursuant to this Section 12 shall be endorsed to provide:

(1)    That thirty (30) days written notice of cancellation, intended non-renewal or reduction in coverage or limits shall be given to the Director and the Corporation in the manner and at the addresses specified below; and

(2)    That such insurance is primary to any other insurance available to an additional insured with respect to claims arising out of this Management Agreement and that insurance applies separately to each insured against whom a claim is made or a suit is brought, but the inclusion of more than one insured shall not operate to increase the insurer's limits of liability.

(b)    Two copies of each performance and fidelity bond, and two copies of each original policy of the property insurance and the boiler and machinery insurance, shall be provided to the Corporation and the Director upon the mutual execution of this Management Agreement.  Two copies of each certificate of all other insurance shall be provided to the Corporation and the Director upon mutual execution of this Management Agreement, and complete copies of any insurance policies obtained pursuant to this Management Agreement shall be provided to the Director and the Corporation if requested at any time.

(c)    Upon the Corporation's or the Director's request, Manager shall provide evidence satisfactory to the Corporation and the Director that Manager has adequately provided for Social Security and Unemployment Compensation benefits for Manager's employees employed at the Garage.

(d)    Manager shall comply with the provisions of any insurance policy covering Manager or the Corporation, and with any notices, recommendations or directions issued by any insurer under such insurance policies so as not to adversely affect the insurance coverage.

(e)    In the event that the Corporation or the Director receives notice that any insurance or bonds are to be or have been cancelled or non-renewed, the Corporation shall notify Manager, in writing, of this failure to meet the requirements of this Management Agreement. If Manager does not provide to the Corporation satisfactory written certification of renewed or replacement insurance or bonds within five (5) business days of the receipt (if delivered) or mailing date of the aforementioned written notice to Manager, the Corporation shall have the right to (i) obtain the required insurance or bonds on behalf of Manager and to deduct the premiums therefor from payment of the next Management Fee, together with an administrative fee of One Thousand Dollars ($1,000) or (ii) solely at the Corporation's option, terminate this Management Agreement.

## 13.    INDEMNITY

13.1    **Indemnification and Hold Harmless.** Manager shall Indemnify the City, the Corporation, and their respective officers, agents and employees (individually or collectively, an **"Indemnitee"**) against any and all Losses (other than those arising out of the gross negligence or willful misconduct of the City or the Corporation or their respective Agents) arising out of: (a) any injury to or death of any person or damage to or destruction of any property occurring in, on or about the Garage premises, or any part thereof, from any cause whatsoever, or (b) any default by Manager in the observance or performance of any of the terms, covenants or conditions of this Management Agreement, or (c) the use or occupancy of the Garage by Manager or its Agents or the performance by Manager of this Management Agreement. In the event any action or proceeding is brought against an Indemnitee by reason of a claim arising out of any Loss suffered on or about the Garage for which Manager has indemnified the Indemnitee, and upon written notice from such Indemnitee, Manager shall at its sole expense answer and otherwise defend such action or proceeding using counsel approved in writing by the Indemnitee. The Indemnitee shall have the right, exercised in their sole discretion, but without being required to do so, to defend, adjust, settle or compromise any claim, obligation, debt, demand, suit or

judgment against the Indemnitee in connection with the Garage.   The provisions of this paragraph shall survive the termination of this Management Agreement with respect to any Loss occurring prior to or upon termination.  Manager specifically acknowledges and agrees that it has an immediate and independent obligation to defend the Indemnitee from any claim which actually or potentially falls within this indemnity provision even if such allegation is groundless, fraudulent or false, and at all times before the determination of the validity of any such claim. The foregoing indemnity is not limited by the amount of insurance required to be maintained by the Manager.

## 14.    DAMAGE OR DESTRUCTION

**14.1    Total Destruction.**  If the Garage is totally destroyed from any cause, whether or not covered by the insurance required hereunder, this Management Agreement shall automatically terminate as of the date of such total destruction.

**14.2    Damage Near End of Term.**  If the Garage is partially destroyed during the term of this Management Agreement from any cause, the Corporation may, at its option, terminate this Management Agreement by giving written notice thereof to Manager.

## 15.    MANAGER'S REPRESENTATIONS AND WARRANTIES

**15.1    Representation and Warranties.**  Manager hereby represents and warrants as follows:

**(a)    Experience.**  Manager is experienced in the operation and management of public parking facilities and hereby agrees to apply its best efforts and most efficient methods in the operations and management of the Garage.

**(b)    Formation.**  If Manager is a corporation, that it is duly incorporated, validly existing and in good standing under the laws of the State of California, and qualified to do business in the State of California.

**(c)    Authority.**  Manager has full power and authority (corporate or otherwise) to enter into this Management Agreement and to consummate the transactions contemplated by it, this Management Agreement has been duly authorized by all necessary action on the part of Manager, and no other corporate or other action on the part of Manager is necessary to authorize the execution and delivery of this Management Agreement.

**(d)    Conflicts and Consents.**  The execution and delivery by Manager of this Management Agreement and the performance by Manager of the transactions contemplated by it will not violate any federal, state or local law, rule or regulation, or conflict with or result in any breach or violation of, or constitute a default under the Articles of Incorporation, Bylaws or partnership agreement of Manager (as applicable) or any indenture, mortgage, lease, agreement or other instrument or obligation to which Manager is a party or by which it may be bound which would materially adversely affect the ability of Manager to perform its obligations under this Management Agreement.  No approval, authorization, consent or other order or action of, or filing or registration with, any person, entity or governmental authority is required for the execution and delivery by Manager of this Management Agreement.

**(e)    No Conflict with Orders, Judgments or Decree.**  The execution and delivery by Manager of this Management Agreement will not conflict with any order, judgment

or decree of any court, government, government agency or instrumentality, whether entered pursuant to consent or otherwise, by which Manager may be bound or affected.

(f)    **Litigation.**    There is no litigation, action, arbitration, grievance, administrative proceeding, suit or claim filed and pending, nor is there any investigation by a governmental agency of Manager or any of its affiliates that, if adversely decided, could have a material adverse impact on Manager's ability to perform its obligations under this Management Agreement.

## 16.    EVENTS OF DEFAULT; REMEDIES

16.1    **Event of Default.**  Each of the following events shall constitute an "**Event of Default**" by the Manager.

(a)    **Deposit of Gross Revenues and Parking Taxes.**  Manager fails to deposit the Gross Revenues or Parking Taxes within the time prescribed in <u>Section 10.3</u> hereof; and such failure continues for a period one (1) Banking Day after oral or written notice thereof from the Corporation or the Director.

(b)    **Parking Taxes.**  Manager fails to provide to the Corporation and Tax Collector a monthly statement containing all Parking Taxes due and payable; and such failure continues for a period of five (5) days after written notice thereof from the Director or the Corporation.

(c)    **Operating Expenses.**  Manager fails to pay any Operating Expense on a timely basis; and such failure continues for ten (10) days after written notice thereof from the Corporation or the Director.

(d)    **Monthly Reports.**  Manager fails to submit a Monthly Report when due; and such failure continues for five (5) days after written notice thereof from the Corporation or the Director.

(e)    **Failure to Open Garage.**  Manager fails to keep the Garage open every day of each month on a twenty-four hour per day basis.

(f)    **Terms.**  Manager fails to comply with any other term, covenant or condition of this Management Agreement; and such failure continues for a period of fifteen (15) days after written notice thereof from the Corporation.

(g)    **Representations and Warranties.**  Any representation or warranty made by Manager in this Management Agreement is found to have been untrue and incorrect as of the effective date hereof.

(h)    **Other Agreement and Obligations.**  Manager fails to pay when due any amount owing from Manager to the Corporation, City or any of their agencies, commissions or departments, including, without limitation, rents, taxes, fees or other charges, whether or not such amounts are related to the operation of the Garage; provided, however, that if Manager disputes the amount of such obligation to the Corporation in good faith and is actively negotiating or litigating such dispute, Manager's failure to pay such amount shall not constitute a default under this paragraph.  The failure of the Corporation to insist upon the strict performance of any of the terms, conditions, covenants, or provisions herein contained shall not be deemed a

waiver of any subsequent breach or default of the terms, conditions, covenants and provisions in this Management Agreement.

**16.2    Remedies.** Upon an Event of Default by the Manager, the Corporation shall have the right to exercise all legal and equitable remedies including, without limitation, the right to terminate this Management Agreement or seek specific performance of all or parts of this Management Agreement. If Manager shall fail after reasonable notice from the Director or the Corporation to perform any of its obligations under this Management Agreement, as determined by the Corporation, in his or her sole discretion, the Corporation shall have the right to cause such work or service to be performed. Any cost incurred by the Corporation in causing such work to be performed shall be due and payable by the Manager upon demand. The Corporation can elect, at its option, to deduct any amount payable from the Management Fee or any other available monies or security.

**16.3    Litigation Expenses.** If either Party hereto, including, without limitation, the Corporation and its officers and agents, brings an action or proceeding (including, without limitation, any cross-complaint, counterclaim, or third-party claim) against another Party by reason of a default under this Management Agreement, or otherwise arising out of this Management Agreement, the prevailing party in such action or proceeding shall be entitled to its costs and expenses of suit, including, but not limited to, reasonable attorneys' fees, which shall be payable whether or not such action is prosecuted to judgment. **"Prevailing party"** within the meaning of this Section shall include, without limitation, a party who dismisses an action for recovery hereunder in exchange for payment of the sums allegedly due, performance of covenants allegedly breached, or consideration substantially equal to the relief sought in the action. Attorneys' fees under this Section shall include attorneys' fees on any appeal, and, in addition, a party entitled to attorneys' fees shall be entitled to all other reasonable costs and expenses incurred in connection with such action. For purposes of this Management Agreement, reasonable fees of the attorneys of the Corporation shall be based on the fees regularly charged by private attorneys with an equivalent number of years of professional experience in the subject matter area of the law for which the services were rendered.

**16.4    Incidental and Consequential Damages.** Manager shall be responsible for incidental and consequential damages resulting in whole or in part from Manager's acts or omissions. Nothing in this Management Agreement shall constitute a waiver or limitation of any rights which the Corporation may have under applicable law.

**16.5    Liability of the Corporation.** The Corporation's obligations to Manager under this contract shall be limited to the payment of the compensation provided for in this Management Agreement. Notwithstanding any other provision in this Management Agreement to the contrary, in no event shall the Corporation be liable, regardless of whether any claim is based on contract or tort, for any special, consequential, indirect or incidental damages, including, without limitation, lost profits, arising out of or in connection with this Management Agreement or the services performed in connection with this Management Agreement.

**16.6    Liability of the City.** The Corporation is a non-profit public benefit corporation, separate and distinct from the City and County of San Francisco. Manager specifically acknowledges and accepts that the City and County of San Francisco does not and shall not have any obligation or liability under this Management Agreement.

17.    RIGHT OF TERMINATION

17.1    <u>Termination</u>.

(a)    The Corporation shall have the right to terminate immediately this Agreement upon an Event of Default.

(b)    The Corporation may terminate this Agreement at any time upon thirty (30) days' written notice to Manager.

18.    DUTIES UPON TERMINATION AND EXPIRATION

18.1    <u>Duties upon Termination and Expiration</u>.  On or before the last day prior to the termination or expiration of this Management Agreement, Manager shall deliver to the Corporation the originals of all books, permits, plans, records, licenses, contracts, unused tickets and other documents pertaining to the Garage and its operation, any insurance policies, bills of sale or other documents evidencing title or rights of the Corporation, and any and all other records or documents pertaining to the Garage, whether or not enumerated herein, which are requested by the Corporation or necessary or desirable for the ownership and operation of the Garage, which are in the Manager's possession.  Manager further agrees to do all other things reasonably necessary to cause an orderly transition of the management and operation of the Garage without detriment to the rights of the Corporation or to the continued management of the Garage.

19.    NOTICES

19.1    <u>Notice Requirements</u>.  All notices required to be given hereunder shall be in writing and either served personally or sent by first-class mail to the appropriate address listed below, or at such other address as shall be provided by written notice.  Notice shall be deemed communicated within forty-eight (48) hours from the time of mailing if mailed as provided in this Section.

<u>MANAGER:</u>

City Park, Inc.
325 – 5th Street
San Francisco, CA  94107
Attn:  Tim Leonoudakis

<u>CORPORATION:</u>

Uptown Parking Corporation
444 Stockton Street
San Francisco, CA  94108
Attn:  Greg Sokol



**with a copy to:**

Paul Newman, Esq.
244 Kearny Street
San Francisco, CA 94108

**CITY:**

Department of Parking and Traffic
25 Van Ness Avenue, Suite 420
San Francisco, CA 94102
Attention: Director, Parking Authority

**with a copy to:**

Real Estate Division
Department of Administrative Services
25 Van Ness Avenue, Suite 400
San Francisco, CA 94102
Attention: Director of Property

City Attorney's Office
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102
Attn: Finance Team/Government Team

## 20.    ASSIGNMENTS

**20.1    Assignment.**  Manager has been chosen by the Corporation to manage the Garage in reliance upon Manager's stated and unique expertise, skill and experience in managing parking garages.  Manager shall not assign, transfer or encumber its interest in this Management Agreement or any other right, privilege or license conferred by this Management Agreement, either in whole or in part, without obtaining the prior written consent of the Corporation which the Corporation may give or withhold in its sole and absolute discretion.  Any assignment or encumbrance without the Corporation's consent shall be voidable and, at the Corporation's election, shall constitute a material default under this Management Agreement.  A sale or transfer of the stock, assets or other equitable interests of Manager that has the effect of a material change in Manager's ownership, determined by the Corporation in its sole discretion, shall constitute a transfer of this Management Agreement requiring the Corporation's prior written approval pursuant to this Section.  The Corporation shall have the right to withhold its consent to any assignment, transfer or encumbrance in its sole and absolute discretion.

## 21.    GENERAL PROVISIONS

**21.1    Drug-Free Workplace Policy.**  Manager acknowledges that pursuant to the Federal Drug-Free Workplace Act of 1989, the unlawful manufacture, distribution, dispensation, possession or use of a controlled substance is prohibited on premises of the Corporation.

Manager agrees that any violation of this prohibition by Manager, its employees, agents or assigns shall be deemed a material breach of this Management Agreement.

**21.2** **Non-Discrimination.** There shall be no discrimination against or segregation of any person, or group of persons, on account of sexual orientation, sex, marital status, race, color, religion, creed, national origin or ancestry in connection with use, occupancy or enjoyment of the Garage, or any part thereof, and the Manager or its agents shall not establish or permit any such practice or practices of discrimination or segregation with reference to the use of the Garage or any part thereof.

**21.3** **Americans with Disabilities Act.** Manager acknowledges that the Americans with Disabilities Act (the "ADA") requires that programs, services and other activities provided by a public entity to the public, whether directly or through a contractor, must be accessible to the disabled public. Manager further acknowledges its obligation to comply with the ADA and any other federal, state or local disability rights legislation. Manager warrants that it will fulfill that obligation, and that it will not discriminate against disabled persons in the provision of services, benefits or activities pursuant to this Management Agreement.

**21.4** **Consent to Notice of Nonpayment of Parking Tax.** Corporation hereby agrees to provide the Director with copies of each of the Corporation's Parking Tax returns within thirty (30) days of their submission to the City's Tax Collector.

**21.5** **Authority.** All rights, powers and privileges of the City under this Management Agreement may be exercised, on behalf of the City, by the Director, or his or her designee. All rights, powers, privileges of the Corporation under this Management Agreement may be exercised, on behalf of the Corporation, by Greg Sokol, the Corporation's Manager, or his designee. All rights, powers, privileges of the Manager under this Management Agreement may be exercised, on behalf of the Manager by Tim Leonoudakis, or his designee.

**21.6** **Successors and Assigns.** Each and all of the conditions and covenants of this Management Agreement shall extend to and bind and inure to the benefit of the Corporation and Manager, and the legal representatives, successors and assigns of either or both of them.

**21.7** **City as Third Party Beneficiary.** The Parties acknowledge that the City is an express third-party beneficiary of the terms and conditions of this Management Agreement.

**21.8** **Access to Garage.** The Corporation and the City and their duly authorized agents shall have access to the Garage at all times for the purpose of (i) inspection and to make any repairs, additions or renovations as the Corporation and the City shall deem advisable, and (ii) for use by the City in case of emergency, as determined by the City in its sole discretion.

**21.9** **Independent Contractor.** The services to be rendered by Manager pursuant to this Management Agreement are as an independent contractor only, and nothing contained in this Management Agreement shall be construed to create a partnership, joint venture, or a relationship of employment or agency.

**21.10** **Agreement made in California.** This Management Agreement shall be deemed to be made in and shall be construed in accordance with the laws of the State of California.

**21.11** **Integrated Agreement; Modification.** This Management Agreement contains all the agreements of the parties hereto relating to the subject matter addressed herein, and cannot

be amended or modified except by a written agreement mutually executed between each of the parties hereto.

**21.12**  **Section Headings.**  The section headings contained herein are for convenience in reference and are not to be used to construe the intent of this Management Agreement or any part thereof, nor to modify, amplify, or aid in the interpretation or construction of any of the provisions thereof.

**21.13**  **Severability.**  In the event any covenant, term or condition herein contained is held to be invalid by any court of competent jurisdiction, such invalidity shall not affect any other valid covenant, term or condition herein contained.

**21.14**  **MacBride Principles—Northern Ireland.**  The City urges companies doing business in Northern Ireland to move towards resolving employment inequities and encourages such companies to abide by the MacBride Principles as expressed in San Francisco Administrative Code Section 12F.1 et seq.  The City also urges San Francisco companies to do business with corporations that abide by the MacBride Principles.

**21.15**  **Tropical Hardwood and Virgin Redwood Ban.**  The City urges companies not to import, purchase, obtain or use, for any purpose, any tropical hardwood or any tropical hardwood wood product or any virgin redwood or any virgin redwood wood product.

**21.16**  **Time of Essence.**  Time is of the essence of each provision of this Management Agreement.

**21.17**  **Equal Opportunity Employment and Business Practices; Liquidated Damages.**

(a)  **12B and 12D.**  Manager agrees to comply fully with all provisions of Chapters 12B and 12D of the San Francisco Administrative Code, as amended from time to time. These chapters are incorporated herein and by reference made a part of this Management Agreement as though fully set forth herein.

(b)  **Damages.**  In the event that Manager fails to comply in good faith with any of the provisions of Chapter 12D, Manager shall be liable for liquidated damages for each violation in an amount equal to Manager's net profit on the Management Agreement, or ten percent (10%) of the total amount of the Management Agreement, or One Thousand Dollars ($1,000.00), whichever is greatest.  The amount of liquidated damages imposed will be determined by the Director of HRC after investigation, pursuant to Section 12D.14(A)2 of the San Francisco Administrative Code.  By entering into this Management Agreement, Manager acknowledges and agrees that any liquidated damages assessed by the Director of HRC shall be payable to the City and County upon demand.  Manager further acknowledges and agrees that any liquidated damages assessed may be withheld from any monies due to Manager on any contract or agreement with the City.

(c)  **Compliance by Subcontractors.**  In the event that the Director of HRC determines pursuant to Section 12D.14, that one or more of Manager's subcontractors has failed to comply in good faith with any of the provisions of Chapter 12B or 12D, Manager agrees to withhold monies due the subcontractor in an amount equal to any liquidated damages assessed by the Director of HRC.  By entering into this Management Agreement, Manager acknowledges

and agrees that it will incorporate into all of its subcontracts a provision permitting Manager to withhold monies equal to any liquidated damages assessed by the Director of HRC.

(d) <u>Penalty</u>. Pursuant to Section 12B.2(h) of the San Francisco Administrative Code, a penalty of Fifth Dollars ($50.00) for each person for each calendar day during which such person was discriminated against in violation of the provisions of this Management Agreement may be deducted from payments due to Manager.

IN WITNESS WHEREOF, the parties hereto have executed, in triplicate, this Management Agreement as of the date first written above.

CORPORATION:

CITY OF SAN FRANCISCO UPTOWN
PARKING CORPORATION

By:_____
    Sidney Goodwill
    President

MANAGER:

CITY PARK, INC.,
a California Corporation

By:_____
    Tim Leonoudakis
    President

APPROVED AS TO FORM:

LOUISE H. RENNE
City Attorney

By:_____
    Deputy City Attorney

APPROVED:

CITY AND COUNTY OF
SAN FRANCISCO

By:_____
    Fred Hamdun
    Director, Department of Parking and
    Traffic

IN WITNESS WHEREOF, the parties hereto have executed, in triplicate, this Management Agreement as of the date first written above.

CORPORATION:

CITY OF SAN FRANCISCO UPTOWN
PARKING CORPORATION

By:_____
      Sidney Goodwill
      President


MANAGER:

CITY PARK, INC.,
a California Corporation

By:_____
      Tim Leonoudakis
      President


APPROVED AS TO FORM:                APPROVED:

LOUISE H. RENNE                     CITY AND COUNTY OF
City Attorney                       SAN FRANCISCO


By:_____            By:_____
      Deputy City Attorney                Fred Hamdun
                                          Director, Department of Parking and
                                          Traffic

Exhibit A

Description of Garage Property

## Exhibit A

## Description of Garage Property

*Union Square Legal*

erly line of McAllister Street 894 feet 2 inches to the Westerly line of Leavenworth Street;
thence Southerly and along said Westerly line of Leavenworth Street 6 feet 1/8 of an inch
to the Northwesterly line of City Hall Avenue; thence Southwesterly along said Northwesterly
line of City Hall Avenue 1162 feet 1-1/4 inches to the Easterly line of Larkin Street; thence
Northerly along said Easterly line of Larkin Street 650 feet 1-1/4 inches to the Southerly
line of McAllister Street and the point of commencement.

BEING the block of land known and designated on the Official Map of the City and
County of San Francisco as "The City Hall Lot".

PARCEL No. 3. COMMENCING at the point of intersection of the Southerly line of Bush
Street with the Easterly line of Battery Street, running thence Easterly and along said
Southerly line of Bush Street 93 feet to the Northwesterly line of Market Street; thence
Southwesterly and along said Northwesterly line of Market Street 114 feet 7-1/2 inches to
the Easterly line of Battery Street; thence Northerly and along said Easterly line of Battery
Street 67 feet to the Southerly line of Bush Street and the point of commencement.

PARCEL No. 4. COMMENCING at a point formed by the intersection of the Southerly line
of Post Street with the Easterly line of Powell Street, running thence Easterly and along
said Southerly line of Post Street 412 feet 6 inches to the Westerly line of Stockton Street;
thence at right angles Southerly and along said Westerly line of Stockton Street 275 feet
to the Northerly line of Geary Street; thence    at right angles Westerly and along said
Northerly line of Geary Street 412 feet 6 inches to the Easterly line of Powell Street;
thence at right angles Northerly and along said Easterly line of Powell Street 275 feet to
the Southerly line of Post Street and the point of commencement.

BEING that block of land known as Union Square.

PARCEL No. 5. COMMENCING at a point formed by the intersection of the Southerly line
of Filbert Street with the Easterly line of Powell Street, running thence Easterly and along
said Southerly line of Filbert Street 412 feet 6 inches to the Westerly line of Stockton
Street; thence at right angles Southerly and along said Westerly line of Stockton Street
275 feet to the Northerly line of Union Street; thence at right angles Westerly and along
said Northerly line of Union Street 215 feet 1-1/2 inches more or less to the Northeasterly
line of Columbus (formerly Montgomery Avenue) thence Northwesterly and along said Northeast-
n y line of Columbus Avenue 242 f...

## Exhibit B

<u>Union Square Garage</u>
<u>Regular Per-Vehicle Parking Rates</u>

<u>Hourly Parking Charges</u>[1]

| Time (Hours) | Rates |
|---|---|
| 0 to 0.50 | $ 1.00 |
| 0.5 to 1.0 | $ 2.00 |
| 1.0 to 1.5 | $ 3.00 |
| 1.5 to 2.0 | $ 4.00 |
| 2.0 to 2.5 | $ 6.00 |
| 2.5 to 3.0 | $ 8.00 |
| 3.0 to 3.5 | $ 9.00 |
| 3.5 to 4.0 | $10.00 |
| 4.0 to 4.5 | $11.00 |
| 4.5 to 5.0 | $12.00 |
| 5.0 to 5.5 | $14.00 |
| 5.5 to 6.0 | $16.00 |
| 6.0 to 7.0 | $20.00 |
| 7.0 to 24 | $25.00 |

High Volume Rate (per vehicle, with in-and-out privileges):

Regular hourly rate up to a maximum for each 24 hour period from
3:01 a.m. through 3:00 a.m. as follows:

| | |
|---|---|
| Transient parkers (taxable)[1] | $11.50 |
| Overnight guest parkers (non-taxable)[2] | $ 9.20 |

<u>Lost Ticket Charges (per day)</u>                                      $25.00
The rate for 24 hours of parking shall be charged for each day, or part thereof, during which the
vehicle has been parked in the Garage, unless Manager can verify that a greater charge is
appropriate by identifying the lost ticket from the records.

<u>Monthly Parking Charges</u>
| | |
|---|---|
| Regular | $350.00 |
| Carpools | $175.00 |

<u>NOTE</u>:  All monthly parkers and High Volume Parkers shall be subject to payment of the
following fees:

| | | |
|---|---|---|
| 1• | $50 | Security deposit for each access card issued |
| 2• | $25 | Late payment |
| 3• | $25 | Lost access card |
| 4• | $25 | Damaged access card |

[1] Includes 25% City parking tax
[2] Excludes City parking tax pursuant to Article 9 of the San Francisco Municipal Code.

## Exhibit C

## Prevailing Wage Requirements

<u>Exhibit D</u>

<u>Maintenance Standards</u>

The goal of the Corporation is to provide the public, at all times, a safe, clean, sanitary, well lighted, and efficient garage. The following maintenance standards are designed to achieve this goal.

1.    **<u>Lighting</u>**    All lights must be in working order and bright enough to convey a sense of safety, especially in and around elevators, stairways, and rest rooms. Burned out bulbs or lamps must be replaced within 24 hours. Non-working fixtures must be repaired or replaced, with energy efficient fixtures within 72 hours. Bulbs or lamps must be secured and must be the same color. Emergency lights must be inspected at least once each month and non-operating battery packs must be changed within one week.

2.    **<u>Walls</u>**    All walls must be kept clean and free of stains, dirt and graffiti. Special attention shall be given to stairwells, elevators, rest rooms and their surrounding areas. Graffiti must be removed or painted over within 24 hours. Black marks from bumpers must be painted over as needed, but in no event not less than once a month.

3.    **<u>Odors</u>**    Foul odors must be removed within 24 hours. Special attention shall be given to stairwells, elevators, rest rooms and their surrounding areas. Stairwells and sidewalks must be steam cleaned as needed, but in no event not less than once a month.

4.    **<u>Cleaning</u>**    The entire facility must be cleaned daily, including interior and exterior stairwells, elevators, rest rooms, parking areas, and sidewalks. Parking areas and Garage floors must be swept, grease and oil must be removed, foul odors must be deodorized, pigeon droppings must be removed, and all litter must be removed.

5.    **<u>Steam Cleaning</u>**    Steam cleaning of all interior stairwells shall be performed on a quarterly basis and the entire Garage on a semi-annual basis.

6.    **<u>Ventilation Equipment</u>**    Thorough cleaning of all ventilation system supply and exhaust vents shall be performed on a semi-annual basis.

7.    **<u>Windows</u>**    All windows, mirrors and glass cases must be cleaned as needed, but in no event not less than once a month.

8.    **<u>Signs</u>**    Signs must be easily understood and professionally made, not hand printed or copy machine reproduced. Corporation may post nonprofessional signs only in case of an emergency, but the emergency signs must be replaced within one week. Signs must also be repaired or replaced promptly when damaged.

9.    **<u>Plants</u>**    Any vegetation must be pruned and watered regularly, consistent with water restrictions of the San Francisco Water Department. Weeds must be pulled as needed, but in no event not less than once a month and trees must be pruned once a year.

10.    <u>Safety Equipment</u>  Equipment including fire alarm call boxes, fire extinguishers, and fire hose units must be maintained in good working order and inspected at least once a month. Closed circuit cameras and the intercom system must be inspected at least once a week.

11.    <u>Structural Inspections</u>    Structural inspections including water leaks, exposed rebar, concrete cracks and metal rust must be performed not less than once a year.

12.    <u>Sidewalk Inspections</u>  Inspections of the sidewalks abutting the Garage for the presence of any sidewalk tripping hazards, including tree planting areas not at sidewalk grade, must be performed once a month.  In the event any hazards are observed, such hazards shall be reported immediately to the Director.

13.    <u>Other Work</u>    All other ordinary maintenance and repair work of the premises and equipment shall be done as needed.

<u>Exhibit E</u>

<u>Form of Budget</u>

**Exhibit F**

Form of Faithful Performance Bond